UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>(1) THE STATE OF OKLAHOMA;<br>(2) KEVIN STITT, in his official capacity as Governor of Oklahoma;<br>(3) GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma;<br>(4) OKLAHOMA DEPARTMENT OF PUBLIC SAFETY; and<br>(5) TIM TIPTON, in his official capacity as Commissioner of Oklahoma Department of Public Safety,<br><br>    *Defendants*. | Case No. CIV-24-511-J |

**COMPLAINT**

1. The United States brings this action to preserve its exclusive authority under federal law to regulate the entry, reentry, and presence of noncitizens. Oklahoma's House Bill 4156 (HB 4156), like Texas's preliminarily enjoined Senate Bill 4 and Iowa's recently enacted Senate File 2340, impermissibly creates a state-specific immigration system that effectively seeks to regulate noncitizens' entry, reentry, and presence in the United States.

2. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Indeed, "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Congress has established a comprehensive scheme governing noncitizens' entry and reentry into the United States—including penalties for unlawful entry and reentry, *see* 8 U.S.C. §§ 1325, 1326—and removal from the country, *see id.* § 1229a. HB 4156 intrudes on that scheme, frustrates the United States' immigration operations, and interferes with U.S. foreign relations. It is preempted by federal law and thus violates the Supremacy Clause of the United States Constitution. HB 4156 also violates the dormant Foreign Commerce Clause, which limits the power of the States to regulate the international movement of persons. Accordingly, the United States seeks a declaration invalidating, and an order enjoining the enforcement of, HB 4156.

### JURISDICTION & VENUE

3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants reside within this district and because a substantial part of the acts or omissions giving rise to this action occurred within this judicial district.

## PARTIES

5. Plaintiff, the United States, regulates immigration and conducts foreign relations under its constitutional and statutory authorities and through its Executive Branch agencies, including the Department of Homeland Security (DHS) and its component agencies—U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS)—the Department of Justice, and the Department of State.

6. Defendant State of Oklahoma is a State of the United States.

7. Defendant Kevin Stitt is the Governor of Oklahoma. He is sued in his official capacity.

8. Defendant Gentner Drummond is the Attorney General of Oklahoma. He is the "chief law officer of the state." Okla. Stat. tit. 74, § 18. He has the authority to prosecute any case under Oklahoma law and has general supervisory authority over Oklahoma criminal prosecutions. Okla. Stat. tit. 74, § 18b. He is sued in his official capacity.

9. Defendant Oklahoma Department of Public Safety (DPS) is an agency of Oklahoma, responsible for enforcing the laws protecting the public safety and providing for the prevention and detection of crimes. Okla. Stat. tit. 47, § 2-117(A).

10. Defendant Tim Tipton is the Commissioner of DPS. He is sued in his official capacity.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

11. Under the Supremacy Clause, the Constitution and federal immigration laws, including the Immigration and Nationality Act (INA), are—like all federal laws—"the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Through the Supremacy Clause, state laws may be preempted in various ways.

12. Under the doctrine of field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Corp.*, 331 U.S. 218, 230 (1947)).

13. State laws are also "preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. "This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

14. The Constitution tasks the federal government with regulating immigration, foreign commerce, and foreign affairs. It grants the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, to "regulate Commerce with foreign Nations," *id.* art. I § 8, cl. 3, and to exercise authority inherent in the United States' national sovereignty, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936). Thus, as the Supreme Court recognized, the "Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona*, 567 U.S. at 394.

15. Congress has exercised its authority over immigration by enacting the INA, 8 U.S.C. § 1101 *et seq.*, and other laws to comprehensively govern the entry, admission, presence, and status of noncitizens.[1]

---

[1] This complaint uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 599 U.S. 222, 226 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

3

16. As relevant here, Congress has established an integrated framework governing the entry of noncitizens into the United States.[2] It has identified who may enter, *see*, *e.g.*, 8 U.S.C. §§ 1181-82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223-25. Congress has also imposed federal criminal penalties on noncitizens who unlawfully enter or reenter the United States. For example, 8 U.S.C. § 1325, titled "Improper entry by [noncitizens]," states that "[a]ny [noncitizen] who . . . enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined . . . or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined . . . or imprisoned not more than 2 years, or both." Likewise, 8 U.S.C. § 1326, titled "Reentry of removed [noncitizens]," states that, subject to certain exceptions, "any [noncitizen] who . . . has been denied admission . . . or removed or has departed the United States while an order of . . . removal is outstanding, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States . . . shall be fined . . . or imprisoned not more than 2 years, or both."

17. Moreover, Congress has established an enforcement apparatus to address unlawful entry and reentry into the United States. For example, CBP, "in coordination with" ICE and USCIS, is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter . . . the United States" and "the detection [and] interdiction … of persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8). And U.S. Border Patrol has "primary responsibility for

---

[2] Following the Homeland Security Act of 2002, many references to the "Attorney General" are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

interdicting persons attempting to illegally enter . . . the United States . . . at a place other than a designated port of entry." *Id.* § 211(e)(3).

18.  Federal law also gives DHS "the power and duty to control and guard" the border against illegal entry and to "perform such other acts as . . . necessary for carrying out [such] authority."  8 U.S.C. § 1103(a)(3), (5).  In doing so, immigration officers enforce prohibitions on unlawful entry.  *See id.* § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States"); *see also id.* § 1357(a)(3) (authorizing access to certain private lands "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States"); H.R. Rep. No. 82-1377, at 3 (1952), 1952 U.S.C.C.A.N. 1358, 1360 (explaining that § 1357(a)(3) was designed to prevent illegal entries, protect "the national security," and preserve "the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens]").

19.  Congress has also comprehensively regulated the removal of noncitizens. Federal law specifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed.  *See* 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1231(a)-(b).  Congress has provided for judicial review of final removal orders, *see id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009), and instructed that, "unless otherwise specified [in the INA]," removal proceedings under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed from the United States," *id.* § 1229a(a)(3).  Noncitizens may apply for relief or protection from removal, such as asylum, *see id.* § 1158(a)-(b), or withholding of removal, *see id.* § 1231(b).

## HOUSE BILL 4156

20. On April 30, 2024, the Governor of Oklahoma signed HB 4156 into law, adding a Section 1795 to Title 21 of the Oklahoma Statutes. HB 4156 will become effective on July 1, 2024. This new law purports to create new state crimes and impose state penalties on noncitizens in Oklahoma who have unlawfully entered or reentered the United States.

21. HB 4156 contains two principal provisions. First, under HB 4156, a noncitizen commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States" (the "Impermissible Occupation" provision). HB 4156 § 2(B), (C)(1) (codified at Okla. Stat. tit. 21, § 1795(B), (C)(1)). This provision effectively makes it a state criminal offense to be present in Oklahoma without having obtained legal authorization to enter the United States. Whereas the federal unlawful entry provision, 8 U.S.C. § 1325(a), generally bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers," HB 4156 extends beyond § 1325 in criminalizing the presence in Oklahoma of those noncitizens who previously entered the United States unlawfully. That is, Oklahoma seeks to enforce a criminal prohibition on unlawful entry to the United States against those noncitizens who also enter and continue to be present in Oklahoma.

22. Closely tracking Texas's SB 4, the Impermissible Occupation provision contains several affirmative defenses. It provides that "[i]t shall be an affirmative defense to prosecution" for violating the Impermissible Occupation provision if (i) "[t]he federal government has granted the defendant . . . lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code"; or (ii) "[t]he defendant was approved for benefits under the federal Deferred Action for

6

Childhood Arrivals [("DACA")] program between June 15, 2012, and July 16, 2021." HB 4156 § 2(F) (codified at Okla. Stat. tit. 21, § 1795(F)).

23. A violation of the Impermissible Occupation provision is generally a misdemeanor "punishable by imprisonment" for up to one year and/or a fine of up to $500, but could, under certain circumstances, constitute a "felony punishable by imprisonment" for up to two years and/or a fine of up to $1,000. HB 4156 § 2(C)(1)-(2) (codified at Okla. Stat. tit. 21, § 1795(C)(1)-(2)). Neither probation nor delayed sentencing is available. HB 4156 § 2(G) (codified at Okla. Stat. tit. 21, § 1795(G)). Any noncitizen convicted under this provision—regardless of whether the violation is considered a misdemeanor or a felony—"shall be required to leave [Oklahoma] within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

24. Second, HB 4156 makes it a state crime for noncitizens to "enter[], attempt[] to enter, or . . . at any time [be] found in Oklahoma" if they previously have been "denied admission, excluded, deported, or removed" or have "departed the United States while an order of exclusion, deportation, or removal is outstanding" (the "Unlawful Reentry" provision). HB 4156 § 2(D) (codified at Okla. Stat. tit. 21, § 1795(D)). This provision effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a), which generally bars noncitizens from "enter[ing], attempt[ing] to enter, or" being "found in, the United States" if they previously have been "denied admission, excluded, deported, or removed" or "ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding."

25. The Unlawful Reentry provision contains two exceptions. It does not apply to a noncitizen if (i) "[p]rior to reembarkation of the [noncitizen] at a place outside the United States or application by the [noncitizen] for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such [noncitizen's] reapplying for admission," or (ii) if the noncitizen was

7

"previously denied admission and removed," the noncitizen "established that he or she was not required to obtain such advance consent under" Section 2 of HB 4156 "or any prior statute." HB 4156 § 2(D) (codified at Okla. Stat. tit. 21, § 1795(D)).

26. A violation of HB 4156's Unlawful Reentry provision is a felony punishable by imprisonment for up to two years and/or a fine of up to $1,000. *See* HB 4156 § 2(C)(2) (codified at Okla. Stat. tit. 21, § 1795(C)(2)). Neither probation nor delayed sentencing is available. HB 4156 § 2(G) (codified at Okla. Stat. tit. 21, § 1795(G)). Furthermore, a person convicted of violating the Unlawful Reentry provision "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." HB 4156 § 2(C)(2), (D) (codified at Okla. Stat. tit. 21, § 1795(C)(2), (D)).

### HB 4156'S EFFECTS ON IMMIGRATION OPERATIONS, FEDERAL LAW ENFORCEMENT, AND FOREIGN RELATIONS

27. If HB 4156 takes effect, it would interfere with the exclusive authority of the federal government to control noncitizens' entry and reentry into, and presence in, the United States and to conduct foreign relations.

28. The United States must speak with one voice in immigration matters. *Arizona*, 567 U.S. at 409. The Supreme Court has long held that the "authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (recognizing "the exclusive federal power over the entrance and residence of [noncitizens]"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (the formulation of "[p]olicies pertaining to the entry of aliens . . . is entrusted exclusively to Congress"), just as "the removal process is entrusted to the discretion of the Federal Government," *Arizona*, 567 U.S. at 409. "The dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy[.]" *Arizona*, 567 U.S. at 397. "It is fundamental that

foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395. "If it be otherwise, a single State [could], at her pleasure, embroil us in disastrous quarrels with other nations." *Chy v. Freeman*, 92 U.S. 275, 280 (1875).

29. By imposing criminal penalties and immigration consequences on noncitizens based on their entry or reentry into, or presence in, the United States, HB 4156 will interfere with the federal government's ability to conduct foreign relations. HB 4156 risks the "unnecessary harassment" of noncitizens, *Arizona*, 567 U.S. at 408, and will antagonize foreign governments. Mexico has already expressed concern about HB 4156. *See* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W. Further, HB 4156 risks undermining the United States' international partnerships dedicated to reducing irregular migration throughout North and Central America. And it risks exposing United States citizens to reciprocal or retaliatory treatment.

30. HB 4156 will also interfere with the comprehensive statutory scheme Congress enacted to govern noncitizen entry, reentry, and presence. Indeed, in some cases, it would prevent the Executive Branch from executing that scheme at all. Even assuming HB 4156 "has the same aim as federal law and adopts its substantive standards," "[w]ere [HB 4156] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. Moreover, HB 4156 would improperly impose a unique scheme of state penalties essentially for violations of federal immigration laws. *See id.* at 402-03 (noting "an inconsistency between [state law] and federal law with respect to penalties").

31. Further, by permitting state officials to effectively exile noncitizens from the State, *see* HB 4156 §2(C)(1)-(2) (codified at Okla. Stat. tit. 21, § 1795(C)(1)-(2)), HB 4156 risks international controversy and possible retaliation against United States citizens in foreign countries.

32. The United States sent a letter to Oklahoma on May 15, 2024, explaining that HB 4156 violates the Supremacy Clause and the Foreign Commerce Clause of the United States Constitution, and that "the United States intends to file suit to enjoin the enforcement of HB 4156 unless Oklahoma agrees to refrain from enforcing the law." Ex. 1. On May 17, 2024, Oklahoma responded that it intends to implement HB 4156. Ex. 2.

## COUNT I — PREEMPTION

33. Plaintiff realleges paragraphs 1 - 32.

34. Under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state laws. *See* U.S. Const. art. VI, cl. 2. "States are precluded from regulating conduct in a field" that Congress commits to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. And a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

35. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

36. The federal government has a dominant interest in deciding "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). The allocation of this authority to the federal government is necessary because "the power to regulate immigration" is "an attribute of sovereignty essential to the preservation of any

nation," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982), and because the United States' "policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395.

37. "Federal governance of immigration and [noncitizen] status" is also so "extensive and complex," *Arizona*, 567 U.S. at 395, that it leaves "no room for the States to supplement it," *id.* at 399. Federal law delineates when it is unlawful for noncitizens to enter or reenter the United States and imposes consequences for violating those proscriptions, including removal. Federal law also establishes a comprehensive apparatus for the federal government to enforce those rules. *See generally* 6 U.S.C. §§ 202, 211, 252, 271; 8 U.S.C. §§ 1103, 1225, 1229a, 1325, 1326. And a "principal feature" of that apparatus "is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

38. HB 4156 unconstitutionally intrudes on the federal government's exclusive authority to regulate noncitizens' entry and reentry into, and presence in, the United States and, therefore, is field preempted. Oklahoma's law seeks to punish conduct already proscribed by federal law—unlawful entry and reentry, *see* 8 U.S.C. §§ 1325, 1326—and to give state officials authority to impose penalties without federal involvement, including removing noncitizens from the State of Oklahoma. Under *Arizona*, even if HB 4156 were "complementary state regulation," it is preempted. *Arizona*, 567 U.S. at 401.

39. HB 4156 further intrudes on the federal government's exclusive authority to remove noncitizens from the United States. *See Arizona*, 567 U.S. at 409. HB 4156 purports to require noncitizens convicted of violating HB 4156 to leave Oklahoma

11

within 72 hours following their conviction or release from custody, whichever is later. *See* HB 4156 § 2(C)(1)-(2). Under the carefully calibrated federal immigration scheme (and indeed, the Constitution), States have no authority to exile noncitizens from the State because if all States enact such a provision, then noncitizens would effectively be forced out of the country. But *Arizona* made clear that removal is "entrusted to the discretion of the Federal Government," 567 U.S. at 409; *see also United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (holding indirect efforts to expel noncitizens from Alabama preempted). Were HB 4156 valid, "every State could give itself independent authority" to banish noncitizens, effectively requiring them to leave the country entirely and thereby "diminish[ing] the [Federal Government's] control over enforcement and detract[ing] from the integrated scheme of regulation created by Congress." *Id.* at 402 (brackets in original).

40. HB 4156's provisions also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Congress granted the federal government the responsibility under federal law to regulate the entry of noncitizens and granted federal officers broad discretion in how those provisions are enforced. By purporting to empower state officials to police unlawful entry and reentry, HB 4156 interferes with the federal government's statutory authority to enforce the entry and re-entry provisions of federal law.

41. HB 4156's criminal provisions also are preempted by various other federal statutory provisions, which together form a framework for state assistance with the federal government's immigration enforcement in certain respects. Congress has mandated that state officials may assist in the enforcement of immigration law only with adequate training and supervision by the federal government, 8 U.S.C. § 1357(g), and in specified circumstances, *see, e.g.*, *id.* § 1103(a)(10) (allowing the federal government to designate state officers for certain immigration enforcement functions in the face of an "imminent mass influx of" noncitizens); *id.* § 1252c(a) (state officers

"are authorized to arrest and detain an individual who . . . is [a noncitizen] illegally present in the United States," but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody"); *id.* § 1324(c) (allowing state officers to arrest individuals for certain crimes of human smuggling). None of these statutory provisions, however, permits a State to impose criminal penalties for illegal entry or reentry by noncitizens.

42.     Further, HB 4156 effectively criminalizes unlawful presence in Oklahoma for those noncitizens who previously entered the United States unlawfully. That is, HB 4156 does not punish unlawful entry itself—which will almost invariably take place in a State other than Oklahoma—but rather seeks to punish the noncitizen's subsequent presence in Oklahoma. Federal law, by contrast, criminalizes the unlawful entry itself, *see* 8 U.S.C. § 1325(a), but not unlawful presence in the United States, *see Arizona*, 567 U.S. at 402-03, 405-06. HB 4156 thus parallels federal law only to the extent that it asserts authority to punish, belatedly, a federal crime that occurred in a different State at a different time.

43.     To the extent Oklahoma seeks to arrest, detain, and prosecute unaccompanied children, such actions would conflict with the unique protections Congress has afforded such noncitizens.[3] *See* 8 U.S.C. § 1232; 6 U.S.C. § 279. Under federal law, an unaccompanied child generally must be transferred to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS), which generally must place the child with a care provider in the least restrictive setting that is in the best interest of the child, 8 U.S.C. § 1232(c)(2)(A).

---

[3] This complaint uses the term "unaccompanied child" as equivalent to the statutory term "unaccompanied alien child." *See* 6 U.S.C. § 279(g)(2).

## COUNT II — FOREIGN COMMERCE CLAUSE

44. Plaintiff realleges paragraphs 1 - 43.

45. The Commerce Clause allows Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976). Under the Constitution, "[f]oreign commerce is pre-eminently a matter of national concern." *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979). And the Foreign Commerce Clause is one of the sources of Congress's power to regulate immigration through the INA and other statutes. The Foreign Commerce Clause thus strongly reinforces the preemptive force of the federal immigration scheme as discussed above.

46. Here, HB 4156 improperly regulates foreign commerce itself, which has long been understood to encompass the regulation of both persons and commodities. *See United States v. Guest*, 383 U.S. 745, 758-59 (1966). HB 4156 regulates *solely* the international movement of noncitizens into the United States (and ultimately into Oklahoma). "As to matters within the scope of the Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so or to authorize the states to regulate." *United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018). Even when "Congress is silent," the Supreme Court has interpreted the Commerce Clause to limit state regulation "by applying the negative implications of the Commerce Clause." *Id.*

47. HB 4156 "prevents this Nation from 'speaking with one voice' in regulating foreign commerce," which "risk[s] . . . retaliation" and places "impediments before this Nation's conduct of its foreign relations." *Japan Line, Ltd.*, 441 U.S. at 452-

53. For example, by penalizing noncitizens who unlawfully enter or reenter the United States, and displacing them from Oklahoma regardless of their circumstances, HB 4156 "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with [foreign countries]." *Biden v. Texas*, 597 U.S. 785, 806 (2022).

\* \* \*

48. Beyond the Impermissible Occupation and Unlawful Reentry provisions—which, as explained in Counts I and II, are both unlawful—the remaining, material HB 4156 provisions (Section 2(a) through (g) and Section 3) are ancillary to, and thus not severable from, the Impermissible Occupation and Unlawful Reentry provisions.[4]

## PRAYER FOR RELIEF

The United States respectfully requests that this Court:

a) Declare that HB 4156 violates the Supremacy Clause and Foreign Commerce Clause and is therefore invalid;

b) Preliminarily or permanently enjoin Defendants—as well as their successors, officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with those individuals—from enforcing HB 4156;

c) Award the United States its costs in this action; and

d) Grant any other relief this Court deems just and proper.

---

[4] Section 2(h), by contrast, does not appear to be ancillary to the preempted provisions of HB 4156 and thus may be severable.

DATED:  May 21, 2024    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

/s/ *Christopher A. Eiswerth*
CHRISTOPHER EISWERTH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 305-0568
Email:  christopher.a.eiswerth@usdoj.gov

*Counsel for the United States*