**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF OKLAHOMA, *et al.*,

Defendants.

Case No. 5:24-cv-00511-J

**UNITED STATES' MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION AND OPENING BRIEF IN SUPPORT**

## TABLE OF CONTENTS


MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION .................. 1

OPENING BRIEF IN SUPPORT OF MOTION................................................. 1

BACKGROUND ........................................................................................... 2

I. Federal Immigration Scheme Governing Noncitizens' Entry and Removal.... 2

II. Federal Efforts to Reduce and Deter Illegal Entry to the United States .......... 6

III. Oklahoma's House Bill 4156 ................................................................ 7

LEGAL STANDARDS ................................................................................ 10

ARGUMENT .............................................................................................. 10

I. The United States Is Likely to Succeed on the Merits. ................................ 10

A. HB 4156 is preempted under the Supremacy Clause. ............... 10

1. Field preemption bars HB 4156's regulation of noncitizens' entry into, presence in, and removal from the United States. ............................................................ 11

2. HB 4156 is conflict preempted by the federal immigration scheme. ................................................................................. 15

B. HB 4156 violates the Foreign Commerce Clause by regulating international movement of persons and by interfering with foreign relations. ........................................... 20

II. Enforcement of HB 4156 Would Cause Irreparable Harm to the United States and the Public. .......................................................................... 21

III. Oklahoma Has No Countervailing Interest in Maintaining An Unconstitutional Law. ................................................................................ 23

IV. The Court Should Enter A Permanent Injunction Because There Are No Material Facts in Dispute. ......................................................................... 25

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Alfwear, Inc. v. Mast-Jägermeister, Inc.*,
2020 WL 5943957 (D. Utah Oct. 7, 2020) ........ 25

*Arizona v. United States*,
567 U.S. 387 (2012) ........ *passim*

*Chy Lung v. Freeman*,
92 U.S. 275 (1875) ........ 15, 20

*Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*,
628 F.2d 1289 (10th Cir. 1980) ........ 25

*Clark v. Martinez*,
543 U.S. 371 (2005) ........ 3

*DeCanas v. Bica*,
424 U.S. 351 (1976) ........ 3, 11

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012) ........ 12, 13

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ........ 20

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........ 23

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........ 11

*Henderson v. Mayor of New York*,
92 U.S. 259 (1875) ........ 20

*Japan Line, Ltd. v. Los Angeles Cnty.*,
441 U.S. 434 (1979) ........ 1, 19, 20

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........ 24

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) .......................................................................... 24

*Mathews v. Diaz*,
426 U.S. 67 (1976) .......................................................................... 11

*Nat'l Foreign Trade Council v. Natsios*,
181 F.3d 38 (1st Cir. 1999) .......................................................................... 20, 21

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
491 U.S. 350 (1989) .......................................................................... 21

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 4, 10

*Osage Nation ex rel. Osage Minerals Council v. Wind Capital Grp., LLC*,
2011 WL 5864368 (N.D. Okla. Nov. 22, 2011) .......................................................................... 25

*Patel v. Garland*,
596 U.S. 328 (2022) .......................................................................... 12

*Plyler v. Doe*,
457 U.S. 202 (1982) .......................................................................... 18

*Prairie Band Potawatomi Nation v. Wagnon*,
476 F.3d 818 (10th Cir. 2007) .......................................................................... 10

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 10

*Reno v. American-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) .......................................................................... 12

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .......................................................................... 23

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) .......................................................................... 23

*Schrader v. Dist. Att'y of York Cnty.*,
74 F.4th 120 (3d Cir. 2023) .......................................................................... 23

*Truax v. Raich*,
239 U.S. 33 (1915) .......... 11

*United States v. Rosales-Aguilar*,
818 F.3d 965 (9th Cir. 2016) .......... 9

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .......... 14, 19

*United States v. Durham*,
902 F.3d 1180 (10th Cir. 2018) .......... 20

*United States v. Guest*,
383 U.S. 745 (1966) .......... 20

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) .......... 13, 23

*United States v. Texas*,
97 F.4th 268 (5th Cir. 2024) .......... *passim*

*United States v. Texas*,
599 U.S. 670 (2023) .......... 12

*United States v. Texas*,
--- F. Supp. 3d. ---, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) .......... *passim*

*United States v. Valenzuela-Bernal*,
458 U.S. 858 (1982) .......... 11

*United States v. Vasquez-Alvarez*,
176 F.3d 1294 (10th Cir. 1999) .......... 13

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......... 13

*Villas at Parkside Partners v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013) .......... 17, 18, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 10

*Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986) .......... 18

*Zschernig v. Miller*,
389 U.S. 429 (1968) .......... 15

**Statutes**

6 U.S.C. § 202 .......... 3

6 U.S.C. § 205 .......... 15

6 U.S.C. § 211 .......... 3, 4, 15

6 U.S.C. § 252 .......... 3

6 U.S.C. § 271 .......... 3

6 U.S.C. § 557 .......... 3

8 U.S.C. § 1103 .......... *passim*

8 U.S.C. § 1158 .......... 4

8 U.S.C. § 1181 .......... 3, 12

8 U.S.C. § 1182 .......... *passim*

8 U.S.C. § 1188 .......... 3, 12

8 U.S.C. § 1223 .......... 3

8 U.S.C. § 1224 .......... 3

8 U.S.C. § 1225 .......... 3, 4, 19

8 U.S.C. § 1227 .......... 4, 15, 19

8 U.S.C. § 1229 .......... 4, 19

8 U.S.C. § 1229a .......... 3, 4, 12, 15

8 U.S.C. § 1229b ........ 15

8 U.S.C. § 1231 ........ 4, 19

8 U.S.C. § 1252 ........ 4, 15, 24

8 U.S.C. § 1252c ........ 5, 13

8 U.S.C. § 1253 ........ 15

8 U.S.C. § 1324 ........ 5, 7, 17, 18, 24

8 U.S.C. § 1325 ........ *passim*

8 U.S.C. § 1326 ........ *passim*

8 U.S.C. § 1327 ........ 7, 18

8 U.S.C. § 1328 ........ 7, 18

8 U.S.C. § 1357 ........ *passim*

8 U.S.C. § 1373 ........ 5

Okla. Stat. tit. 21, § 1795 ........ 1

**Constitutional Provisions**

U.S. Const. art. I, § 8 ........ 3

U.S. Const. art. II, § 2 ........ 3

U.S. Const. art. VI ........ 3, 10

**Rules**

Fed. R. Civ. P. 65 ........ 25

**Executive Materials**

Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 5, 2021) ........ 6

**Other Authorities**

142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) .................... 16

CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW .......................................................... 6

CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ......... 7

Cong. Rsch. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11898 .................. 5

Oklahoma House Bill 4156 (to be codified at Okla. Stat. tit. 21, § 1795) (HB 4156) ........................................................................................*passim*

Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024), https://perma.cc/36R4-JXHE ............................................................ 9

Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W ................................................... 2, 9, 22

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR ............................................................ 9

The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. .......................................................... 6

## MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION

The United States moves for a preliminary or permanent injunction prohibiting the enforcement of Oklahoma House Bill 4156 (to be codified at Okla. Stat. tit. 21, § 1795) (HB 4156), which seeks to regulate noncitizens' entry into and presence in the United States by imposing state criminal penalties on noncitizens who have unlawfully entered or reentered the United States and are subsequently found in Oklahoma. As explained in the supporting brief, HB 4156 violates the Supremacy and Foreign Commerce Clauses of the United States Constitution. Because HB 4156 is set to take effect on July 1, 2024, the United States respectfully requests that the Court decide this motion as soon as possible to allow time for potential appellate review.

## OPENING BRIEF IN SUPPORT OF MOTION

This Court should enjoin the enforcement of HB 4156 because admitting and removing noncitizens are core responsibilities of the federal government, as recognized by the Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), and more than a century of precedent. Recent rulings from the Western District of Texas and the Fifth Circuit addressing a similar Texas law confirm that HB 4156 is preempted because it intrudes into a field that Congress reserved exclusively for the federal government and conflicts with the federal immigration scheme. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (*Texas SB 4*) (denying stay pending appeal); *United States v. Texas*, --- F. Supp. 3d. ---, 2024 WL 861526, at *1 (W.D. Tex. Feb. 29, 2024) (*Texas SB 4*) (granting preliminary injunction). HB 4156 also violates the Foreign Commerce Clause by seeking to regulate the international movement of persons and by impeding the United States' ability to "speak with one voice" in foreign relations. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 449 (1979).

Enforcement of HB 4156 would irreparably harm the United States at home and abroad and conflicts with the public interest. As the Supreme Court has recognized, immigration policy can "affect trade, investment, tourism, and diplomatic relations for

the entire Nation," and "[p]erceived mistreatment of" noncitizens "in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395. HB 4156 would interfere with the United States' relations with other countries in at least three ways. First, it would antagonize foreign governments. The Government of Mexico, for example, has already expressed concern about HB 4156, *see* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W, as it has done with Texas's and Iowa's recently enacted analogous laws. Second, it would undermine the United States' international efforts to address regional irregular migration. Third, it would risk reciprocal and retaliatory treatment of U.S. citizens abroad. Domestically, HB 4156 would frustrate Congress's objectives in establishing the comprehensive federal immigration scheme.

To the extent Oklahoma wishes to help with immigration enforcement, it can do so by working with the federal government through the statutory framework Congress established, *see* 8 U.S.C. § 1357(g), or by urging Congress to change the law. It may not usurp the federal government's authority in core areas of federal control. HB 4156 is the latest attempt by a State to create state-specific immigration laws, but it "is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona,* 567 U.S. at 395. HB 4156 contravenes that principle and should be enjoined.

## BACKGROUND

### I. Federal Immigration Scheme Governing Noncitizens' Entry and Removal

The federal government has the "inherent power as sovereign to control and conduct relations with foreign nations." *Id.* Under the Constitution, the national government "make[s] Treaties," commissions and receives "Ambassadors, other public Ministers and Consuls," "regulate[s] Commerce with foreign Nations," and "establish[es] a[] uniform Rule of Naturalization." U.S. Const. art. I, § 8; *id.* art. II,

§ 2. These constitutional provisions and the federal laws enacted thereunder are "the supreme Law of the Land," preempting any contrary state laws. U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

Congress has exercised its constitutional authority by codifying a "comprehensive federal statutory scheme for [the] regulation of immigration." *DeCanas v. Bica*, 424 U.S. 351, 353 (1976). The Immigration and Nationality Act (INA) sets forth detailed rules governing the entry and reentry of noncitizens.[1] It identifies who may enter, *see*, *e.g.*, 8 U.S.C. §§ 1181-82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223-25. It imposes both criminal and civil penalties on those who unlawfully enter the United States. Section 1325 of Title 8, for example, makes it a crime for "[a]ny [noncitizen]" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers," and violators may be fined and/or imprisoned for up to two years. Similarly, § 1326 mandates fines, imprisonment "not more than 2 years, or both" for any noncitizen "who has been denied admission" or "removed" and subsequently "enters, attempts to enter, or is at any time found in, the United States."

In addition, Congress has established a comprehensive enforcement apparatus to address unlawful entry and reentry into the United States. *See generally* 6 U.S.C. §§ 202, 211, 252, 271; 8 U.S.C. §§ 1103(a), 1225, 1229a, 1325, 1326. The Secretary of Homeland Security, for example, is given "the power and duty to control and guard" against illegal entry and to "perform such other acts" as "necessary for carrying out [such] authority." 8 U.S.C. § 1103(a)(3), (5); *see* 6 U.S.C. § 202 (tasking the Secretary with "[e]stablishing national immigration enforcement policies and priorities"); *see also*

[1] After the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

8 U.S.C. § 1357(a) (authorizing federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States" or already "in the United States"). The Department of Homeland Security's component agency, U.S. Customs and Border Protection—in coordination with U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services—is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of "persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8); *see id.* § 211(e)(3) (assigning Border Patrol "primary responsibility for interdicting persons attempting to illegally enter . . . the United States . . . at a place other than a designated port of entry").

Congress has also comprehensively regulated the removal of noncitizens. Federal law identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See* 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1231(a)-(b). Congress has provided for judicial review of final removal orders, *see id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009), and instructed that, "unless otherwise specified [in the INA]," removal proceedings under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed from the United States," *id.* § 1229a(a)(3). Noncitizens may apply for relief or protection from removal. *See, e.g.*, *id.* §§ 1158(a)-(b) (asylum), 1231(b)(3) (withholding of removal).

Under this comprehensive framework, States have specific avenues for participating in immigration enforcement. For example, the federal government may "authorize any State or local law enforcement officer" to perform immigration duties in the face of an "imminent mass influx of" noncitizens. 8 U.S.C. § 1103(a)(10). And

state officers are given the "authority" to arrest individuals for certain crimes of human smuggling. *See id.* § 1324(c). State officers are also "authorized to arrest and detain an individual" who "is [a noncitizen] illegally present in the United States" but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody." *Id.* § 1252c. And under 8 U.S.C. § 1357(g), "the [Secretary of Homeland Security] may enter into a written agreement with a State" allowing state officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" as consistent with state law. The State must "certif[y]" that such state officers "performing the function under the agreement have received adequate training" and, "[i]n performing [that] function," the officers "shall be subject to the direction and supervision of the [Secretary]." *Id.* § 1357(g)(2)-(3). Historically, many state and local law enforcement entities have used § 1357(g) agreements to assist in immigration enforcement. By 2020, there were 150 such agreements. Cong. Rsch. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11898.

Beyond formal agreements, § 1357(g) also allows States to "communicate with the [Secretary] regarding the immigration status of any individual" and "to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A)-(B); *see id.* § 1373 (addressing communication between DHS and state and local governments regarding citizenship and immigration status). Such cooperation could include participation in a "joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

## II. Federal Efforts to Reduce and Deter Illegal Entry to the United States

The federal government has been using its enforcement authority to address unlawful entry and reentry. "Individuals and families without a legal basis to remain in the U.S. continue to be subject to removal," and from May to November 2023, "DHS removed or returned over 400,000 individuals." CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These removal numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceed[] the annual totals for each year 2015-2018." *Id.* "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014-2019)." *Id.*

However, sustainably reducing irregular migration in, from, and through North and Central America requires cooperation between the United States and other foreign governments. As part of its comprehensive strategy to address the root causes of irregular migration, *see* Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 5, 2021), the United States has established long-term strategic partnerships with governments in the region. Declaration of Eric Jacobstein Decl. ¶¶ 17-23 (attached as Exhibit 1). To that end, for example, in late December 2023, senior U.S. officials, including the Secretary of State and the Secretary of Homeland Security met with the President of Mexico. The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries "affirm[ed] their existing commitments to fostering orderly, humane, and regular migration, including reinforcing the countries' root causes partnership and cooperating to disrupt human smuggling, trafficking, and criminal networks." Jacobstein Decl. ¶ 21. The Mexican President has also "stressed the need to continue the diplomatic and political engagement with all countries in the region." *Mexico-U.S. Joint Communique*. The Secretary of State and the Mexican Foreign Secretary have continued to meet to pursue cooperative efforts on migration. Jacobstein Decl. ¶ 21.

These efforts have yielded results not only in the United States but also in the broader region. Border Patrol has encountered fewer migrants at the U.S.-Mexico border in the first months of 2024 than the same months in 2023. *See* CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited May 22, 2024). As of August 2023, countries in Latin America and the Caribbean have been able to host 6.5 million of 7.7 million displaced Venezuelans. Jacobstein Decl. ¶ 22. Colombia alone has granted temporary protected status to more than 2 million Venezuelans, and Brazil has resettled more than 200,000 refugees and migrants. *Id.*

## III. Oklahoma's House Bill 4156

Despite the existence of a comprehensive federal immigration framework, as well as the current enforcement and diplomatic efforts by the United States, Oklahoma enacted HB 4156 seeking to regulate noncitizens' entry and reentry into, and presence in, the United States. The new law contains two principal provisions, each of which is similar to analogous provisions of Texas's now-enjoined law, SB 4.

First, under HB 4156, a noncitizen commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States" (the "Impermissible Occupation" provision). HB 4156 § 2(B), (C)(1). This provision effectively makes it a state crime for a noncitizen to be present in Oklahoma if they did not have authorization to enter the United States. HB 4156 tracks the federal unlawful-entry provision, 8 U.S.C. § 1325(a) (barring noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers"), but punishes only those noncitizens who subsequently enter and continue to be present in Oklahoma.

The Impermissible Occupation provision contains affirmative defenses. It provides that "[i]t shall be an affirmative defense to prosecution" for violating the

Impermissible Occupation provision if (i) "[t]he federal government has granted the defendant . . . lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code"; or (ii) "[t]he defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals [("DACA")] program between June 15, 2012, and July 16, 2021." HB 4156 § 2(F).

A violation of the Impermissible Occupation provision is generally a misdemeanor "punishable by imprisonment" for up to one year and/or a fine of up to $500, but could, under certain circumstances, constitute a "felony punishable by imprisonment" for up to two years and/or a fine of up to $1,000. HB 4156 § 2(C)(1)-(2). HB 4156 requires a convicted noncitizen "to leave [Oklahoma] within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Second, HB 4156 makes it a state crime for noncitizens to "enter[], attempt[] to enter, or . . . at any time [be] found in Oklahoma" if they previously have been "denied admission, excluded, deported, or removed" or have "departed the United States while an order of exclusion, deportation, or removal is outstanding" (the "Unlawful Reentry" provision). HB 4156 § 2(D). This provision effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a), which generally bars noncitizens from "enter[ing], attempt[ing] to enter, or" being "found in, the United States" if they previously have been "denied admission, excluded, deported, or removed" or "ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding."

The Unlawful Reentry provision contains two exceptions, which appear to be attempts to track those in 8 U.S.C. § 1326(a)(2). The provision does not apply if (i) prior to departing for the United States, "the United States Attorney General has

expressly consented to such [noncitizen's] reapplying for admission,"[2] or (ii) if the noncitizen was "previously denied admission and removed," the noncitizen "established that he or she was not required to obtain such advance consent under" Section 2 of HB 4156 "or any prior statute." HB 4156 § 2(D). A violation of HB 4156's Unlawful Reentry provision is a felony punishable by imprisonment for up to two years and/or a fine of up to $1,000. *See* HB 4156 §§ (C)(2), (D). And a person convicted of violating the Unlawful Reentry provision must "leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." HB 4156 § 2(C)(2), (D).

Mexico has "expresse[d] its concern over the signing into law of Oklahoma HB4156," Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), https://perma.cc/E6Z4-HS7W, as it did when Texas enacted SB 4, *see* Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR, and when Iowa enacted another analogous law, Senate File 2340, *see* Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024), https://perma.cc/36R4-JXHE.

On May 15, 2024, the United States sent a letter to Oklahoma, explaining that HB 4156 violates the United States Constitution, and notifying Oklahoma of its intent "to bring a lawsuit to enforce the supremacy of federal law and to enjoin the enforcement of HB 4156." *See* ECF No. 1-1. In response, Attorney General Drummond stated that Oklahoma would not refrain from enforcing HB 4156. *See* ECF No. 1-2. In his view, the law "supplement[s] federal prohibitions with robust state penalties," *id.* at 2, and Oklahoma can enforce federal immigration "restrictions more effectively," *id.* (quoting *Arizona*, 567 U.S. at 437 (Scalia, J., dissenting in part)).

[2] Although the federal statutory counterpart to this exception still refers to the U.S. Attorney General, *see* 8 U.S.C. § 1326(a)(2)(A), the Secretary of Homeland Security has been substituted for the Attorney General. *See, e.g.*, *U.S. v. Rosales-Aguilar*, 818 F.3d 965, 971 n.1 (9th Cir. 2016); *see also* 8 U.S.C. § 1182(a)(9)(C)(ii).

The United States then filed this suit on May 21, 2024, and now moves for an order enjoining enforcement of HB 4156.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the federal government seeks a preliminary injunction, the second and fourth factors merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken,* 556 U.S. at 436. Obtaining a permanent injunction requires a "remarkably similar" showing, but the movant must establish actual success on the merits. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

## ARGUMENT

### I. The United States Is Likely to Succeed on the Merits.

#### A. HB 4156 is preempted under the Supremacy Clause.

Under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state laws. U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399. While the Constitution or Congress can explicitly preempt state law, they can also do so implicitly in two ways. *Arizona*, 567 U.S. at 399. First, through field preemption, they can preclude States "from regulating conduct in a field that" Congress commits to the federal government's "exclusive governance." *Id.* Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* (cleaned up). Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical

impossibility" or because the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Because HB 4156 intrudes into a field of exclusive federal control and conflicts with the federal immigration scheme, it is both field and conflict preempted.

**1. Field preemption bars HB 4156's regulation of noncitizens' entry into, presence in, and removal from the United States.**

HB 4156 is field preempted because it seeks to regulate conduct—the entry, continued presence, and removal of noncitizens in the United States—that Congress has committed to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. There is both a dominant federal interest at stake and a comprehensive legislative scheme "so pervasive that Congress left no room for the States to supplement it." *Id.* (cleaned up).

The federal government has a dominant interest in deciding "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. The Supreme Court has long held that the "authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal [G]overnment," *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (recognizing "the exclusive federal power over the entrance and residence of [noncitizens]"), just as "the removal process is entrusted to the discretion of the Federal Government," *Arizona*, 567 U.S. at 409. "[T]he power to regulate immigration" is "an attribute of sovereignty essential to the preservation of any nation," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982), and the United States' "policy toward [noncitizens] is vitally and intricately interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws."

*Arizona*, 567 U.S. at 395. Thus, the "discretionary decisions" on immigration regulation "involve policy choices that bear on this Nation's international relations," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Id.* at 396-97.

In an exercise of the National Government's paramount authority in this area, Congress enacted the INA, which today comprehensively regulates the entry and removal of noncitizens. *See Patel v. Garland*, 596 U.S. 328, 331 (2022). Congress has provided that unless otherwise specified in the INA, 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizens] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also id.* §§ 1181-88, 1201-04, 1225, 1228, 1231(a)(5). Congress has specified when a noncitizen's entry or reentry into the United States is a crime. *Id*. §§ 1324-28; *see Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*") (recognizing a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States). And Congress has provided immigration officers with broad and often unreviewable discretion in exercising the authorities it has vested in them. *See* Background § I, *supra*; *see also United States v. Texas*, 599 U.S. 670, 679-80 (2023); *Arizona*, 567 U.S. at 396, 409; *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84, 485 n.9 (1999). It intentionally left States only a specified and narrow role. *See* Background § I, *supra.*

Because Congress has thus fully occupied the field of noncitizen entry and removal, there is "no room for the States to supplement it," even with "complementary state regulation." *Arizona*, 567 U.S. at 399, 401. Oklahoma's effort to do so is field preempted just as the state noncitizen-registration statute was in *Arizona*. There, the State attempted to "add[] a state-law penalty for conduct proscribed by federal law,"

*id.* at 400, where "[t]he federal statutory directives [had] provide[d] a full set of standards," including "the punishment for noncompliance," and the statutory framework "was designed as a harmonious whole," *id.* at 401. The Supreme Court concluded that "[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with the careful framework Congress adopted." *Id.* at 402.

The same is true here. HB 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct. Under *Arizona*, therefore, HB 4156 is "impermissible" even if it is a "complementary state regulation." 567 U.S. at 401. Otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even [when] federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Indeed, since *Arizona*, courts have repeatedly held that state immigration crimes paralleling their federal counterparts are field preempted. *See, e.g.*, *GLAHR*, 691 F.3d at 1263-64; *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013).[3]

HB 4156 further intrudes on the federal government's exclusive authority to remove noncitizens from the United States. *See Arizona*, 567 U.S. at 409. HB 4156

[3] The Tenth Circuit's decision in *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1300 (10th Cir. 1999), is not to the contrary. That case upheld a state officer's authority to arrest a noncitizen for a suspected violation of 8 U.S.C. § 1326 despite the authorization in 8 U.S.C. § 1252c permitting state officer arrests in a narrower set of circumstances. Notably, in that case, a federal officer had requested that the state officer arrest the noncitizen and the state officer thereafter turned the noncitizen over to the federal government for prosecution. *See* 176 F.3d at 1296. The court did not address efforts by state officers to enforce immigration law independent of the federal government—a topic that was subsequently addressed by the Supreme Court in *Arizona*—much less suggest that a State could prosecute and impose penalties for immigration violations.

purports to require noncitizens convicted of violating HB 4156 to leave Oklahoma within 72 hours following their conviction or release from custody, whichever is later. *See* HB 4156 § 2(C)(1)-(2). But *Arizona* made clear that removal is "entrusted to the discretion of the Federal Government," 567 U.S. at 409, and States cannot interfere with the federal government's authority to remove noncitizens. *United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (holding indirect efforts to expel noncitizens from Alabama preempted). If "every State could give itself independent authority" to exile noncitizens from its territory, it would "diminish" the federal government's exclusive control over removal and "detract[] from the integrated scheme of regulation." *Arizona*, 567 U.S. at 402 (cleaned up). Oklahoma's provision is no more lawful as the first state law to be enacted than if it were the 50th.

Recent rulings concerning Texas's similar law, SB 4, confirm that HB 4156 is field preempted. SB 4—which likewise criminalized illegal entry and reentry—was preliminarily enjoined by the U.S. District Court for the Western District of Texas. The court explained that "the federal government has a dominant and supreme interest in the field of" noncitizen entry and removal and that "[t]he country's immigration laws are massive, sprawling, detailed, complex, and pervasive." *Texas SB 4*, 2024 WL 861526, at *11-14. And after comparing Texas's analogous law with the state law at issue in *Arizona*, the court concluded that Texas's law was likely field preempted. *Id.* at *15-16. The Fifth Circuit, in denying a stay pending appeal, conducted a similarly detailed analysis and echoed the district court's ruling: "there is strong support for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation." *Texas SB 4*, 97 F.4th at 287-88.

At bottom, allowing a single State to make determinations regarding noncitizen entry and continued presence would permit a State "at her pleasure" to "embroil us in disastrous quarrels with other nations." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875);

*accord Arizona*, 567 U.S. at 395. There could be no "great[er] potential for disruption or embarrassment" than the chaos that would ensue from 50 different immigration systems with varying (and likely conflicting) provisions for illegal entry and noncitizen removal. *Zschernig v. Miller*, 389 U.S. 429, 435 (1968). HB 4156's intrusion into the field of noncitizen entry, continued presence, and removal is preempted.

**2. HB 4156 is conflict preempted by the federal immigration scheme.**

Oklahoma's law also stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.

First, as an overarching matter, HB 4156 would undermine the United States's ability to "ensure that enforcement policies are consistent with this Nation's foreign policy," *id.* at 397, 402, and to speak with "one voice" in matters involving foreign relations, *id.* at 409. The prosecution of noncitizens for immigration offenses necessarily has consequences for the United States' relationship with other countries, and "[p]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* at 395. It is paramount that the federal government determines whether to impose immigration consequences, just as it is "fundamental" that foreign governments must be able to "confer and communicate on this subject with one national sovereign, not the 50 separate States," *id.* For these reasons, Congress has comprehensively defined immigration offenses and their consequences, *see, e.g.*, 8 U.S.C. §§ 1182(a), 1227(a), 1229a, 1253, 1325, 1326, and granted the Executive Branch significant discretion to enforce that scheme, with judicial review in federal courts, *see, e.g.*, 6 U.S.C. §§ 205(5), 211(c)(8); 8 U.S.C. §§ 1103, 1229a(c)(4), 1229b, 1252. *See generally Arizona*, 567 U.S. at 395-96, 407-10.

Oklahoma's attempt to punish foreign nationals for immigration violations and to exile them from the State without regard to the interests of the Nation is patently inconsistent with the framework Congress enacted. *See Arizona*, 567 U.S. at 406 (holding that even though Arizona's law "attempts to achieve one of the same goals

as federal law," it "would interfere with the careful balance struck by Congress"); *Texas SB 4*, 2024 WL 861526, at *21. As the Fifth Circuit explained, "[t]he INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once a noncitizen is apprehended." *Texas SB 4*, 97 F.4th at 289. Yet Oklahoma's "scheme blocks this exercise of discretion" because a noncitizen apprehended for allegedly violating HB 4156 "is charged with a crime, and the federal government has no voice in further proceedings." *Id.* Put simply, "[a]n arrest or conviction [under HB 4156] would interfere with federal law because the [Oklahoma] process for arrests and convictions suppresses or subverts federal authority over a noncitizen's status in the United States." *Id.*

Second, HB 4156 exceeds the limited role that Congress assigned state officers in enforcing immigration law. Consistent with the paramount national interests discussed above, Congress provided for only "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408, 409. In each of those circumstances, state officers are subject to the oversight of federal officials, who take the lead in fashioning enforcement priorities and techniques that the state officers must respect. *See* Background § I, *supra*. Most prominently, States may enter into an agreement with DHS to allow qualified state officers to carry out functions of an immigration officer "subject to the direction and supervision of the [Secretary of Homeland Security]," and only after they have "received adequate training." 8 U.S.C. § 1357(g)(2)-(3); *see Arizona*, 567 U.S. at 408-09; 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (statement of Rep. Cox) (recognizing that such agreements ensure that "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards"). Outside formal agreements, state officers may "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not lawfully present in the United States." 8 U.S.C.

§ 1357(g)(10)(B). But "no coherent understanding of the term ['cooperate'] would incorporate the unilateral decision of state officers to arrest a[] [noncitizen] for being [illegally present in the United States] absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. And even in circumstances where Congress authorizes state officers to arrest noncitizens unlawfully present in the United States, any detention may last only until the noncitizen could be delivered into federal custody for appropriate proceedings under federal law. *See* 8 U.S.C. § 1252c(a).

Oklahoma's law flouts these narrow provisions for state participation. *See* Background § I, *supra*; 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c). Those provisions mean nothing if States can enact their own immigration crimes and then arrest, detain, prosecute, and punish noncitizens without federal authorization, without any special training, and without being "subject to the direction and supervision of the" United States. *Id.* § 1357(g)(3); *see Texas SB 4*, 97 F.4th at 293. HB 4156 thus conflicts with federal law by "go[ing] far beyond" the measures contemplated by Congress, "defeating any need for real cooperation" and "allow[ing] the State to achieve its own immigration policy." *Arizona*, 567 U.S. at 408, 410. Put differently, HB 4156 "and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority." *Texas SB 4*, 2024 WL 861526, at *23; *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc) (plurality) (local ordinance criminalizing the housing of noncitizens preempted, despite claim that ordinance will concurrently enforce federal anti-harboring law, in part because the ordinance purported to give state officials authority to act as immigration officers outside the limited circumstances specified in § 1357(g)).

Third, the specifics of HB 4156 further illustrate the incompatibility of the Oklahoma law and the federal immigration framework. For example, HB 4156 does

not just punish unlawful entry itself—which will almost invariably take place in a State other than Oklahoma—but rather seeks to punish the noncitizen's subsequent presence in Oklahoma. Unlawful presence is not, as a general matter, a criminal offense, *see Arizona*, 567 U.S. at 407, so HB 4156 parallels federal law only to the extent that it asserts authority to punish, belatedly, a federal crime that occurred in a different State at a different time. Moreover, even if 4156's Impermissible Occupation and Unlawful Reentry provisions did parallel 8 U.S.C. §§ 1325 and 1326, they authorize different punishments. *Compare, e.g.*, 8 U.S.C. § 1325(a)-(b) *with* HB 4156 § (C)(1)-(2), (G). And the Supreme Court has recognized that when "two separate remedies are brought to bear on the same activity," "conflict is imminent." *Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986).[4]

For another example, the Impermissible Occupation provision includes an affirmative defense for when "[t]he federal government has granted" a noncitizen "lawful presence in the United States." HB 4156 § F(1). But federal law does not supply one definition of "lawful presence"; it means different things in different contexts. Allowing state judges to determine noncitizens' immigration status, purportedly based on their reading of federal law, is impermissible because "[t]he federal government alone . . . has the power to classify non-citizens." *Farmers Branch*, 726 F.3d at 536 (citing *Arizona*, 567 U.S. at 409-10). And there are "significant complexities" in determining immigration status. *Id.* (quoting *Arizona*, 567 U.S. at 409); *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which [noncitizens] are entitled to residence, and which eventually will be deported."). State determinations of whether the federal government has "granted" a particular

---

[4] To the extent that Oklahoma seeks to arrest, detain, or prosecute unaccompanied children, HB 4156 also conflicts with the protections Congress has provided to such noncitizens. *See* 8 U.S.C. § 1232; 6 U.S.C. § 279.

noncitizen "lawful presence" also would "open[] the door to conflicting state and federal rulings." *Farmers Branch*, 726 F.3d at 536.

Fourth, Oklahoma's requirement that any noncitizen convicted of violating HB 4156 must "leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later," HB 4156 § (C)(1)-(2), conflicts with the carefully calibrated federal removal scheme, *e.g.*, 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1229a, 1231(a)-(b). *See Texas SB 4*, 97 F.4th at 291. It is immaterial that HB 4156 requires removal only from the State rather than the United States because only the federal government has authority to preclude a noncitizen from being in the 50 States. Even one state-specific immigration regime upsets the balance Congress struck in addressing the presence, status, and removal of noncitizens. *See Alabama*, 691 F.3d at 1295 & n.21.[5]

In sum, HB 4156 does exactly what the Supreme Court warned against: It conflicts with the federal immigration scheme and undermines the federal government's ability to engage in a sensitive balancing of United States' foreign relations and other interests when making immigration enforcement decisions. *See Arizona*, 567 U.S. at 409-10. It allows state officials' "unilateral enforcement" of the prohibitions on illegal entry and reentry (8 U.S.C. §§ 1325, 1326) without the federal authorization, oversight, or training required by federal law. *See id.* at 410. And it arrogates to state officials the power to expel noncitizens from its territory, without regard to the federal government's exclusive authority to determine a noncitizen's presence in the United States. Accordingly, HB 4156 is conflict preempted.

---

[5] A law prohibiting a noncitizen from being present in Oklahoma also raises additional constitutional problems with respect to the regulation of interstate travel, comity among States, and the central premise that we are one Nation in the field of immigration. *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 65-68 (1941).

### B. HB 4156 violates the Foreign Commerce Clause by regulating international movement of persons and by interfering with foreign relations.

HB 4156 also violates the Foreign Commerce Clause, which recognizes that "[f]oreign commerce is pre-eminently a matter of national concern." *Japan Line*, 441 U.S. at 448. "In international relations and with respect to foreign intercourse and trade[,] the people of the United States act through a single government with unified and adequate national power." *Id.* Simply put, "[t]he commerce of the United States with foreign nations, is that of the whole United States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824); *see United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018) ("The dormant Commerce Clause doctrine extends to state regulation that may conflict with Congress's foreign commerce regulatory authority."). And the power to regulate commerce has long been understood to encompass the regulation of both *persons* and commodities. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 758-59 (1966); *Texas SB 4*, 2024 WL 861526, at *24 ("The Supreme Court has repeatedly emphasized that the movement of persons between states is commerce."); *see also Henderson v. Mayor of New York*, 92 U.S. 259, 274 (1875) (holding state statute regulating shipmasters bringing foreign passengers to the United States violated the dormant Foreign Commerce Clause); *Chy Lung*, 92 U.S. at 280.

In assessing state laws implicating foreign commerce rather than interstate commerce, "a more extensive constitutional inquiry is required." *Japan Line*, 441 U.S. at 446. That inquiry is necessary because, if a state law disadvantages foreign countries, those countries may retaliate "so that the Nation as a whole would suffer." *Id.* at 450. The Foreign Commerce Clause analysis must therefore examine whether the law discriminates against or unduly burdens foreign commerce, as well as whether the state law would "prevent[] the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" *Id.* at 451; *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 68 (1st Cir. 1999*), aff'd sub nom. Crosby v.*

*Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). If so, the law is unconstitutional.

Under that analysis, HB 4156 is unconstitutional. It discriminates against foreign commerce on its face: it imposes criminal penalties only on noncitizens who travel into the United States from abroad and end up in Oklahoma, but says nothing about purely intrastate or interstate travelers—except to the extent it impermissibly banishes noncitizens from the State.[6] Even if HB 4156 were nondiscriminatory, it still targets only noncitizens, criminalizing their movements and ordering their removal from the State, thereby disrupting the uniform immigration laws and preventing the federal government from conveying a unified message in the sensitive area of foreign affairs. *See Texas SB 4*, 2024 WL 861526, at *24 (recognizing that Texas's analogous law facially "discriminates against foreign commerce" and "undermin[es] the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states"); Argument § I.A, *supra*.

## II. Enforcement of HB 4156 Would Cause Irreparable Harm to the United States and the Public.

The United States and the public will suffer irreparable harm if HB 4156 takes effect. As courts have explained, irreparable harm necessarily results from enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989); *Texas SB 4*, 2024 WL 861526, at *38 (collecting cases and explaining that "the United States has shown irreparable harm as a matter of law" if a preempted state law is enforced). HB 4156's violation of the Supremacy Clause alone suffices to establish harm.

[6] While HB 4156 does not look like the protectionist economic regulations that usually arise under the dormant Commerce Clause, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." *Natsios*, 181 F.3d at 67. And "[e]ven if [HB 4156] is consistent with federal purposes, it cannot be saved by a showing that it is consistent with the purposes behind federal law." *Texas SB 4*, 2024 WL 861526, at *24 n.27.

But HB 4156's harm would extend further. Internationally, HB 4156 would harm the United States' relationship with foreign nations, including Mexico, in multiple ways. Jacobstein Decl. ¶¶ 8-26. It would antagonize foreign governments, and indeed, it already has. Mexico has expressed concern about HB 4156, *see* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W, just as it did with Texas's and Iowa's comparable laws, *see* p. 9, *supra*. State laws that unfavorably treat noncitizens strain diplomatic relations and make it more difficult for foreign governments to cooperate with the United States on trade agreements, disaster response arrangements, anti-terrorism and anti-drug trafficking efforts, and other priority U.S. goals. Jacobstein Decl. ¶¶ 9-16; *see Texas SB 4*, 97 F.4th at 295 ("there is a high risk that enforcement of [such laws] would cause international friction"). HB 4156 also risks undermining the long-term strategic partnerships that the United States has formed or seeks to form with other governments in the region to reduce irregular migration. These diplomatic efforts, including the establishment and strengthening of other countries' asylum systems, have resulted in a significant reduction of irregular migration into the United States. Jacobstein Decl. ¶ 22. HB 4156 undermines the United States' ability to partner with other countries and may weaken other countries' commitment to providing protections to refugees and other vulnerable migrants, ultimately resulting in greater flows of migrants north to the United States. *Id.* ¶ 23. And lastly, HB 4156 risks exposing United States citizens abroad to reciprocal and retaliatory treatment and may impair U.S. citizens' ability to travel, conduct business, or live abroad. *Id.* ¶¶ 24-25; *see Arizona*, 567 U.S. at 395 ("Perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad.").

Domestically, HB 4156 would displace federal officers' exercise of discretion in enforcing the immigration laws, including their choice between criminal prosecution and removal. And because HB 4156 does not provide for abatement of a state

prosecution despite pending federal immigration proceedings, HB 4156 enforcement proceedings against noncitizens may interfere with those noncitizens' ability to participate in federal immigration proceedings that could ultimately lead to the adjustment of their immigration status in the United States. *See* Declaration of Russell Hott ¶¶ 18-19 (attached as Exhibit 2). "Other forms of irreparable harm will follow from [HB 4156's] enforcement, too numerous to spell out in detail." *Texas SB 4*, 2024 WL 861526, at *39; *see id.* at *38-39 (discussing various other irreparable harms); *see generally* Jacobstein Decl. ¶¶ 8-26; Hott Decl. ¶¶ 18-21.

These harms are compounded by the fact that, if HB 4156 is allowed to stand, other States could be emboldened to impose similar restraints. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same"). This could create a problematic "patchwork" system of laws, *id.*; *see* Jacobstein Decl. ¶ 7; Hott Decl. ¶ 21, and have a disastrous impact on the federal government's ability to carry out its core immigration functions, not to mention undermining the United States' conduct of foreign affairs. *See South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent."). For these reasons and others offered in the attached declarations, this Court should find that the United States and the public would suffer irreparable harm from the enforcement of HB 4156.

## III. Oklahoma Has No Countervailing Interest in Maintaining An Unconstitutional Law.

In contrast to the irreparable harm likely to be suffered by the United States and the public, Oklahoma has no legitimate interest in running its own unconstitutional immigration system; it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Texas SB 4*, 2024 WL 861526, at *41. And "enforcement of an unconstitutional law is always

contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *accord Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023).

In any event, Oklahoma would not be harmed by an injunction here. Oklahoma is free to assist in the enforcement of federal immigration law by proceeding under the framework Congress established. *See, e.g.*, 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c), 1357(g). It may, for example, enter an agreement with the federal government to aid in the "investigation, apprehension, or detention of [noncitizens] in the United States" if state officers receive adequate training and are "subject to the direction and supervision of the" federal government. *Id.* § 1357(g). But Oklahoma has no lawful interest in encroaching on an exclusive federal domain. This is nothing new for Oklahoma. The United States has been enforcing the *federal* crimes of illegal entry and reentry (§§ 1325 and 1326) since they were enacted in 1952. Oklahoma has gone at least seven decades without an unconstitutional state counterpart like HB 4156. Moreover, Oklahoma remains free to enforce its generally applicable criminal laws that prohibit drug, sex, or labor trafficking, which apply to citizens and noncitizens alike. *See* HB 4156 § 1(B); *Kansas v. Garcia*, 589 U.S. 191, 211-13 (2020).

Finally, in a suit brought by the United States, Oklahoma can assert no legally cognizable interest in protecting its citizens from purported immigration-related harms. As explained above, the entry, presence, and removal of noncitizens is an exclusively federal field. And "[i]n that field it is the United States, and not the [S]tate, which represents" Oklahomans; "to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see Texas SB 4*, 97 F.4th at 296 ("[T]he Supreme Court explained in *Hines v. Davidowitz* [312 U.S. at 52] that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations."); *Texas SB 4*, 2024 WL 861526, at *40 ("The United States is asserting its sovereign power to regulate a field dedicated to the federal government.

[A State] may disagree with the federal government's policy decisions, but they are the federal government's to make."). At bottom, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

### IV. The Court Should Enter A Permanent Injunction Because There Are No Material Facts in Dispute.

Because the purely legal issues in this motion are dispositive, the Court could proceed directly to final judgment under either Rule 56 or Rule 65. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."). Rule 65(a)(2) was "designed to efficiently expedite final disposition of an injunctive action" by making "evidence introduced at a [preliminary-injunction] hearing . . . admissible at trial." *Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1298-99 (10th Cir. 1980). "[W]hen the relief demanded by the complaint is the same as the relief in the motion for preliminary injunction, consolidation is warranted." *Alfwear, Inc. v. Mast-Jägermeister, Inc.*, 2020 WL 5943957, at *2 (D. Utah Oct. 7, 2020) (citing *Osage Nation ex rel. Osage Minerals Council v. Wind Capital Grp., LLC*, 2011 WL 5864368, at *1 (N.D. Okla. Nov. 22, 2011)). Here, the Court can, and should, simply apply the Supremacy Clause and the Foreign Commerce Clause to the undisputed facts and enter a permanent injunction in favor of the United States.

## CONCLUSION

For the reasons explained above, the Court should grant the United States' motion for a preliminary or permanent injunction and enjoin the enforcement of HB 4156 or enter any other equitable relief the Court deems appropriate. The United States respectfully requests that the Court rule on this motion as soon as possible to allow for potential appellate review.

DATED: May 22, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

*/s/ Christopher A. Eiswerth*
CHRISTOPHER A. EISWERTH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-0568
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the CM/ECF system, which automatically transmits notice of electronic filing to registered participants in the ECF system. In addition, I caused a copy of the foregoing document to be served via U.S. mail on the following defendants who have not yet entered their appearance in the case:

State of Oklahoma
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105

Governor Stitt
Office of the Governor
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105

Attorney General Drummond
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Oklahoma Department of Public Safety
3600 N. Martin Luther King Avenue
Oklahoma City, OK 73111

Commissioner Tipton
Oklahoma Department of Public Safety
3600 N. Martin Luther King Avenue
Oklahoma City, OK 73111

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth

Counsel for the United States