IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

THE STATE OF OKLAHOMA, *et al.,*

*Defendants.*

Case No:     CIV-24-511-J

---

**DEFENDANTS' COMBINED RESPONSE IN OPPOSITION**

---

GARRY M. GASKINS, II, OBA 20212
  *Solicitor General*
ZACH WEST, OBA 30768
  *Director of Special Litigation*
CULLEN D. SWEENEY, OBA 30269
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................**1**

**BACKGROUND** .................................................................................................**1**

**STANDARD OF DECISION** ............................................................................**11**

**ARGUMENT** .....................................................................................................**12**

   I.  Plaintiffs are not likely to succeed in showing that HB 4156 is unconstitutional when it merely complements federal law. ....................................................**12**

      A.  HB 4156 is not preempted because it readily comports—rather than conflicts—with federal immigration laws. ............................................**13**

      B.  No part of HB 4156 is field preempted. ...........................................**21**

      C.  The Foreign Commerce Clause does not prohibit states from criminalizing those immigrants who are illegally present because the regulated conduct is illegal and entirely unrelated to foreign commerce. ...............................**25**

      D.  Oklahoma is constitutionally entitled to defend itself against invasion when the federal government abdicates its own duties. ...................................**29**

      E.  All Plaintiffs' claims are nonjusticiable. .........................................**30**

   II.  The remaining factors weigh against granting an injunction. ...........................**33**

**CONCLUSION** ..................................................................................................**35**

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ...................................................................................................31

*Arizona v. United States,*
567 U.S. 387 (2012) ..............................................1, 13, 14, 16, 17, 21, 22, 24, 26, 34

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ...................................................................................................31

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) ...................................................................................................35

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ...................................................................................................32

*Bronson v. Swensen,*
500 F.3d 1099 (10th Cir. 2007) .................................................................................32

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
520 U.S. 564 (1997) ...................................................................................................27

*Chamber of Commerce of U.S. v. Whiting,*
563 U.S. 582 (2011) ......................................................................................14, 15, 17

*City of Philadelphia v. New Jersey,*
437 U.S. 617 (1978) ...................................................................................................28

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................................................33

*Davis v. Passman,*
442 U.S. 228 (1979) ...................................................................................................30

*DeCanas v. Bica,*
424 U.S. 351 (1976) ......................................................................................21, 22, 23

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) .................................................................................35

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) .................................................................................11

*Edwards v. California,*
314 U.S. 160 (1941) ..............................................................................................28, 29

*First W. Capital Mgmt. Co. v. Malamed,*
874 F.3d 1136 (10th Cir. 2017) .................................................................................11

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) ................................................................................21

*Florida v. United States*,
   660 F. Supp. 3d 1239 (N.D. Fla. 2023) ....................................................23

*Free the Nipple–Fort Collins v. City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019) ..................................................................12

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ...................................................................................14

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) .................................................................................26

*Gilbert v. Minnesota*,
   254 U.S. 325 (1920) .................................................................................15

*Gunn v. Minton*,
   568 U.S. 251 (2013) .................................................................................31

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ................................................................32

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .................................................................................33

*Huron Portland Cement Co. v. City of Detroit*,
   362 U.S. 440 (1960) .................................................................................18

*Initiative & Referendum Inst. v. Walker*,
   450 F.3d 1082 (10th Cir. 2006) ................................................................33

*Japan Line v. County of Los Angeles*,
   441 U.S. 434 (1979) .................................................................................29

*Juidice v. Vail*,
   430 U.S. 327 (1977) .................................................................................35

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ............................................14, 16, 17, 19, 21, 22

*Liddell v. Heavner*,
   180 P.3d 1191 (Okla. 2008) .....................................................................35

*Mayor of New York v. Miln*,
   36 U.S. (11 Pet.) 102 (1837) ....................................................................26

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .................................................................................11

iv

*Michelin Tire Corp. v. Wages,*
    423 U.S. 276 (1976) ............................................................................27

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) ............................................................................25

*New York v. New Jersey,*
    598 U.S. 218 (2023) ............................................................................35

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................34

*Original Invs., LLC v. Oklahoma,*
    542 F. Supp. 3d 1230 (W.D. Okla. 2021) ...........................................33

*Panhandle E. Pipeline Co. v. State ex rel. Comm'rs of Land Office,*
    83 F.3d 1219 (10th Cir. 1996) ............................................................35

*Parker Drilling Mgmt. Servs. v. Newton,*
    139 S. Ct. 1881 (2019) ........................................................................15

*Parker v. Brown,*
    317 U.S. 341 (1943) ............................................................................13

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ............................................................................26

*Plyler v. Doe,*
    457 U.S. 202 (1982) .......................................................21, 22, 23, 24

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ............................................................12

*Ramos v. Louisiana,*
    590 U.S. 83 (2020) ..............................................................................24

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ............................................................................13

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
    325 U.S. 761 (1945) ............................................................................27

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) ..........................................................11

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ............................................................................29

*Smith v. Turner,*
    48 U.S. (7 How.) 283 (1849) ..............................................................30

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................32

*Tandy v. City of Wichita*,
  380 F.3d 1277 (10th Cir. 2004) ...............................................................32

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019) ..................................................................................27

*Texas v. DHS*,
  No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ................3

*U.S. v. California*,
  655 F.2d 914 (9th Cir. 1980) .....................................................................31

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*,
  883 F.2d 886 (10th Cir. 1989) ...................................................................11

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .................................................................24

*United States v. Hansen*,
  599 U.S. 762 (2023) ..................................................................................12

*United States v. Salerno*,
  481 U.S. 739 (1987) ..................................................................................12

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) .....................................................................27

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) ..................................................................................13

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ....................................................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................11

*Younger v. Harris*,
  401 U.S. 37 (1971) ....................................................................................32

**Statutes**

8 U.S.C § 1101 .....................................................................................16, 22

8 U.S.C. § 1182 ...........................................................................................15

8 U.S.C. § 1225 ...........................................................................................15

8 U.S.C. § 1229 ...........................................................................................15

8 U.S.C. § 1253 ...............................................................................................................15

8 U.S.C. § 1325 .........................................................................................................14, 21

8 U.S.C. § 1326 .........................................................................................................15, 21

8 U.S.C. § 1357 .........................................................................................................16, 17

18 U.S.C § 758 ..........................................................................................................16, 22

18 U.S.C § 3571 ..............................................................................................................15

18 U.S.C. § 3559 .............................................................................................................15

22 U.S.C. § 7105 .......................................................................................................16, 23

OKLA. STAT. tit. 21, § 1795 ...............................................................................................8

OKLA. STAT. tit. 75, § 11 ................................................................................................35

**Other Authorities**

Camilo Montoya–Galvez, *Migrant Crossings at the U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 28, 2023)................................................................3

Garrett Yalch, et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*
THE FRONTIER (March 14, 2024) .....................................................................................5

HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*
(Jan. 18, 2024)....................................................................................................................3

OKLA. BUREAU OF NARCOTICS AND DANGEROUS DRUGS CONTROL, *Position Statement on Medical Marijuana Registrants Providing Certificates of Occupancy* (July 2023) ...................4

Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023) .......................4

THE WHITE HOUSE, *A Proclamation on Securing the Border*
(June 4, 2024) ....................................................................................................................7

U.S. HOUSE HOMELAND SECURITY COMMITTEE, *"Every State Is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis*
(Dec. 7, 2023) ....................................................................................................................4

**Rules**

86 Fed. Reg. 7225
(Jan. 20, 2021)....................................................................................................................7

Exec. Order No. 13993, 86 Fed. Reg. 7051
(Jan. 25, 2021)....................................................................................................................7

Exec. Order No. GA-41, Governor of State of Texas
(July 7, 2022)...................................................................................................6

**Constitutional Provisions**

U.S. CONST. amend. X................................................................................31

U.S. CONST. art. I, § 8................................................................................37

U.S. CONST. art. I, § 10..............................................................................36

U.S. CONST. art. II, § 3..............................................................................29

U.S. CONST. art. VI.......................................................................19, 27, 37

## INTRODUCTION

Plaintiffs seek to enjoin the enforcement of Oklahoma House Bill 4156 (HB 4156), which makes it a state offense, with state penalties, for a noncitizen who is in the United States illegally to unlawfully enter, re-enter, or remain in Oklahoma. *See* HB 4156, 59th Leg., 2nd Reg. Sess. (2024). This law in no way conflicts with or undermines federal law. Plaintiffs' pre-enforcement, facial challenges to HB 4156 are based on speculative assumptions about how HB 4156 will be implemented, spurious legal conclusions about the law's underpinnings, and fundamental misconceptions about a state's sovereign rights and duties in a federalist system of government. Plaintiffs place almost all their chips on an overbroad interpretation of *Arizona v. United States*, 567 U.S. 387 (2012). But that interpretation would render the states helpless and passive vassals to a federal government that refuses to enforce its own laws in express and misguided deference to the whims of foreign governments. For these reasons and more, the Court should deny Plaintiffs' requests for an injunction.

## BACKGROUND

A crisis exists in our Nation: a crisis of unprecedented and uncontrolled illegal immigration. Although one would not know it from Plaintiffs' submissions, President Biden himself has said so. Indeed, he admitted earlier this year—just before the Oklahoma Legislature began its session—that "we all know the border's been broken" for "too long," which has created a "border crisis." THE WHITE HOUSE, Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024).[1] Similar sentiments were proclaimed around the same time by more than half of our State Attorneys General, who

---

[1] *Available at* https://perma.cc/K9S8-TLZV.

1

pointed out that the "federal government has failed to stanch this flow" of "more than six million illegal immigrants," which has "effectively add[ed] the population of Iowa and Utah to our country in less than three years." Letter from Multiple State Attorneys General to President Joseph R. Biden, Jr. (Jan. 29, 2024).[2] In response to this "unprecedented border crisis," *id.*, the Oklahoma Legislature enacted HB 4156. *See* HB 4156, § 1(B) ("[A] crisis exists in Oklahoma."). The law is straightforward: if a person lacks authorization to enter or remain in the United States, then that person may not enter or remain in Oklahoma. But instead of welcoming Oklahoma's efforts to address and correct an untenable situation, the federal government balked at Oklahoma's temerity in asserting its own legitimate sovereignty.

The border crisis has swamped Oklahoma with an unprecedented onslaught of criminal activity. It takes the form of "illegal marijuana grow operations, which have exploded in number in recent years." *Id.* It brings "fentanyl distribution, sex trafficking, and labor trafficking" at the hands of "organized crime, such as drug cartels, [that] have no regard for Oklahoma's laws or public safety." *Id.* (stating that "Oklahoma agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border"). Oklahoma's communities are being harmed and harassed, while its law enforcement officers are overburdened and overwhelmed. The state's "crisis of unauthorized entry and presence is endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local government entities." *Id.*

---

[2] *Available at* https://www.texasattorneygeneral.gov/sites/default/files/images/press /AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

Again, nearly 6 million migrants unlawfully crossed the southwest land border between January 2021 and September 2023. U.S. HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, at 2 (Jan. 18, 2024).[3] "The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). And things continue to fall apart. December 2023 saw a new record for monthly encounters with aliens illegally crossing the southwestern border: over 225,000 people, in just one month. Camilo Montoya–Galvez, *Migrant Crossings at the U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 28, 2023).[4] The effects of this ongoing cataclysm reverberate far beyond the river and deserts of the southwest border country: as just discussed, they have found their way to and made an unwelcome home in Oklahoma.

The border crisis is not confined to the massive influx of unlawful immigrants alone. "As expected, organized criminal organizations take advantage of these large numbers." *Texas*, 2023 WL 8285223, at *3. The trafficking of human beings across the United States border "has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* More alarmingly, "the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl." *Id.* Fentanyl "is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *Id.* Oklahoma has

---

[3] *Available at* https://perma.cc/5USD-YX6F.
[4] *Available at* https://www.cbsnews.com/news/migrant-crossings-u-s-southern-border-record-monthly-high-december/.

3

not been spared from this deadly epidemic. Fentanyl-related deaths in this state "have increased by nearly 500 percent over the past few years." U.S. HOUSE HOMELAND SEC. COMM., *"Every State Is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023) (statement of U.S. Rep. Bice of Oklahoma).[5] As it stands now, the Oklahoma Department of Health reports that "fentanyl is the leading substance involved in drug overdoses in Oklahoma." *Id.* And the Office of National Drug Control Policy has formally designated Oklahoma and Canadian Counties as "high intensity drug trafficking areas," in large part because of their proximity to the intersection of three major interstate highways: Interstates 35, 40, and 44. *Id.*

Although every state in the Nation is threatened by the rampant trafficking activity of the various drug cartels (among others), Oklahoma faces unique problems of its own. The aforementioned explosion of lawless, unchecked, and dangerous marijuana grow operations threatens everyone in Oklahoma—citizen and noncitizen alike. *See, e.g.,* Ex. 2, Decl. of Donnie Anderson ¶ 7 ("violent and deadly altercations occurring at illicit marijuana grows").[6] With the statewide approval of medical marijuana in 2018, Oklahoma "has seen a significant increase in the number of encounters with foreign nationals, both with and without legal status in the United States, operating within medical marijuana facilities." Ex. 2, Anderson ¶ 2. Since that same year, Oklahoma has shut down more than 800 marijuana growing operations that have

---

[5] *Available at* https://perma.cc/HTS5-BP7U.

[6] *See also* OKLA. BUREAU OF NARCOTICS AND DANGEROUS DRUGS CONTROL, *Position Statement on Medical Marijuana Registrants Providing Certificates of Occupancy* (July 2023), ww.obndd.ok.gov/home/showpublisheddocument/430/638252794456800000 ("Since 2021, at least 10 confirmed fires at marijuana manufacturer locations"); *see also* Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023), https://www.politico.com /news/magazine/2023/03/07/oklahoma-marijuana-legalization-00085299.

ties to organized crime and "seized more than 600,000 pounds of illegal weed and made nearly 200 arrests." Demko, *supra* note 6. Many of the illegal grow operations are directly traceable to Chinese organized crime. *See* Garrett Yalch et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*, THE FRONTIER (March 14, 2024) (describing Oklahoma as the "latest and wildest frontier in the marijuana underworld").[7] The victims of this industry include thousands of Chinese migrants (and those of other nationalities) who are smuggled across the open border in Texas and end up in Oklahoma. *Id.* "These laborers make up the low-cost workforce that allows the black market marijuana trade to persist." Ex. 2, Anderson ¶ 3. Foreign workers suffer from rampant physical abuse, trafficking, wage theft, forced prostitution, and more. Yalch, *supra* note 7.

Not just an urban blight, the illicit marijuana operations also "affect rural communities through introducing banned foreign chemicals to the land, abandoning of grow cites by operators, and the stressing of electrical utilities and water resources." Ex. 2, Anderson ¶ 4. "[R]ural Oklahomans are being increasingly affected and disturbed by illegal operations in the state." *Id.* "The federal response, however, has been muted." Yalch, *supra* note 7.

Oklahoma officials have appealed to the U.S. Department of Justice, seeking assistance in prosecuting the proliferating illegal marijuana operations and the foreign criminal syndicates whose profits depend on the exploitation of a trafficked labor force. *See* Letter from Senator

---

[7] *Available at* https://www.readfrontier.org/stories/gangsters-money-and-murder-how-chinese-organized-crime-is-dominating-oklahomas-illegal-medical-marijuana-market/#:~:text=Gangsters%2C%20money%20and%20murder%3A%20How,Oklahoma's%20illegal%20medical%20marijuana%20market&text=A%20quadruple%20murder%20in%20Oklahoma,ties%20to%20China's%20authoritarian%20regime.

Joni Ernst to Attorney General Merrick Garland (Feb. 2, 2024).[8] This is a matter of both public safety and national security: "investigators in Oklahoma discovered illicit marijuana growers engaged in human trafficking, sex trafficking, ketamine trafficking, illegal gambling, and international money laundering." *Id.* at 2. Rather than providing meaningful and effective enforcement of its many immigration statutes, the United States now responds with litigation against Oklahoma and those charged with enforcing state laws that do nothing more than mirror important federal laws.

The damage to Oklahoma might have been ameliorated had the government made a priority of securing the country's border. But an unprecedented crisis has been met with unconscionable inaction. *See* AG Letter, *supra* note 2, at 1. The current administration's policies "have magnetized the southern border to attract ever greater numbers into attempting illegal immigration." *Id.* at 3–4. The drug cartels even have a word for this "deliberate refusal to enforce immigration law," *id.* at 4: "the cartels refer to these open-border policies as *la invitación* ('the invitation')." Exec. Order No. GA-41, Governor of State of Texas, at 1 (July 7, 2022).[9]

Tellingly, just hours after taking the oath of office, President Biden (1) signed an executive order revoking the prior administration's "Enhancing Public Safety in the Interior of the United States" executive order, thereby massively limiting interior immigration enforcement in states such as Oklahoma; (2) terminated the construction of the southern border wall upon "determin[ing] that the declaration of a national emergency at our southern border … was unwarranted"; and (3) authorized the Department of Homeland Security to

---

[8] *Available at* https://perma.cc/6K36-YZ3K.

[9] *Available at* https://perma.cc/WJH4-V3RB.

impose an immediate 100-day moratorium on most deportations. *See* Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021); Proclamation No. 10142, Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 20, 2021); Memorandum from DHS Acting Secretary David Pekoske on Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities (Jan. 20, 2021). These actions—or, more accurately, refusals to act—have epitomized this Administration's disastrous hands-off policy.

Perhaps reality is finally sinking in. A scant two weeks after the United States filed this lawsuit, President Biden issued an executive proclamation suspending the "entry of any noncitizen into the United States across the southern border" and limiting access to asylum. THE WHITE HOUSE, A Proclamation on Securing the Border (June 4, 2024).[10] The proclamation is noteworthy for its searing depiction of the federal immigration system over which the federal executive presides, and which this lawsuit seeks to enthrone at the expense of Oklahoma's own on-the-ground solutions. According to President Biden, the federal immigration system is not just "simply broken—and not equipped to meet current needs," but also "under-resourced" and plagued by "outdated laws and inadequate resources." *Id.* The federal immigration statutes themselves are "outdated and inadequate." *Id.* And the system in general "has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims."

---

[10] *Available at* https://perma.cc/785C-72KE.

*Id.* Meanwhile, the United States persists in castigating Oklahoma for pursuing constitutionally permissible ways to protect itself in an admittedly broken system.

The Oklahoma Legislature has enacted one such way with HB 4156. In the most basic terms, HB 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry. It contains two principal provisions. First, an alien commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." HB 4156, § 2(B) (codified at OKLA. STAT. tit. 21, § 1795(B)). A violation of this provision is a misdemeanor punishable by imprisonment for up to one year, or by a fine of up to $500, or both. *Id.* § 2(C)(1) (codified at OKLA. STAT. tit. 21, § 1795(C)(1)). Under this provision, any unlawfully present noncitizen "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Second, HB 4156 makes it a crime for an alien to "enter[], attempt[] to enter, or ... at any time [be] found in Oklahoma" if he or she has previously been "denied admission, excluded, deported, or removed" or has "departed the United States while an order of exclusion, deportation, or removal is outstanding." *Id.* § 2(D) (codified at OKLA. STAT. tit. 21, § 1795(D)). This provision has two exceptions. It does not apply to an alien (1) if "prior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission," or (2) if the alien was "previously denied admission and removed" and "such alien established that he or she was not required to obtain such advance consent under" HB 4156's Section 2 or "any prior

statute." *Id.* A violation of this provision is a felony punishable by imprisonment for up to two years, or by a fine of not more than $1,000. *Id.* § 2(C)(2) (codified at OKLA. STAT. tit. 21, § 1795(C)(2)). Under this provision, like the first, the unlawfully present alien "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* Neither provision requires Oklahoma to deport anyone to a foreign country, *contra Padres Unidos* Mot. at 14 ("states have no business deporting people"), nor do they even require those unlawfully present to leave the country. If another state wishes to open its doors to aliens who are present in our country in stark violation of federal law, they may do so; the convicted individuals just cannot remain in Oklahoma.

Importantly, HB 4156 provides an affirmative defense to prosecution if (1) "[t]he federal government has granted the defendant ... lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code," or (2) "[t]he defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021." HB 4156, § 2(F) (codified at OKLA. STAT. tit. 21, § 1795(F)). In other words, if the alien's conduct does not violate federal illegal-entry or illegal-reentry statutes, or if the federal government has granted the alien lawful presence or asylum in the United States, then HB 4156 plainly disallows a state-law prosecution in Oklahoma. In the meantime, nothing in HB 4156 prevents—or even purports to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law.

On May 21, 2024, the United States filed suit against the State of Oklahoma, along with J. Kevin Stitt, in his official capacity as Governor of Oklahoma; Gentner Drummond, in his official capacity as Attorney General of Oklahoma; the Oklahoma Department of Public

Safety; and Tim Tipton, in his official capacity as Commissioner of the Oklahoma Department of Public Safety. On May 23, 2024, Padres Unidos de Tulsa and four private individuals (collectively, the *Padres Unidos* Plaintiffs) filed suit against Attorney General Drummond and Commissioner Tipton, in their official capacities, in *Padres Unidos de Tulsa v. Drummond*, No. 5:24-cv-526 (W.D. Okla.). The *Padres Unidos* Plaintiffs also sued Vicki Behenna and Steve Kunzweiler in their official capacities as the District Attorneys of Oklahoma and Tulsa Counties, respectively. The United States filed a motion for preliminary or permanent injunction on May 22, 2024. Doc. 4. The *Padres Unidos* Plaintiffs filed a motion for preliminary injunction on May 24, 2024. Doc. 15 in *Padres Unidos*. On Defendants' unopposed motion, the Court consolidated the two cases on June 5, 2024.

Both the United States and the *Padres Unidos* Plaintiffs broadly argue on Supremacy Clause grounds that federal immigration law preempts HB 4156 in its entirety. They also maintain that HB 4156 violates the dormant Foreign Commerce Clause's purported prohibition on state regulation of illegal entry and reentry. For the reasons explained below, both arguments fail. Moreover, in response to Plaintiffs' assertions and affiants, Oklahoma offers the testimony of three current and former public officials on the state, national, and international implications of HB 4156: (1) Donnie Anderson, Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control; (2) Rodney S. Scott, Former Chief, U.S. Border Patrol, of U.S. Customs and Border Protection; and (3) Christopher Landau, former United States Ambassador to Mexico. Their statements, along with the sworn congressional testimony of Attorney General Drummond, Exhibit 1, rebut in detail many of the claims made in the respective motions for a preliminary injunction. Those motions should be denied.

## STANDARD OF DECISION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To earn a preliminary injunction, a plaintiff must show (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Any successful plaintiff's "right to relief" must be demonstrably "clear and unequivocal." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quotations omitted); *see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."). And because it is "an extraordinary and drastic remedy," a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" as to each element. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted). Even if a movant manages to satisfy each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). Put simply, granting a preliminary injunction is "the exception rather than the rule." *Id.* at 797 (quotation omitted). In addition, a permanent injunction, as demanded by the United States, "requires showing actual success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

**ARGUMENT**

I. **Plaintiffs are not likely to succeed in showing that HB 4156 is unconstitutional when it merely complements federal law.**

To prevail on a facial challenge, in a context such as this, a plaintiff must normally show "that no set of circumstances exists under which" the challenged statute can be constitutionally applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To start, HB 4156 is not facially preempted because a state law that essentially duplicates federal law does not "conflict" with that law—it comports with it. Likewise, no provision of HB 4156 is field preempted: the Supreme Court has never recognized "exclusive" federal authority over all laws touching on immigration. Oklahoma, like any other state exercising police power, may exclude aliens who violate federal standards.

In addition, HB 4156 does not offend the Foreign Commerce Clause, "dormant" or otherwise. No one contends that Oklahoma's law has anything to do with impermissible economic protectionism—the vice with which the Founders were concerned in relation to interstate-commerce restrictions. The activity regulated by HB 4156 is the *illegal* trespassing by, and trafficking in, human beings and contraband. Oklahoma's valid exercise of its constitutional police power in excluding unlawfully present persons from its territory neither violates federal law nor endangers the national interest.

Finally, the claims of Plaintiffs founder on the shoals of standing and justiciability. The Supremacy Clause does not provide an independent cause of action, either for the United States, for an organizational plaintiff, or for a private individual. And the *Padres Unidos* Plaintiffs lack standing to bring this lawsuit because a contrary ruling would not change their lawful or unlawful status under federal law. Plaintiffs, that is, cannot rely on any alleged illegal

12

presence to attain standing. Because Plaintiffs cannot establish the likelihood that HB 4156 is

unconstitutional in *all* its applications, the Court must decline to enjoin the law.

**A.     HB 4156 is not preempted because it readily comports—rather than conflicts—with federal immigration laws.**

Let us begin with first principles: "Federalism, central to the constitutional design,

adopts the principle that both the National and State Governments have elements of

sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398. Under the Supremacy

Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST.

art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract

from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Any implied preemption,

therefore, "start[s] with the assumption that the historic police powers of the States were not

to be superseded ... unless that was the clear and manifest purpose of Congress." *Rice v. Santa*

*Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "Invoking some brooding federal interest or

appealing to a judicial policy preference should never be enough to win preemption of a state

law ...." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., joined by Thomas

and Kavanaugh, JJ.). Stated more pointedly, whether express or implied, the "preemption of

state laws represents a serious intrusion into state sovereignty." *Id.* at 773 (cleaned up).

Such intrusion is unwarranted in this case. To begin, no provision of HB 4156 is

conflict-preempted by federal law. Conflict preemption exists only where it is "impossib[le]"

to comply with both state and federal law, or where state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567

U.S. at 399 (quotations omitted). This is a high hurdle. "In all cases," the purported "conflict

with state law must stem from either the Constitution itself or a valid statute enacted by

13

Congress." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). It is not enough to say that "a state statute is in tension with federal objectives." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quotation omitted). And "there is no federal preemption *in vacuo*"—that is, "without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas*, 589 U.S. at 202 (quotation omitted); *see also Whiting*, 563 U.S. at 607 (a "freewheeling judicial inquiry" is an insufficient method for finding preemption). Supreme Court precedent makes it clear that "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and in the judgment). Federal law preempts state law only when the two stand in irreconcilable contradiction.

Here, Plaintiffs have not demonstrated that HB 4156 contradicts federal law; quite the contrary, the United States has nearly admitted the opposite. HB 4156, the government concedes, "tracks the federal unlawful-entry provision," U.S. Mot. at 7, which generally bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers," 8 U.S.C. § 1325(a). Federally, any alien who commits this crime of illegal entry "shall"—not "may"—be fined up to $5,000, imprisoned for up to 6 months, or both. *Id.* (referencing penalties in 18 U.S.C. §§ 3559(a)(7), 3571(b)(6)).

Congress has also criminalized reentry by aliens who have been "denied admission," have been involuntarily "removed," or have departed the country "while an order of exclusion, deportation, or removal is outstanding." 8 U.S.C. § 1326(a). Federally, an alien who illegally reenters "shall"—not "may"—be imprisoned up to two years, fined $250,000, or both. *Id.* (referencing penalty provisions under 18 U.S.C. §§ 3559(a)(5), 3571(b)(3)). Aliens with certain

14

aggravating factors may face harsher penalties. 8 U.S.C. § 1326(b). Yet again, the United States concedes that HB 4156 "effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a)." U.S. Mot. at 8. Further, Congress has directed immigration officers to "order ... removed from the United States without further hearing or review" an alien who lacks a "valid entry document." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7)(A)(i)(I). In lieu of removal proceedings, an alien may agree to a "stipulated order" of removal or "voluntarily to depart the United States." *Id.* §§ 1229a(d), 1229c(a)(1). The failure to comply with these requirements constitutes a felony. *Id.* § 1253(a)(1); 18 U.S.C. § 3559(a)(5). The text of HB 4156 neither contradicts nor conflicts with any of this, nor with any other portion of federal law. HB 4156 simply mirrors these provisions.

The federal government may adopt state laws for federal-law purposes. *See, e.g.*, *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881, 1887–88 (2019). And state governments may adopt federal law for state-law purposes. *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325, 331 (1920). "[T]here can by definition be no conflict" between the laws of two sovereigns where state law "trace[s] the federal law." *Whiting*, 563 U.S. at 601–02; *see also Arizona*, 567 U.S. at 429 (Scalia, J., concurring in part and dissenting in part) ("It is beyond question that a State may make violation of federal law a violation of state law as well. We have held that to be so even when the interest protected is a distinctively federal interest ...."). Indeed, "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap." *Kansas*, 589 U.S. at 212. More specifically here, except in matters of alien registration, the Supreme Court has never held that state laws that overlap with federal criminal immigration statutes are impermissible. *See*

*Arizona*, 567 U.S. at 402 (concluding that the federal government fully occupied the "field of alien registration"); *accord Kansas*, 589 U.S. at 210 ("In *Arizona*, ... we held that federal immigration law occupied the field of alien registration. 'Federal law,' we observed, 'makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.'") (quoting *Arizona*, 567 U.S. at 401–02) (internal citations omitted)). *Arizona*, that is, provides a narrow exception to the general rule that state and federal criminal laws can readily coexist.

As a practical matter, it is worth observing that the effective implementation of HB 4156 will likely require meaningful cooperation with federal authorities. Oklahoma would have to prove, after all, that an individual lacks legal immigration status, which is difficult to do without consulting the federal government. *See* Ex. 2, Anderson ¶ 8. This is not unusual. As Plaintiffs themselves observe, multiple sections of the federal immigration statutes call for State–federal cooperation in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(T)(i)(iii)(aa), 1101(a)(15)(U)(iii), 1324(c), 1357(g)(1)–(10); 18 U.S.C. § 758; 22 U.S.C. § 7105(c)(3)(C)(i). That is to say, the "federal scheme" "leaves room" for enforcement of a state law like HB 4156, much as it did "for a policy requiring state officials to contact ICE as a routine matter." *Arizona*, 567 U.S. at 412–13 (citing *Whiting*, 563 U.S. at 609–10).

Federal law also expressly permits state officials to "'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Arizona*, 567 U.S. at 411–12 (quoting 8 U.S.C. § 1357(g)(10)(A)). They do so regularly. *See* Exhibit 3, Decl. of Rodney Scott, ¶ 12 ("in all prior administrations, DHS, and specifically [ICE Enforcement

16

and Removal Operations Branch], actively encouraged assistance from local law enforcement"). Along the same lines, "Congress has made clear that no formal agreement or special training needs to be in place" for state officers to communicate with the federal government about immigration status. *Arizona*, 567 U.S. at 411–12. In sum, under HB 4156, "Oklahoma law enforcement would be aiding ICE by helping clear their Fugitive Docket and reducing the demand on [enforcement] resources." Ex. 3, Scott ¶ 10.

In other words, HB 4156 comports and harmonizes with federal law; it does not conflict with or obstruct its application. "[T]here are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors." *Kansas*, 589 U.S. at 212. "[I]n the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* HB 4156 does not criminalize under Oklahoma law anything that is not already criminal under federal law. It is no obstacle to federal law to make the violation of federal criminal immigration law a companionate crime in Oklahoma. "To hold otherwise would be to ignore the teaching of [Supreme Court] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). It would also turn the states into little more than federal provinces or vassals, unable to do anything to protect their citizens from lawless intrusions, or even to pick up the slack should the federal government abandon its duty to enforce federal law.

To be sure, Plaintiffs claim there are "multiple 'inconsistenc[ies] between' H.B. 4156's entry and reentry crimes 'and federal law.'" *Padres Unidos* Mot. at 16 n.3 (citation omitted). But the only real difference specified is a six-month increase in the maximum punishment

permissible, *see id.*, and they cite no case indicating that such a minor difference in criminal-law punishments creates a "conflict" of any significance. *See, e.g.*, U.S. Mot. at 18 (relying solely on a civil law case on "remedies"). Regardless, if a minor difference in potential punishment stands as the only impediment to HB 4156's validity, then the Legislature can easily amend the statute during its next session. Defendants doubt Plaintiffs would find that satisfactory.

In truth, the only "obstacle" raised by HB 4156 is political, rather than legal—and therefore is not a valid basis for granting a preliminary injunction. The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for HB 4156 comprehensible. Indeed, the United States and its witnesses repeatedly make it plain that they have subordinated the enforcement of clear federal law to the whims of foreign governments. *See, e.g.*, U.S. Mot. Ex. 1, Jacobstein Decl. ¶ 6 ("This federal law must be employed with sensitivity to the spectrum of foreign relations interests …."). Given the admitted resemblance between HB 4156 and federal law, Defendants' claim that "HB 4156 would harm the United States' relationship with foreign nations … in multiple ways" and "antagonize foreign governments," U.S. Mot. at 22, can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has enacted because foreign governments will get angry. That is the only way its staunch opposition to HB 4156 makes any sense. If the United States were enforcing the law as it should be, it would have no problem with what Oklahoma is doing, in the same way that the United States has no problem with both the state and federal governments prosecuting fraud, murder, or bank robberies.

18

Tellingly, the United States concedes that "Oklahoma remains free to enforce its generally applicable criminal laws that prohibit drug, sex, or labor trafficking, *which apply to citizens and noncitizens alike.*" U.S. Mot. at 24 (emphasis added). Plainly so: "The mere fact that state laws like the [] provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Id.* at 212. The United States has no choice but concede this point, because it knows that states regulate and prosecute unlawfully present individuals *all the time.* They do so whenever those persons are found in violation of other criminal laws within the jurisdiction. "For instance, the Oklahoma Department of Corrections reports that it currently houses nearly 500 illegal immigrants convicted of state crimes." Ex. 1, Drummond at 3–4; *see also, e.g.*, Ex. 3, Scott ¶ 12 ("It is important to note that having [an illegal alien] ... end up in local law enforcement custody is a regular occurrence around the country and there are already [ICE Enforcement and Removal Operations Branch] processes in place to handle such events."); Ex. 2, Anderson ¶ 8 (noting that Oklahoma Bureau of Narcotics "has no independent mechanism to confirm the legal status of an individual in the United States" and therefore "rel[ies] on federal law enforcement ... to determine legal status, especially in investigations of alleged human trafficking"). "Put differently, HB 4156 does not appear ... designed to operate in opposition to the federal government, but in some form of collaboration with it." Ex. 3, Anderson ¶ 8.

What the United States fails to acknowledge, however, is that Plaintiffs' arguments, if taken to their logical conclusion, would invariably undermine those everyday law enforcement

actions as well, essentially rendering illegal immigrants untouchable by state law. Nothing in Plaintiffs' rationale, that is, can somehow be limited to protecting immigrants from their violations of immigration laws only. Take an illegal immigrant who is arrested in Oklahoma for trespassing on private property. Would that immigrant's arrest and prosecution not risk angering a foreign government just as much as arresting and prosecuting him for unlawfully entering Oklahoma in general? If not, why not? Why can an illegal immigrant be prosecuted by Oklahoma for trespassing on, say, a 50,000-acre private farm but not for essentially trespassing in the State as a whole? And why would a State's initiating the former prosecution not infringe upon or upset the federal government's supposedly carefully crafted and discretionary law enforcement approach in dealing with illegal immigrants? We are not told. The answer to all this, of course, is that enforcing laws like HB 4156 would *not* actually change the way things currently work. Oklahoma and the United States would collaborate just as they currently do when an illegal immigrant is prosecuted for theft, murder, or a violation of countless other statutes that the United States would not dream of claiming are preempted.

In the end, the "Supremacy Clause gives priority to 'the laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting U.S. CONST. art. VI, cl. 2). That is to say, the United States cannot create conflict preemption with state laws that duplicate federal law by claiming it has the discretion not to enforce laws that Congress has passed. This is especially so when the federal statutes in question are phrased mandatorily—they both *require* ("shall") punishment for these offenses. *See* 8 U.S.C. §§ 1325(a), 1326(a). Plaintiffs have failed to show conflict preemption here.

**B.      No part of HB 4156 is field preempted.**

Nothing less than an "unambiguous congressional mandate" will support a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Only "[i]n rare cases" has the Supreme Court held "that Congress has 'legislated so comprehensively' in a particular field that it 'left no room for supplementary legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted). This is not such a case. Oklahoma does not dispute that the federal government has broad power to regulate immigration. Federal immigration law controls "who should or should not be admitted into the country, and conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404, and *Kansas*, 589 U.S. at 195. But the Supreme Court "has never held that every state enactment which in any way deals with aliens" is "pre-empted by this constitutional power, whether latent or exercised." *DeCanas*, 424 U.S. at 355. The Court has also never "conclude[d] that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982).

Contrary to Plaintiffs' assertions, the federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration. In *Arizona*, the Court stated that the government "has occupied the field of alien registration," and then it proceeded to interpret the other challenged Arizona law sections using a conflict-preemption analysis. *Arizona*, 567 U.S. at 401, 403–13; *see also Kansas*, 589 U.S. at 210 (rejecting argument that *Arizona* requires broad application of immigration field preemption). The fact that the federal

government possesses exclusive power to admit and naturalize aliens does not deprive states of their concurrent and complementary power to take action against aliens who then violate federal standards. Indeed, the Supreme Court has expressly recognized that "the States do have some authority to act with respect to illegal aliens, **at least where such action mirrors federal objectives and furthers a legitimate state goal**." *Plyler*, 457 U.S. at 225 (emphasis added). Both are true here, which eliminates the possibility that Oklahoma is field preempted.

Indisputably, the "central concern" of the Immigration and Nationality Act "is with the terms and conditions of admission to the country and the subsequent treatment of aliens *lawfully* in the country." *DeCanas*, 424 U.S. at 359 (emphasis added). Oklahoma's HB 4156 does not punish aliens lawfully present in the country; instead, it expressly *protects* them. *See* HB 4156, § 1(A) ("it is a compelling public interest of this state to protect its … lawfully present visitors"). HB 4156's criminal provisions deal solely with the alien who is both *unlawfully* present in the country *and subsequently found in Oklahoma*. Federal immigration law expressly anticipates and acknowledges state authority and involvement in this field. *See, e.g.*, 18 U.S.C. § 758 (making it a crime for alien to "flee[]" from "State[] or local law enforcement" around immigration checkpoints); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) (contemplating "State[] or local investigation or prosecution" of illegal trafficking); *id.* § 1101(a)(15)(U)(iii) (state and local criminal laws can include trafficking); *id.* § 1324(c) (State law enforcement granted authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. § 7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking").

HB 4156 does not intrude on a clearly preempted "field"—an area that courts have narrowly and carefully defined. A court "will not presume that Congress, in enacting the

[Immigration and Nationality Act], intended to oust state authority to regulate ... in a manner consistent with pertinent federal laws." *DeCanas*, 424 U.S. at 357. Even if this Court were to define the field more broadly, state law should not be impliedly preempted unless the federal government is actually occupying the field in question. Given the ongoing, unprecedented, and unabated border crisis, it is difficult to conclude anything other than that the federal government is "obviously derelict in enforcing" its "statutory obligations." *Texas*, 2023 WL 8285223, at *14; *see also Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023) (likening the current administration's actions to "posting a flashing 'Come In, We're Open' sign on the southern border"). The federal executive is entrusted to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. As a matter of equity and law, the federal government should not be allowed to invoke field preemption when it has abandoned the field and failed to "take Care" that basic immigration laws are enforced.

Moreover, Plaintiffs' overheated rhetoric notwithstanding, HB 4156 does not interfere with the United States's foreign relations in any coherent or meaningful way. "Every foreign government that negotiates with the United States understands, or should understand, that the Executive Branch of the Federal Government does not dictate all law and policy in this country." Ex. 4, Decl. of Christopher Landau, ¶ 5. Enforcing an illegal alien's compliance with bedrock federal law should have no bearing on relations with other countries, as those other countries have no "right" to insert their citizens into the United State illegally. *Compare* U.S. Mot. Ex. 1, Jacobstein ¶ 12 (indicating that laws like HB 4156 negatively affect "rights"), *with* Ex. 4, Landau ¶ 7 (explaining that a foreign country's "displeasure with federal and state laws and policies" has no "legal force to invalidate any law or policy that was otherwise duly

enacted").  In short, HB 4156 permissibly "mirrors federal objectives and furthers a legitimate state goal." *Plyler*, 457 U.S. at 225. HB 4156 thus avoids *Arizona*'s proscription on a state's entry into "an area the Federal Government has reserved for itself." 567 U.S. at 402.[11] Accordingly, Oklahoma's law permissibly adjoins the field of federal immigration law as valid—and necessary—supplementary legislation.

Plaintiffs' other arguments do not affect this conclusion. For example, the *Padres Unidos* Plaintiffs claim HB 4156 "would effectively banish a large set of immigrants from the State." *Padres Unidos* Mot. at 12. Granted, "a state's decision to impose 'distinct, unusual and extraordinary burdens and obligations upon aliens' *may* constitute an impermissible intrusion into the federal domain." *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (emphasis added) (citation omitted). But HB 4156 does not deviate from federal law in any novel fashion. Whatever "set of immigrants" is "banish[ed]" from the State will be those whom federal law has deemed banish-able, and not those "lawfully present." HB 4156, § 1(A). And if that number is "large," then it only shows that federal law is currently being violated with impunity and on a massive scale, *in Oklahoma*. Plaintiffs' argument collapses on itself.

The *Padres Unidos* Plaintiffs also claim that Oklahoma threatens thousands of illegal aliens "whom the federal government *may* grant lawful status, permanent residence, and citizenship" at some later time. *Padres Unidos* Mot. at 13 (emphasis added). The contention is purely speculative, and certainly not worthy of facial relief. Oklahoma should not be expected

---

[11] To the extent that *Arizona* sweeps as broadly as the Plaintiffs claim, then the decision should be revisited and overruled by the Supreme Court. In the twelve years since *Arizona*, the illegal-migration crisis has grown ever more unmanageable for the states and ever more threatening to state sovereignty.  And "*stare decisis* isn't supposed to be the art of methodically ignoring what everyone knows to be true."  *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020).

to stand idly in deference to hypothetical decisions about an individual's citizenship status that will likely take years to resolve. Either someone has permission to be here, or they do not. The Court should also discount Plaintiffs' gibe that complementary state legislation like Oklahoma's will lead to "a chaotic patchwork of 50 separate immigration systems." *Id.* at 14. "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory ... without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *see also* U.S. CONST. amend. X. Moreover, President Biden himself has admitted that the current system is "broken" and in "crisis." *See supra* pp.1–2. Maybe the United States should pay more attention to the current chaos that is of its own making, and not worry about states handling basic criminal law like they have done for hundreds of years.

## C.  The Foreign Commerce Clause does not prohibit states from criminalizing those immigrants who are illegally present because the regulated conduct is illegal and entirely unrelated to foreign commerce.

Oklahoma is a sovereign entity. It has the power to exclude unlawfully present persons from its territory, subject to the limitations of the U.S. Constitution and applicable federal law. The power predates the Constitution itself, and "the Constitution did not strip states of that authority." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part and dissenting in part). In this litigation, Plaintiffs contend that HB 4156 is unconstitutional because it allegedly interferes with the United States's power to regulate foreign commerce. This argument relies on a spectacularly overbroad interpretation of dormant Commerce Clause jurisprudence. Plaintiffs never convincingly explain how a state law that prohibits illegal entry and presence will

negatively impact (or at all affect) international commerce. The reason for their omission is obvious: by its very nature, illegal immigration is not legitimate international commerce.

Historically, the primary function of the dormant Foreign Commerce Clause dealt with the taxation or regulation of entities transporting immigrants to the United States, not regulation of the immigrants themselves. Early on, the Supreme Court identified a difference between the regulation of people as commerce, and the regulation of people as an extension of that state's police power. *See Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837). *Miln* involved a state immigration statute that required each immigrant arriving at the Port of New York to be listed in a written report to the mayor; the master of the ship would be fined for each unreported immigrant brought into port. *Id.* at 130–32. The Court upheld the statute as "a regulation, ***not of commerce***, but police." *Id.* at 132 (emphasis added).

The Supreme Court has explained that "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). A state statute is valid, even if it places a burden on foreign commerce, unless the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). States are allowed to regulate local matters, and this includes commerce. *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945) ("Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation."); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (stating that nondiscriminatory tax, when applied to imported goods, did not impact federal government's

26

regulation of foreign commerce). Here, Oklahoma's interest far outweighs any potential burden that may be placed on foreign commerce even when viewed through a purely economic lens.

Again, the purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (stating that "economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). And at root, HB 4156 "is not about economic protectionism; it is about unlawful immigration." *United States v. Texas*, 97 F.4th 268, 332 (5th Cir. 2024) (Oldham, J., dissenting). In other words, the law is an expression of a state's retained police power to punish those who are within its borders illegally, much in the same way that a state could punish an illegal immigrant for trespassing on the property of a private citizen. And the state may properly deploy its police power to take something undeniably illegal under federal law and criminalize the same act under state law—especially when doing so "protect[s] and enhance[s]" the "essential rights ... of its citizens, authorized residents, and lawfully present visitors." HB 4156, § 1(A). The fact that these actions are criminal under federal law makes it impossible for a dormant Foreign Commerce Clause violation to exist. Nothing is dormant: Congress has spoken, and it has outlawed the behavior.

To be sure, the United States has alleged it will suffer harm should HB 4156 go into effect. Specifically, it complains that Oklahoma's legislation will "antagonize foreign governments," "undermine long-term strategic partnerships," and "expose United States

citizens abroad to reciprocal and retaliatory treatment." U.S. Mot. at 22. But the United States's allegations of harm do not revolve around *commercial* harm, presumably because HB 4156 does not discriminate against foreign commerce. Ultimately, any burden the United States (or any foreign nation) may have due to HB 4156 does not involve commerce and cannot outweigh Oklahoma's interest in public safety.

Separately, the *Padres Unidos* Plaintiffs allege they will be harmed because HB 4156 might impede their free movement into and out of Oklahoma—in their view, a forbidden act of interference with interstate commerce. For this claim, they principally rely on *Edwards v. California*, 314 U.S. 160 (1941). The Court in *Edwards* invalidated a California statute that prohibited "bringing into the State any indigent person who is not a resident of the State," *id.* at 171, holding that such was "an unconstitutional burden upon interstate commerce," *id.* at 177. The Court's reasoning was straightforward: amid the Dust Bowl and the Great Depression, no "single State [could] isolate itself from difficulties common to all of them." *Id.* at 173; *cf. City of Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978) (disclaiming, in a case about waste disposal, an "attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate *trade*") (emphasis added).

In discussing *Edwards*, the *Padres Unidos* Plaintiffs omit the critical fact that the person California sought to exclude was "a citizen of the United States and a resident of Texas." *Id.* at 170. "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all *citizens* be free to travel throughout the length and breadth of our land ...." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (emphasis added). Nothing in the Court's decision suggests—and the Court likely would have been astounded to contemplate—that a

28

noncitizen unlawfully in the country could enjoy unfettered freedom of movement across state lines without any objection from the affected states.

The case of *Japan Line v. County of Los Angeles*, 441 U.S. 434 (1979), is similarly instructive. There, a shipping company was temporarily holding its shipping containers in California. *Id.* at 436–37. The shipping containers were owned by a Japanese company and taxed as property in Japan. *Id.* at 436. California enacted an ad valorem tax against Japan Line's containers. *Id.* at 437. The Supreme Court found the tax unconstitutional because it subjected Japan Line to multiple taxation and violated the United States's ability to "speak with one voice" regarding foreign commerce. *Id.* at 449 (quotation omitted). Here, the bulk of the United States's argument centers on the claim that HB 4156 inhibits it from speaking with one voice on foreign *affairs*, not commerce. Specifically, it alleges that Oklahoma "disrupt[s] the uniform immigration laws and prevent[s] the federal government from conveying a unified message in sensitive area of foreign affairs." U.S. Mot. at 21. *Japan Line* confirms that the sole concern of the Foreign Commerce Clause is commercial relations. *See id.* at 448 (discussing the importance of "the Federal Government [] speaking with one voice when regulating commercial relations with foreign governments).

## D. Oklahoma is constitutionally entitled to defend itself against invasion when the federal government abdicates its own duties.

Even if HB 4156 somehow offends federal immigration law or the Commerce Clause, Oklahoma still retains an inherent, sovereign power of self-defense against invasion. *See* U.S. CONST. art. I, § 10, cl. 3 (States may respond when "actually invaded"). Upon entering the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean,

J.). Today, Oklahoma is in the throes of a crisis, while the federal government oscillates between neglectful indifference and outright antagonism. This is evidenced by the present lawsuit where the United States is protesting an Oklahoma law reflecting Congress's express priorities even while admitting our immigration system is "broken." *See supra* pp.1–3, 7–8. Oklahoma daily faces a veritable deluge of illegal immigration and criminality: desperate human beings, deadly weapons, dangerous drugs, etc. *See* Ex. 1, Drummond at 2–3. It is not hyperbole to call it an invasion when, as noted above, a population the size of Utah and Iowa has been added to our country in just three years. *See supra* p.2. And it does not violate the Constitution when a state takes steps to repel the invasion. States "may guard against the introduction of anything which may ... endanger the health or lives of their citizens." *Id.*

**E.      All Plaintiffs' claims are nonjusticiable.**

Axiomatically, a plaintiff must show it has a cause of action before it can demonstrate any likelihood of success. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). In this action, both the United States and the *Padres Unidos* Plaintiffs have brought nonjusticiable claims that bar an award of relief from this Court.

To be sure, the government "may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *U.S. v. California.*, 655 F.2d 914, 918 (9th Cir. 1980). And "[f]ederal courts are courts of limited jurisdiction possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251 (2013) (cleaned up). Further, equitable relief must be "grounded in traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

The United States points to neither a specific statutory authority nor a traditional equitable principle that would allow its claims to go forward. Rather, it relies on the Supremacy Clause, U.S. CONST. art. VI, cl. 2, and the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, for its claims against Oklahoma. *See* Doc. 1, ¶¶ 33–43 (Supremacy Clause-based preemption claims); ¶¶ 44–48 (Foreign Commerce Clause). But the Supremacy Clause does not confer a cause of action. "[T]he Supremacy Clause is not the source of any federal rights," and it "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. In other words, it "creates a rule of decision" only. *Id.* at 324.

The Supremacy Clause does not "give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." *Id.* at 325. The same rule holds true when a party other than the United States is the plaintiff: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). For similar reasons, any claim predicated on Congress's "dormant" Foreign Commerce Clause must also fail because a supposedly dormant power necessarily implies the lack of a positive exercise of congressional authority in creating a cause of action.

Additionally, Padres Unidos de Tulsa (as organizational plaintiff) and the four individual plaintiffs have fallen short of a clear showing that they have the standing necessary to obtain a preliminary injunction. "[A]t the preliminary injunction stage, [plaintiffs] must make a clear showing that they have standing." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring in part and dissenting in part) (cleaned

up). In a facial pre-enforcement challenge—as here—the *Padres Unidos* Plaintiffs must also show an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "[T]he plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). The alleged "threatened injury must be certainly impending and not merely speculative." *Id.* (cleaned up); *see also Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007) ("In a plea for injunctive relief, a plaintiff cannot maintain standing by asserting an injury based merely on subjective apprehensions that the defendant might act unlawfully.") (cleaned up); *Younger v. Harris*, 401 U.S. 37, 42 (1971) (it is not enough for plaintiffs to allege that they "fe[lt] inhibited" by a law).

To be sure, "organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Padres Unidos de Tulsa has attempted to do so here. A membership organization has standing to bring suit if, in pertinent part, "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). A dilemma, however, is threaded throughout the *Padres Unidos* filings. In sum, the named individuals and affiants are either openly present in violation of federal law, meaning they are asking this Court to facilitate their illegality, or they are here in compliance with federal law, and thus HB 4156 cannot touch them. Either way, they lack standing. As for the first category, "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative &*

*Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc). That is precisely what is happening here. To the extent that any Plaintiffs are admitting they are here unlawfully under federal law, a ruling in their favor will *not* eliminate their unlawfulness, as is the typical case with a plaintiff challenging a law. Rather, they are complaining that Oklahoma's actions will make their "criminal activity more difficult" because—unlike the federal government—they believe Oklahoma may actually prosecute them. This cannot be a ground for standing, as this Court should not use its equitable powers to elude and undermine federal law. *See, e.g.*, *Original Invs., LLC v. Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021) ("[D]efendants argue that the court should not use its equitable power to facilitate conduct that is illegal under federal law. The court agrees."). As for the second possibility, that one or more of the Plaintiffs are here with express federal permission, that would preclude the enforcement of HB 4156.

In any event, Plaintiffs' assertions are speculative. HB 4156 does not become effective until July 1, 2024. Baseless assumptions about how a law might be enforced are insufficient to show actual, imminent harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (for standing, "an injury must be concrete, particularized, and actual or imminent") (cleaned up). It would be premature and inappropriate to enjoin HB 4156 "before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives." *Arizona*, 567 U.S. at 416.

## II.    The remaining factors weigh against granting an injunction.

This is pre-enforcement challenge to a law that will not go into effect until July 1, 2024. No harm has been inflicted on any of the Plaintiffs, who have also failed to demonstrate a

likelihood of success on the merits. This fact alone is fatal to their motions. The remaining factors, however, also weigh against granting a preliminary injunction.

Plaintiffs do not face irreparable harm. It could not possibly cause "irreparable harm" to the United States if Oklahoma—a separate sovereign—chooses to enforce a state law that is consistent and congruent with the laws of the United States. *Cf. Original Invs.*, 542 F. Supp. 3d at 1237 ("This Court is bound to follow the law as written and may not depart therefrom based on enforcement decisions made by the executive branch." (citation omitted)). Nor does it suffice to suggest that HB 4156 will hurt the United States' relationship with Mexico. As a former ambassador to Mexico testifies here: "Disagreements between nations are not inimical to diplomacy; they are the very predicate for diplomacy." Ex. 4, Landau ¶ 7. At any rate, the Mexican government's views (or that of any other foreign nation) on the wisdom of HB 4156 should carry no legal weight in this Court's analysis of this case. *See id.* ¶ 6.

The third and fourth factors—"harm to the opposing party and weighing the public interest"—"merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the equities favor Oklahoma because Oklahoma's hardship is greater. The State has a manifest and inviolate interest in addressing the ongoing border crisis. Oklahoma will suffer irreparable harm if its officials are enjoined from acting to protect those who are lawfully within State borders from those who are not. *See New York v. New Jersey*, 598 U.S. 218, 225 (2023) (describing "a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders"); HB 4156, § 1(A) ("protecting the health, safety, welfare, and constitutional rights of its citizens, authorized residents, and lawfully present visitors is of utmost importance"). And the unlawful activity associated with

illegal immigration harms everyone in Oklahoma, citizen and alien alike. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977) (underscoring importance of "the State's interest in the enforcement of its criminal laws"). An injunction is not in the public interest.

Finally, Oklahoma respectfully emphasizes that its statutory enactments are presumed constitutional. *E.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[W]e give all statutes a presumption of constitutionality ...."); *Liddell v. Heavner*, 180 P.3d 1191, 1200 (Okla. 2008) (court presumes that "the Legislature conducts its business with due regard for the framers' and people's intent," and therefore a "statute will be presumed to conform to the state and federal Constitutions and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution"). Furthermore, "a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). A court should "prefer ... to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact."[12] *Id.* at 328–29 (citations omitted). Plaintiffs have not shown that they are likely to prevail on their claims. If the Court should find otherwise, then it should tailor a narrow remedy and sever only the provisions held invalid instead of preliminarily enjoining HB 4156 in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should deny the motions for a preliminary injunction. *A fortiori*, the Court should also deny the request for a permanent injunction.

---

[12] Moreover, Oklahoma statutes are presumed to be severable. OKLA. STAT. tit. 75, § 11a; *see Panhandle E. Pipeline Co. v. State ex rel. Comm'rs of Land Office*, 83 F.3d 1219, 1229 (10th Cir. 1996) ("The severability of a statute is an issue of state law.").

Respectfully Submitted,

*s/ Garry M. Gaskins, II*

GARRY M. GASKINS, II, OBA 20212
   *Solicitor General*
ZACH WEST, OBA 30768
   *Director of Special Litigation*
CULLEN D. SWEENEY, OBA 30269
   *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants*