## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No. CIV-24-511-J
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
THE STATE OF OKLAHOMA, et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀)

## <u>ORDER</u>

This matter centers around the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), signed into law by Oklahoma Governor Kevin Stitt on April 30, 2024. The law, effective July 1, 2024, imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States. *See* H.B. 4156, 59th Leg., 2d Reg. Sess. (Okla. 2024) (codified at Okla. Stat. tit. 21, § 1795).

On May 21, 2024, the United States filed suit against the State of Oklahoma, Oklahoma Governor Kevin Stitt, Oklahoma Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton (collectively, Oklahoma). [Doc. No. 1]. The United States seeks declaratory and injunctive relief enjoining Oklahoma from enforcing H.B. 4156. On May 22, it formally moved to enjoin enforcement, arguing principally that H.B. 4156 is preempted under federal law. [Doc. No. 4].

On May 23, a similar lawsuit was filed by Padres Unidos de Tulsa and one private individual against Oklahoma Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. *Padres Unidos de Tulsa v. Drummond*, No. CIV-24-526-J (W.D. Okla.), [Doc. No. 1]. An amended complaint was filed on May 24, adding

three more private individuals as plaintiffs. *Id.*, [Doc. No. 14]. The same day, on grounds similar to those argued by the United States, Padres Unidos de Tulsa and the four private individuals (collectively, the Padres Unidos Plaintiffs) moved to enjoin enforcement of H.B. 4156. *Id.*, [Doc. No. 15].

The Court consolidated the two cases on June 5. [Doc. No. 17].[1] The United States' motion for injunctive relief is presently before the Court.[2] (U.S. Mot.) [Doc. No. 4]. Oklahoma responded, (Okla. Resp.) [Doc. No. 21], and the United States replied, [Doc. No. 28].[3] Upon careful review of the parties' submissions, the Court makes its determination.

## I.    Background

### A.    Federal Statutory Immigration Framework

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens," authority that rests on its constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024) (emphasis in original) (collecting cases); *see also*

---

[1] Unless otherwise specified, all subsequent document references are to the electronic case filing system in *United States v. Oklahoma*, No. CIV-24-511-J.

[2] The United States and the Padres Unidos Plaintiffs raise substantially similar arguments in their respective motions for injunctive relief. In response, however, Oklahoma raises a standing argument against the Padres Unidos Plaintiffs that it does not raise against the United States. Given the Court's desire to promptly rule on the underlying constitutionality of H.B. 4156, this Order will address only the United States' motion.

[3] All page citations refer to the Court's CM/ECF pagination.

*DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404; *Hampton v. Mow Sun Wong*, 426 U.S. 88, 95 (1976) ("Congress and the President have broad power over immigration and naturalization which the States do not possess."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."). It "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks omitted); *see also Lopez v. INS*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("[W]e note that the United States Constitution confers on Congress the power to regulate matters relating to immigration. . . . This broad grant of authority is exclusive to Congress.").

Consistent with this legislative power, in 1952, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The INA provides a comprehensive framework regulating the entry, presence, and removal of noncitizens. *Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."); *DeCanas*, 424 U.S. at 353 (deeming the INA a "comprehensive federal statutory scheme for regulation of immigration"). This framework is bolstered by a multifaceted enforcement scheme—with both criminal and civil components.

For instance, federal law mandates that entry into the United States occur through designated entry points, where noncitizens must present necessary entry documents and undergo inspection by federal immigration officers. 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the

United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection). Under the INA, noncitizens who surreptitiously enter or reenter the United States may face federal criminal prosecution. 8 U.S.C. §§ 1325(a), 1326(a). The law also criminalizes activities that involve smuggling noncitizens into the United States, transporting noncitizens within the United States, or otherwise assisting unlawfully present noncitizens to remain. *Id.* § 1324.

In addition to these criminal penalties, noncitizens who have engaged in certain types of prohibited conduct may be denied admission to the United States or, if already present, face removal. *Id.* § 1182(a) (establishing grounds for denying admission and for removing an unadmitted noncitizen); *id.* § 1227(a) (establishing grounds for removing an admitted noncitizen). Removal proceedings are civil, not criminal, in nature. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). Where a federal immigration officer determines that a noncitizen arriving in the United States is inadmissible because they misrepresented their admission status or lack valid entry documents, the immigration officer must generally order the noncitizen removed from the United States without further hearing or review. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7). Similar expedited proceedings apply to noncitizens already present in the country if they "(1) [are] inadmissible because he or she lacks a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal." *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(I)-(II)). Conversely, for all other removable noncitizens apprehended within the United States, more standard proceedings apply. 8 U.S.C. § 1229a(a)(3)

("Unless otherwise specified . . . , a [standard] proceeding . . . shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

The INA specifies that "[a]n immigration judge shall conduct [standard] proceedings for deciding the inadmissibility or deportability of an alien." *Id.* § 1229a(a)(1).   During these proceedings, "aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1229a(c)(4), 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)).  "If . . . the alien is [ultimately] ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals." *Thuraissigiam*, 591 U.S. at 108 (citing 8 U.S.C. §§ 1229a(c)(5), 1252(a)).

The INA empowers the Department of Homeland Security (DHS), among other federal agencies, to administer and enforce immigration laws.  The Secretary of DHS is "charged with the administration and enforcement" of the INA "and all other laws relating to the immigration and naturalization of aliens," and "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority."  8 U.S.C. § 1103(a)(1), (3).  DHS's authority extends to immigration enforcement efforts at and within the country's borders.  *Id.* § 1103(a)(5) (granting the Secretary of DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"); *id.* § 1357 (granting federal immigration officers specific law enforcement powers for enforcing immigration laws).

Subagencies within DHS "play a major role in enforcing the country's immigration laws." *Arizona*, 567 U.S. at 397.  U.S. Customs and Border Protection, in conjunction with other federal

agencies, bears responsibility to "enforce . . . all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, . . . and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement, another DHS subagency, is "responsible for the identification, apprehension, and removal of illegal aliens from the United States." *Arizona*, 567 U.S. at 397 (internal quotation marks omitted). Subagencies within DHS often collaborate with local and state authorities in federal immigration enforcement efforts, and it is evident that Congress contemplated some assistance from state and local officers. *Id.* at 410. Indeed, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408.

### B.     Unlawful Immigration in Oklahoma

"The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397. Oklahoma undoubtedly "bears many of the consequences of unlawful immigration." *Id.* This Court need look no further than H.B. 4156 itself.

H.B. 4156 declares that a "crisis exists in Oklahoma," one which is "endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local governmental entities." H.B. 4156 § 1(B). "Throughout the state, law enforcement comes into daily and increasingly frequent contact with foreign nationals who entered the country illegally or who remain here illegally." *Id.* "Often, these persons are involved with organized crimes such as drug cartels, they have no regard for Oklahoma's laws or public safety, and they produce or are involved with fentanyl distribution, sex trafficking, and labor trafficking." *Id.* H.B. 4156 provides that "Oklahoma agents and law

enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma places the blame for this crisis squarely on the current presidential administration. *See, e.g.*, Okla. Resp. at 26 ("The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for H.B. 4156 comprehensible.").

Criminal activity associated with unlawful immigration is not, however, a recent phenomenon.  Indeed, in *Arizona*, a preemption case decided in 2012, the Supreme Court acknowledged the "[h]undreds of thousands of deportable aliens . . . apprehended in Arizona" around that time. *Arizona*, 567 U.S. at 397; *see also id.* ("Unauthorized aliens who remain in the State constitute, by one estimate, almost 6% of the population.").  The record before the *Arizona* Court evidenced "an epidemic of crime, safety risks, serious property damage, and environmental problems associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398 (internal quotation marks omitted).  Arizona, like Oklahoma, was exceedingly frustrated with the then-presidential administration's enforcement of federal immigration laws— consequences it bore directly. *See* Brief for Petitioners, *Arizona*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 416748, at *2 ("The President fairly describes our Nation's system of immigration regulation and enforcement as 'broken.' Lack of effective enforcement of the existing immigration rules has permitted an estimated 11 million aliens to reside in the United States unlawfully." (footnote omitted)); *id.* at *3 ("Th[e] flood of unlawful cross-border traffic, and the accompanying influx of illegal drugs, dangerous criminals and highly vulnerable persons, have resulted in massive problems for Arizona's citizens and government, leaving them to bear a seriously disproportionate share of the burden of an already urgent national problem."); *id.* at *3–4

("Unlawfully entering aliens include criminals evading prosecution in their home countries and members of Mexican drug cartels—organizations the federal government has called more sophisticated and dangerous than any other organized criminal enterprise.  Such cartels have repeatedly threatened the lives of American police officers working near the border." (footnote and internal quotation marks omitted)); *id.* at *8 ("Arizona has repeatedly asked the federal government for more vigorous federal enforcement, but to no avail." (internal citation omitted)). And Arizona sought to address its "crisis" with its own state immigration legislation, S.B. 1070. *See id.* at *60 ("[I]t is the disuniformity of federal immigration enforcement efforts that has funneled unlawful entrants to Arizona and exacerbated the crisis that led to S.B. 1070's enactment.").

Notwithstanding these serious concerns, the Supreme Court in *Arizona* found that most provisions of S.B. 1070 were preempted.  *See Arizona*, 567 U.S. at 400–10.  While making clear that "[t]he problems posed to the State[s] by illegal immigration must not be underestimated," *id.* at 398, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation.

### C.    H.B. 4156

For reasons similar to those in *Arizona*, Oklahoma's H.B. 4156 takes aim at illegal immigration.  To that end, the law first criminalizes "impermissible occupations" in Oklahoma. "A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(A)-(B).  A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more

than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 2(C)(1).  Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 2(C)(2).  And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 2(C)(1)-(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; and (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates.  *Id.* § 2(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 2(D).  A noncitizen convicted under § 2(D) is deemed guilty of a

felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *Id.* And like § 2(C), all those convicted under § 2(D) must leave Oklahoma. *Id.*

## II.   <u>Preliminary Injunction Standard</u>

The United States seeks a preliminary injunction barring Oklahoma's enforcement of H.B. 4156. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

## III.   <u>Analysis</u>

### A.   Likelihood of Success on the Merits

The United States contends that H.B. 4156 facially[4] violates both the Supremacy Clause and the Commerce Clause of the United States Constitution. Regarding the Supremacy Clause, the United States argues, among other things, that H.B. 4156 impermissibly regulates conduct comprehensively governed by federal law, undermines the federal government's dominant interest in setting immigration policy, and conflicts with established procedures for state and local participation in immigration enforcement. *See* U.S. Mot. at 18–27. As for the Commerce Clause,

---

[4] A litigant "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id.* (brackets and internal quotation marks omitted).

it argues that H.B. 4156 discriminates against foreign commerce, disrupts uniform immigration laws, and prevents the federal government from speaking with one voice in foreign relations. *Id.* at 28–29.

### 1.    Preemption Under the Supremacy Clause

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398.  Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2).  It is well established that "state law that conflicts with federal law is 'without effect.'" *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Only the latter is at issue here.

Implied preemption includes field preemption and conflict preemption. *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to

preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Conflict preemption can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Categories of preemption, however, are not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990). "Indeed, field preemption may be understood as a species of conflict pre-emption," because "[a] state law that falls within a pre-empted field [necessarily] conflicts with Congress' intent . . . to exclude state regulation." *Id.*

### 2.    The United States' Right to Sue in Equity

At the outset, the Court must determine whether the United States has the right to seek equitable relief under the Supremacy Clause. Though Oklahoma recognizes the general availability of equitable relief, it asserts that such relief is unavailable in this case because the United States has not relied on a specific statutory authority or a traditional equitable principle. Okla. Resp. at 38–39. The Court disagrees.

While Oklahoma is correct that the Supremacy Clause does not create a cause of action, it is well established that "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (ellipses and internal quotation marks omitted); *see also id.* at 324–25 (explaining that "the Supremacy Clause is not the source of any federal rights," and "certainly does not create a cause

of action" (internal quotation marks omitted in first quotation)).  Specifically, courts of equity have created the "ability to sue to enjoin unconstitutional actions by state and federal officers."  *Id.* at 327.  As such, the federal government may bring an action in equity to enforce federal supremacy. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (discussing *Armstrong* and noting that, "[t]o the extent that *Armstrong*'s Supremacy Clause holding is motivated by the desire to preserve the federal government's 'ability to guide the implementation of federal law,' this counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest" (quoting *Armstrong*, 575 U.S. at 326)); *United States v. Bd. of Cnty. Commr's of Cnty. of Otero*, 843 F.3d 1208, 1209 (10th Cir. 2016) (affirming grant of summary judgment premised upon the Supremacy Clause); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (noting "the general rule that the United States may sue to protect its interests").

Oklahoma is also correct that the Court is limited in its jurisdiction and, specifically as relevant here, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 327; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  Accordingly, for Oklahoma to prevail on its argument that equitable relief is unavailable, it must identify some law that has displaced the Court's equitable powers.  *See Armstrong*, 575 U.S. at 329 (noting that "equitable relief . . . is traditionally available to enforce federal law" unless Congress has "displace[d]" it).  As the Fifth Circuit recently found when considering this very question, "[t]he United States has broad powers and rights granted by the Constitution and Congress regarding immigration matters."  *Texas*, 97 F.4th at 276.  And, as in that case, Oklahoma here "cites to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity to enjoin executive action with regard

to the matters at issue in this litigation." *Id.* The United States thus properly brings its federal preemption claim.

### 3.  Assessment of H.B. 4156

#### a.  Field Preemption

Looking to H.B. 4156, its objective is clear: to criminally punish noncitizens found in Oklahoma who have entered or reentered the United States unlawfully. It provides for fines and/or imprisonment of noncitizens in Oklahoma who have entered or reentered the United States without legal authorization. Additionally, all noncitizens convicted under H.B. 4156 are subject to mandatory expulsion from the state.

The INA addresses virtually all matters related to immigration, but it is especially outspoken on noncitizen entry. "Policies pertaining to the entry of aliens" are "entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954), and Congress has legislated quite extensively in that respect, establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully," *Texas*, 97 F.4th at 283 (emphasis in original) (footnotes omitted).

Unlawful entry and reentry are criminal offenses under 8 U.S.C. §§ 1325 and 1326. Under § 1325(a), criminal liability attaches when a noncitizen (1) enters or attempts to unlawfully enter the United States at a place other than a designated port of entry, (2) eludes examination and inspection by immigration officers, or (3) attempts to enter or enters the United States by a willfully false or misleading representation or the willful concealment of a material fact. 8 U.S.C. § 1325(a). A noncitizen who has previously been removed or voluntarily departed under an outstanding removal order may be convicted for violating § 1326(a) after reentering or attempting to reenter

the United States or after being "found in" the United States without authorization to enter.  8 U.S.C. § 1326(a).

The prohibitive provisions of H.B. 4156, §§ 2(C) and 2(D), largely resemble §§ 1325(a) and 1326(a).  Comparing § 2(C) and § 1325(a), both provisions criminalize the same underlying conduct—unlawful entry into the United States—but § 2(C) specifically targets noncitizens located in Oklahoma after doing so.[5]  Sections 2(D) and 1326(a) are nearly identical.  Both provisions criminalize the act of entering, attempting to enter, or being found in the United States after having been denied admission, excluded, deported, or removed, or after departing while an order of exclusion, deportation, or removal is outstanding.  Both provisions also provide exceptions for noncitizens who have obtained express consent from the Attorney General to reapply for admission or who were not required to obtain such consent.

Effectively, H.B. 4156 criminalizes conduct already proscribed under federal law.  The parties agree as much.  *See* U.S. Mot. at 21 ("H.B. 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct."); Okla. Resp. at 16 ("In the most basic terms, H.B. 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry.").  The issue, then, is whether federal regulation of noncitizen entry and reentry is sufficiently comprehensive to give rise to a reasonable inference that Congress left no room for similar action by Oklahoma.

---

[5] H.B. 4156 defines an "impermissible occupation" as a noncitizen's entry into Oklahoma "without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(B).  This definition would naturally encompass the forms of unlawful entry proscribed by 8 U.S.C. § 1325(a).

The Supreme Court's ruling in *Arizona* is instructive.  There, the Supreme Court found preempted Section 3 of Arizona state law S.B. 1070, which replicated noncitizen registration requirements under federal law and "add[ed] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400.  It reasoned that Congress, through its "comprehensive" and "harmonious" framework for noncitizen registration, left no room for additional state regulation—even state regulation that "ha[d] the same aim as federal law and adopt[ed] its substantive standards." *Id.* at 401–02 (internal quotation marks omitted in second quotation).  This is because "[e]ven if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law." *Id.* at 402.  "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* at 401.

This Court acknowledges, to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry.  *See* Okla. Resp. at 29 ("[T]he federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration.").  And this Court is likewise aware that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the federal government's] constitutional power, whether latent or exercised." *DeCanas*, 424 U.S. at 355.  Nevertheless, this Court sees no reason why *Arizona*'s logic does not naturally extend to this case, where H.B. 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry.  Just recently, the Fifth Circuit extended *Arizona*'s reasoning to S.B. 4, a Texas law with two provisions "closely resembl[ing]" 8 U.S.C. §§ 1325(a) and 1326(a).  *Texas*, 97 F.4th at 280.  The Fifth Circuit discussed at length the

comprehensiveness of the INA, particularly its regulation of noncitizen entry and reentry. *See, e.g.*, *id.* ("The [INA's] central concern is the entry and stay of aliens in the United States. The [INA] makes it unlawful for any noncitizen to enter the United States other than through a port of entry, and punishes any noncitizen who unlawfully reenters or remains in the United States." (footnotes and internal quotation marks omitted)). This comprehensiveness, it reasoned, would preclude even parallel state regulation:

> In the same way Arizona S.B. 1070 added a state-law penalty for conduct proscribed by federal law, S.B. 4 criminalizes behavior already prohibited by the INA. Particularly applicable in the present case, the Supreme Court held in *Arizona* that permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. That is just as true regarding the Texas laws regarding entry and removal.

*Id.* (brackets, footnotes, and internal quotation marks omitted).[6] Other circuit courts have likewise extended *Arizona*'s reasoning to preclude state attempts to criminalize the unlawful transport, concealment, and inducement of unlawfully present noncitizens because such activities are comprehensively regulated under federal law. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263–64 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 531–32 (4th Cir. 2013).

Thus, there is "strong support" for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation. *Texas*, 97 F.4th at 288; *see also DeCanas*, 424 U.S. at 359 (acknowledging the "comprehensiveness of legislation governing the entry and stay of aliens"); *Patel*, 596 U.S. at 331 ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the

---

[6] The Fifth Circuit's reasoning came in the form of an extensive interlocutory ruling denying Texas' request for a stay of an injunction issued by the United States District Court for the Western District of Texas.

United States."); *Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (deeming the INA "a comprehensive and complete code covering all aspects of admission of aliens to this country"); *United States v. Texas*, --- F. Supp. 3d ---, 2024 WL 861526, at *13 (W.D. Tex. Feb. 29, 2024) ("Congress has created a comprehensive framework 'of federal statutes criminalizing the acts undertaken by noncitizens and those who assist them in coming to' the United States." (brackets omitted) (quoting *Ga. Latino*, 691 F.3d at 1264)). Again, "[w]here Congress occupies an entire field," as it has in the field of noncitizen entry and reentry, "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. As such, Oklahoma's attempt to parallel federal law must fail.

A similar fate befalls H.B. 4156's expulsion penalty. Expulsion from Oklahoma is a criminal penalty imposed for a conviction of unlawful entry or reentry under H.B. 4156. Having found H.B. 4156's regulation of unlawful entry and reentry field preempted, this expulsion penalty would naturally fail. However, even viewing the expulsion penalty in isolation, there is strong support for a finding of preemption. To Oklahoma's credit, H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States. But that does not necessarily mean the law avoids intrusion into a federal domain. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (internal quotation marks omitted). Through the INA, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." *Texas*, 97 F.4th at 285 (emphasis added).

For example, in *United States v. Alabama*, the Eleventh Circuit found preempted a provision of Alabama state law amounting to a "calculated policy of expulsion" from the state.

691 F.3d 1269, 1294 (11th Cir. 2012).  The provision prohibited Alabama state courts "from enforcing or recognizing contracts between a party and an unlawfully present alien," *id.* at 1292, effectively barring "undocumented aliens . . . from enforcing contracts for basic necessities," *id.* at 1293.  By imposing "distinct, unusual and extraordinary burdens," the provision was designed "to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294 (internal quotation marks omitted in first quotation).  The Eleventh Circuit concluded that the law "constitute[d] an impermissible intrusion into the federal domain" of noncitizen expulsion. *Id.* at 1293; *see also id.* at 1294 (highlighting the "comprehensive statutory framework governing alien removal").  It did not matter that the law served to expel noncitizens only from Alabama: "If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head.  The federal government—not the fifty states working in concert—retains the power to exclude aliens from the country." *Id.* at 1295 n.21.

Consider as well the Third Circuit's decision in *Lozano v. City of Hazleton*, where it found preempted several city ordinances that made "legal immigration status a condition precedent to entering into a valid lease."  620 F.3d 170, 179 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011).  The *Lozano* court emphasized the comprehensive federal scheme regulating the entry and treatment of noncitizens in the United States, which "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Id.* at 220.  The city ordinances at issue effectively did just that.  And while the ordinances aimed to "regulate presence only within [the] city limits, not the entire country," the Third Circuit's analysis remained unaffected: "To be meaningful, the federal government's exclusive control over residence in this country must extend to any political subdivision.  Again, it is not only Hazleton's

ordinance that we must consider.  If Hazleton can regulate as it has here, then so could every other state or locality.  *Id.* at 221; *see also id.* at 220 ("[W]e cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish.").

Relatedly, the Supreme Court has recognized that "[t]he federal power to determine immigration policy is well settled."  *Arizona*, 567 U.S. at 395; *see also Texas*, 2024 WL 861526, at *15 (finding, in the context of field preemption, that the federal government has a "dominant interest in regulating immigration enforcement").  This power naturally encompasses discretion on enforcement, "where '[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.'"  *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) (quoting *Arizona*, 567 U.S. at 397); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (acknowledging that an agency's enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether a violation has occurred," "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all").  "Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently.  That is Administrative Law 101."  *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring).

Oklahoma largely dismisses these broader considerations cited by the United States, insisting that the United States' "claim that H.B. 4156 would harm [its] relationship with foreign nations in multiple ways and antagonize foreign governments can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has

enacted because foreign governments will get angry." Okla. Resp. at 26 (ellipses, citation, and internal quotation marks omitted). In support of this position (and others throughout its response), Oklahoma leans heavily on the Supreme Court's decision in *Kansas v. Garcia*, 589 U.S. 191 (2020), which upheld the state convictions of three noncitizens for fraudulently using another person's Social Security number on tax-withholding forms when obtaining employment. The Supreme Court broadly rejected the noncitizens' claims that their state convictions were preempted by federal immigration laws, finding that "using another person's Social Security number on tax forms threatens harm that has no connection with immigration law," *Garcia*, 589 U.S. at 209, and that the prosecutions were not at odds with federal interests,[7] *id.* at 212. Indeed, the federal government "fully support[ed]" Kansas' power to prosecute. *Id.*

Certainly, the same cannot be said in this case, where federal pushback is the genesis of litigation and H.B. 4156 touches so deliberately on matters of immigration regulation. Nor can this Court simply adopt Oklahoma's political frustrations and ignore *Arizona*'s extensive discussion of the broader implications surrounding immigration policy. Among other things, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395; *see also id.* ("Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."); *id.* ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one

---

[7] The noncitizens maintained that prosecution would limit the federal government's ability to "obtain[] the cooperation of unauthorized aliens in making bigger cases." *Garcia*, 589 U.S. at 211.

national sovereign, not the 50 separate States.").[8]  The *Arizona* Court cautioned that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.  These theoretical concerns appear to be at play in this case, as Mexico has already expressed concern over H.B. 4156.  *See* Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), available at https://perma.cc/E6Z4-HS7W.

Most noteworthy, though, is *Arizona*'s application of these principles to § 3 of S.B. 1070, which criminalized a noncitizen's failure to comply with certain registration requirements under federal law.  *See Arizona*, 567 U.S. at 400.  In finding § 3 field preempted, the Supreme Court reasoned that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.  If the Supreme Court believed that state prosecution for federal registration violations implicated federal policy considerations, it is hard to fathom how criminal prosecution and expulsion under H.B. 4156 would not pose similar, if not greater, concerns.  *See Texas*, 97 F.4th at 280 ("Equally important, in concluding there was field preemption, the Supreme Court in *Arizona* relied on the fact that were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determined that prosecution would frustrate federal policies.  The same is true of the Texas laws at issue here." (brackets and internal

---

[8] *Arizona*'s observations are by no means isolated.  *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

quotation marks omitted)).  However well-intentioned, H.B. 4156 authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy.  If permitted to stand, each state could give itself "independent authority" to achieve its own immigration policy, *Arizona*, 567 U.S. at 402, undoubtedly "'diminishing the Federal Government's control over enforcement' and 'detracting from the integrated scheme of regulation created by Congress,'" *id.* (brackets omitted) (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 288–89 (1986)).

While this Court may very well be sympathetic to the concerns raised by Oklahoma, such concerns should not—and, indeed, cannot—be allowed to undermine the long-standing, comprehensive federal framework that defines immigration policy.  Sensitive matters of immigration policy "must be made with one voice." *Id.* at 409.  And for better or for worse, that voice belongs not to one individual state, but to the United States.  Accordingly, the Court finds that H.B. 4156 is likely field preempted.

### b.   Conflict Preemption

Field preemption aside, the United States argues that H.B. 4156 is likely conflict preempted.  Again, conflict preemption "occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).

Oklahoma argues that "'[t]here can by definition be no conflict' between the laws of two sovereigns where state law 'trace[s] the federal law.'"  Okla. Resp. at 23 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 601–02 (2011)).  It adds that "[t]he mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case

for conflict preemption." *Id.* at 27 (quoting *Garcia*, 589 U.S. at 211).  That may be true, but the Supreme Court has recognized that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby*, 530 U.S. at 380 (internal quotation marks omitted). "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions . . . undermines the congressional calibration of force." *Id.*

H.B. 4156 penalizes unlawful entry conduct and targets removable noncitizens with fines, imprisonment, and mandatory expulsion.  Under federal law, however, "there are various avenues by which a noncitizen may ultimately be admitted or receive absolution even though he or she initially entered illegally." *Texas*, 97 F.4th at 289.  A noncitizen who unlawfully enters the United States is removable, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a, but "[b]eing found removable is not always the end of the story . . . because Congress has authorized relief from removal in certain contexts," *Patel*, 596 U.S. at 332.  Noncitizens may, for example, apply for asylum or cancellation of removal—often for the first time after removal proceedings have begun.  8 U.S.C. §§ 1158(a)(1), 1229b.  And in the case of asylum, the defense can ultimately be raised for the first time during either standard or expedited removal proceedings. *Id.* §§ 1229a(c)(4), 1225(b)(1)(A), 1225(b)(1)(B); 8 C.F.R. §§ 208.2(b), 1240.11(c).

In other words, there are mechanisms under federal law that allow unlawfully present noncitizens to remain in the United States—whether in Oklahoma or elsewhere. *See Holder v. Martinez Gutierrez*, 566 U.S. 583, 586 (2012) ("The immigration laws have long given the Attorney General discretion to permit certain otherwise-removable aliens to remain in the United States.").  H.B. 4156 conflicts with this federal system.  While it offers certain affirmative defenses to those already granted lawful presence or asylum under federal law, *see* H.B. 4156 § 2(F), it ignores the opportunities offered under federal law for discretionary relief once prosecution has

begun.  Oklahoma insists that "[e]ither someone has permission to be here, or they do not."  Okla. Resp. at 33.  But it is just not that simple: "[I]t is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize.  Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen."  *Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring).

But a more sweeping and glaring conflict exists.  "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  Under 8 U.S.C. § 1357(g), for instance, DHS is authorized to enter into written agreements with state and local jurisdictions, allowing specially trained state or local officers to perform specific functions related to the investigation, apprehension, or detention of noncitizens, under federal supervision.  Additionally, § 1357(g) provides that an agreement is not necessary for any state or political subdivision "to communicate with the Attorney General regarding the immigration status of any individual," or "to otherwise cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  *Id.* § 1357(g)(10)(A)-(B).  Federal law even permits state and local officers to make arrests for immigration crimes in certain defined circumstances.  *See, e.g.*, *id.* § 1324(c) (permitting "all . . . officers whose duty it is to enforce criminal laws" to make arrests for violations of immigration law concerning smuggling, transporting, or harboring); *id.* § 1252c (authorizing state and local law enforcement officers to "arrest and detain" a noncitizen who is "illegally present in the United States" and "has previously been convicted of a felony in the United States and deported or left the United States after such conviction," but "only after the State or local law

enforcement officials obtain appropriate confirmation from" federal officials "of the status of such individual and only for such period of time as may be required for" federal officials " to take the individual into Federal custody for purposes of deporting or removing the alien from the United States"). Leaning on these avenues of assistance, Oklahoma insists that "the federal scheme leaves room for enforcement of a state law like H.B. 4156." Okla. Resp. at 24 (internal quotation marks omitted).

Congress' delineation of these cooperative frameworks, however, "is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present." *Texas*, 97 F.4th at 292. "Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." *Id.* at 292–93. The Supreme Court's decision in *Arizona* is again instructive. There, Section 6 of S.B. 1070 authorized state officers to arrest a person if the officer had probable cause to believe that person was removable. *Arizona*, 567 U.S. at 407. Supporters of § 6 cited to Congress' authorization of cooperation under 8 U.S.C. § 1357(g). *Id.* at 410. But the Supreme Court concluded that "no coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.* at 410. By authorizing such unilateral activities that deviated from the procedures established by federal law, § 6 "allow[ed] the State to achieve its own immigration policy" and "create[d] an obstacle to the full purposes and objectives of Congress." *Id.* at 408, 410.

The Supreme Court's reasoning applies with greater force here. As constructed, H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses "absent any request, approval, or other instruction from the Federal

Government." *Id.* at 410.  "This is not the system Congress created," *id.* at 408, nor can the existing system be expanded to fit Oklahoma's preferred legislative design.  For these reasons, the Court finds that H.B. 4156 is also likely conflict preempted.

<strong>c.        "Invasion" Defense</strong>

Notwithstanding preemption, Oklahoma insists it "retains an inherent, sovereign power of self-defense against invasion."  Okla. Resp. at 37.  Though it cites scant case law suggesting the defense is applicable here, it derives this "invasion" defense from Article I, Section 10, Clause 3 (the State War Clause) of the United States Constitution, which provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

Neither the Supreme Court nor the Tenth Circuit has recognized the application of the State War Clause as broadly as Oklahoma advocates.  And when a similar argument was raised in defense of S.B. 4 in Texas, both the Western District of Texas and the Fifth Circuit rejected its use. The Western District of Texas performed an extensive analysis of the historical and constitutional context of the State War Clause, concluding in detail that the surge in unauthorized immigration did not qualify as an "invasion" under the Constitution and that S.B. 4 was not a wartime measure. *See Texas*, 2024 WL 861526, at *24–37.  The Fifth Circuit, in its interlocutory ruling, reasoned that "[c]onstitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered." *Texas*, 97 F.4th at 295.  Other courts have similarly rejected application of the State War Clause in the context of immigration.  *See California v. United States*, 104 F.3d

27

1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). In short, this Court is unpersuaded that it should be an outlier in permitting a sweeping application of the State War Clause.[9]

### B.    Irreparable Harm

The second preliminary-injunction factor asks whether irreparable injury is likely to befall the movant without an injunction. *Winter*, 555 U.S. at 20. What makes an injury "irreparable" is the inadequacy of a monetary remedy. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

The United States argues that irreparable harm necessarily results from enforcement of a preempted state law. U.S. Mot. at 29. Though the Supreme Court has suggested that may be the case, it has not definitively held that it is. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366–67 (1989). And though some courts have held as much, the Tenth Circuit has not. *See United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed."); *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) (noting the difference between establishing irreparable harm for a claim of deprivation of an individual constitutional right and for a separation of powers claim). Nonetheless, as recently

---

[9] Because the Court finds that the United States is likely to prevail on its claim under the Supremacy Clause, it need not address the United States' likelihood of prevailing under the Commerce Clause. *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

found by the Southern District of Iowa when considering this question, "persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law." *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430, at *14 (S.D. Iowa June 17, 2024). As that court noted, "[t]his makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Id.* (quoting *Arizona*, 567 U.S. at 399).

Here, the United States claims that it and the public will suffer irreparable harm if H.B. 4156 takes effect, specifically noting that the bill would harm the United States' relationship with foreign nations by antagonizing foreign governments; straining diplomatic relations and, thus, making cooperation more difficult on matters such as trade agreements, disaster response arrangements, anti-terrorism efforts, anti-drug-trafficking efforts, and other priorities; undermining long-term strategic partnerships formed to reduce irregular migration; undermining partnerships to provide protections to refugees; and exposing United States citizens abroad to reciprocal and retaliatory treatment that could impair their ability to travel, conduct business, or live abroad. Additionally, the United States claims that H.B. 4156 will displace the federal exercise of discretion in enforcing immigration laws, as well as interfere with federal immigration proceedings.

Having reviewed the arguments and declarations presented by both sides, including declarations provided by the United States regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over the signing of H.B. 4156, the Court finds the United States' arguments are well-taken. *See, e.g.*, *Texas*, 97 F.4th at 295 ("In this case, repeated representations by the Executive Branch supported by

formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state [law] stands in the way of Congress's diplomatic objectives." (quoting *Crosby*, 530 U.S. at 386)).  Indeed, as the United States notes, Oklahoma's cursory argument against irreparable harm asserts primarily that H.B. 4156 is not preempted without adequately refuting the United States' declarations of harm.  Accordingly, the Court finds that the United States has demonstrated it is likely to suffer irreparable injury in the absence of an injunction.  *See Iowa*, 2024 WL 3035430, at *14 ("Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to . . . the United States . . . ."); *Texas*, 2024 WL 861526, at *38 (finding irreparable harm by virtue of a violation of the Supremacy Clause); *South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States.").

### C.    Equities and Public Interest

The final two factors of the preliminary injunction inquiry are the balance of equities and public interest, but when the United States is a party to a preliminary injunction motion, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Though Oklahoma argues an injunction is not in the public interest because it will suffer greater harm than the United States if it cannot enforce H.B. 4156, *see* Okla. Resp. at 41–42, as the Eleventh Circuit has found, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.  Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301; *see also Texas*, 97 F.4th at 296 (holding that in the areas of immigration and foreign affairs, it is the federal interest that prevails, as "state and local interests are subservient to those of the nation at large"); *South Carolina*, 720 F.3d at 533 (affirming entry

of preliminary injunction where state law was likely preempted by federal immigration law, and holding that the balance of equities tipped in favor of the federal government and preliminary injunctive relief was in the public interest); *Iowa*,  2024 WL 3035430, at *15 (finding the factors weigh in favor of injunctive relief where the state law is likely preempted by federal law); *Texas*, 2024 WL 861526, at *40–41 (same).  This Court finds these cases persuasive and concludes that the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law.

**IV.**　**<u>Conclusion</u>**

　　　Oklahoma "may have understandable frustrations with the problems caused by illegal immigration . . . , but the State may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.  Should more explicit guidance foreclose that conclusion, this Court will listen.

　　　But until then, for the reasons set forth herein, the United States' motion for a preliminary injunction [Doc. No. 4] is GRANTED.  Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings.

　　　IT IS SO ORDERED this 28th day of June, 2024.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE