## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, et al.,     )
             )
        Plaintiffs,      )
             )
v.                     )     Case No. CIV-24-511-J
             )
GENTNER DRUMMOND, et al.,      )
             )
        Defendants.     )

## <u>ORDER</u>[1]

Before the Court is Plaintiffs Padres Unidos de Tulsa, League of United Latin American Citizens Oklahoma City, Barbara Boe, and Christopher Coe's motion for injunctive relief.[2] (Pls.' Mot. for Inj.) [Doc. No. 60]. At the Court's direction, Defendants Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler responded in opposition. (Defs.' Resp.) [Doc. No. 76]. For the reasons that follow, the Court grants Plaintiffs' motion to the extent it seeks a temporary restraining order.

## I.   <u>Background</u>

This case is the product of two separate lawsuits challenging the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), codified at Okla. Stat. tit. 21, § 1795, which imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States. First, H.B. 4156 criminalizes what it terms an "impermissible occupation" in Oklahoma.

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] Plaintiffs also move for class certification under Federal Rule of Civil Procedure 23 and for leave to allow Boe and Coe to proceed under their designated pseudonyms. *See* [Doc. Nos. 61, 62]. The Court addresses these requests below.

"A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States."  Okla. Stat. tit. 21, § 1795(A)–(B).  A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 1795(C)(1).  Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 1795(C)(2).  And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 1795(C)(1)–(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; or (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates. *Id.* § 1795(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for

admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 1795(D). A noncitizen convicted under subsection (D) is deemed guilty of a felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *See id.* And like subsection (C), all those convicted under subsection (D) must leave Oklahoma. *See id.*

On May 21, 2024, the federal government—then led by President Joe Biden—sued the State of Oklahoma, Governor Kevin Stitt, Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton for declaratory and injunctive relief to enjoin enforcement of H.B. 4156 on grounds that the law was preempted and violated the Commerce Clause. The next day, it moved for a preliminary injunction.

On May 23, 2024, Padres Unidos de Tulsa and Ximena Monserrat Lopez Mena brought a separate yet similar lawsuit challenging H.B. 4156—on preemption and Commerce Clause grounds—against Attorney General Drummond, Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. An amended complaint followed one day later adding three additional plaintiffs—Jordy Madrigal Martinez, Antonio Marquez, and Rene Doroteo Hernandez (collectively, with Padres Unidos de Tulsa and Ximena Monserrat Lopez Mena, the Padres Unidos Group). That same day, the Padres Unidos Group moved for a preliminary injunction. The Court consolidated the two cases on June 5, 2024.

On June 28, 2024, just before H.B. 4156's scheduled effective date, the Court granted the federal government's motion for a preliminary injunction and denied the Padres Unidos Group's injunction motion as moot.  *See United States v. Oklahoma*, 739 F. Supp. 3d 985, 1007 (W.D. Okla. 2024).  In doing so, the Court found that H.B. 4156 was likely field preempted and conflict preempted.  *See id.* at 997–1004.  The State of Oklahoma and its officials appealed, but the federal government—now led by President Donald Trump—voluntarily dismissed its complaint before appellate review.  The Tenth Circuit then dismissed the appeal as moot and denied the Padres Unidos Group's motion to intervene.

This all leads to the present request for a temporary restraining order (TRO).  On May 13, 2025, Ximena Monserrat Lopez Mena, Jordy Madrigal Martinez, Antonio Marquez, and Rene Doroteo Hernandez voluntarily dismissed their claims, leaving Padres Unidos de Tulsa as the sole challenger in this consolidated case.  Padres Unidos de Tulsa then moved for (1) leave to file a second amended complaint adding League of United Latin American Citizens Oklahoma City and two individuals (using the pseudonyms Barbara Boe and Christopher Coe) as plaintiffs, along with class action allegations; and (2) a TRO to enjoin the remaining defendants, Drummond, Tipton, Behenna, and Kunzweiler, from enforcing H.B. 4156.  The Court granted leave to amend the same day, and the TRO request now awaits the Court's decision.

## II.    <u>Use of Pseudonyms</u>

Before turning to the merits of the TRO request, the Court considers whether Boe and Coe should be allowed to proceed under their designated pseudonyms.  *See* [Doc. No. 62] at 1–11 (requesting leave for Boe and Coe to proceed under pseudonyms).  "Proceeding under a pseudonym in federal court is, by all accounts, 'an unusual procedure.'"  *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998)).

There is no "specific statute or rule supporting the practice," and "the Federal Rules of Civil Procedure mandate that all pleadings contain the name of the parties." *Id.*

Still, a plaintiff may be permitted to proceed under a pseudonym in certain "exceptional cases." *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)). While "[t]he risk that a plaintiff may suffer some embarrassment is not enough," pseudonym status may be warranted in "cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Id.* (quoting *Doe*, 951 F.2d at 324). Though pseudonymity is not the norm, "there is a long tradition in the federal courts of plaintiffs bringing suit under an alias." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024).

Defendants argue that pseudonym status here serves as a shield from the consequences of federal immigration violations. *See* Defs.' Resp. at 23–25. In their view, "[b]y seeking leave to cloak themselves with pseudonyms," Boe and Coe "are attempting to enlist a federal court as the enabler of their admitted and ongoing lawbreaking." *Id.* at 23.

To be clear, the Court is not asked to enjoin enforcement of federal immigration law. Boe and Coe, if discovered in Oklahoma, may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established. This Court's consideration of pseudonymity does not, and will not, interfere with that federal framework.

At the same time, though, Boe and Coe should not be forced to choose between challenging H.B. 4156 and exposing themselves to federal authorities. To require them to litigate this matter under their real names would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found—is likely preempted. *See Oklahoma*, 739 F. Supp. 3d at 997–1004.

The Court therefore finds that this case presents "exceptional" circumstances permitting the use of pseudonyms. So in this limited instance, it will allow Boe and Coe to litigate under their designated pseudonyms.

### III. Legal Standard for a TRO

Federal Rule of Civil Procedure 65 authorizes a district court to issue preliminary relief in the form of a TRO or a preliminary injunction. *See* Fed. R. Civ. P. 65(a)–(b). To obtain such relief, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

Preliminary relief "is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (internal quotation marks omitted). Its issuance is "within the sound discretion of the trial court." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986).

#### A.    Likelihood of Success

##### 1.    Standing

At the threshold, Defendants challenge Plaintiffs' standing for preliminary relief. Article III of the Constitution limits federal courts' jurisdiction by requiring that litigants have standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Standing is a prerequisite to a federal court's exercise of Article III jurisdiction, 'serv[ing] to identify those disputes which are appropriately resolved through the judicial process.'" *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). It "ensures the plaintiff

has a personal stake in the dispute, distinguishing them from a mere bystander." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (brackets and internal quotation marks omitted).

"Standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). At the preliminary injunction stage, this means that "at least one" plaintiff "make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1261 (10th Cir. 2024) ("If 'at least one plaintiff' has a personal stake . . . then 'the suit may proceed.'" (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023))). The Court assumes the same standard applies to Plaintiffs' request for a TRO.[3]

"To establish standing, a plaintiff must prove: (1) they 'ha[ve] suffered or likely will suffer an injury in fact,' (2) 'the injury likely was caused or will be caused by the defendant,' and (3) 'the injury likely would be redressed by the requested judicial relief.'" *Rocky Mountain Gun*, 121 F.4th at 108 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)). Put more simply, "a plaintiff must establish three elements: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

---

[3] Appellate courts naturally have fewer opportunities to establish standing requirements at the TRO stage because TROs, unlike preliminary injunctions, are "generally not appealable." *Bessent v. Dellinger*, 145 S. Ct. 515, 516 (2025) (mem.) (Gorsuch, J., dissenting). Nevertheless, because the core requirements for obtaining a TRO and a preliminary injunction are "essentially the same," the Court sees no reason why the showing for standing, subject to necessary procedural adjustments, should not likewise be the same. *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

Here, the dispute centers on the first element: injury-in-fact. To establish this type of injury, "a plaintiff must show that they have suffered or likely will suffer 'an invasion of a legally protected interest' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Rocky Mountain Gun*, 121 F.4th at 109 (quoting *Lujan*, 504 U.S. at 560).

At the heart of Defendants' standing argument is the assertion that Boe and Coe, along with the members Padres Unidos de Tulsa (Padres) and League of United Latin American Citizens Oklahoma City (LULAC) seek to protect, lack a "legally protected interest" due to their unlawful presence in the United States. *See* Defs.' Resp. at 10–12. In support, Defendants cite language from *Initiative and Referendum Institute v. Walker* observing that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (internal quotation marks omitted).

But Defendants' reliance on *Walker* is misplaced. The Tenth Circuit's brief reference to criminal activity was nothing more than an illustrative example—one of several types of conduct generally deemed insufficient to meet the threshold for standing. *See Kerr v. Polis*, 930 F.3d 1190, 1198 (10th Cir. 2019) (characterizing the "situations" from *Walker* as an "illustrative list"). It was not a sweeping declaration that any unlawful status (like unauthorized presence) categorically precludes standing.

More fundamentally, though, Defendants' position would broadly eviscerate standing in preemption challenges of parallel state laws.[4] Under Defendants' theory, someone facing criminal

---

[4] Federal courts evaluate standing on a "claim-by-claim basis; a plaintiff may have standing to bring some, but not all, claims raised in a complaint." *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021). Because the Court ultimately finds that

prosecution under a state law mirroring federal law would be precluded from asserting preemption merely because their underlying conduct is unlawful under federal law. This logic would allow states to insulate even the most severe criminal sanctions from judicial scrutiny simply by mirroring federal prohibitions. *See Idaho Org. of Res. Councils v. Labrador*, ___ F. Supp. 3d ___, No. 1:25-cv-00178-AKB, 2025 WL 1237305, at *8 (D. Idaho Apr. 29, 2025) (rejecting argument that plaintiffs' unlawful presence under federal immigration law precluded standing in preemption challenge of state immigration law); *cf. Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1014–16 (9th Cir. 2013) (finding standing for plaintiff engaged in conduct criminalized under federal immigration law to challenge state immigration law on preemption grounds); *Lozano v. City of Hazleton*, 620 F.3d 170, 191–94 (3d Cir. 2010) (finding standing for unauthorized immigrants challenging local immigrant-targeting ordinance on preemption grounds), *vacated on other grounds*, 563 U.S. 1030 (2011).

Alternatively, but still within standing's injury-in-fact requirement, Defendants argue that Plaintiffs "have failed to allege sufficient facts establishing whether they are presently engaging, or will imminently engage, in conduct that violates H.B. 4156." Defs.' Resp. at 11. Put differently, Defendants maintain that Plaintiffs lack a harm that is both "concrete and particularized" and is "actual or imminent."

Indeed, the injury-in-fact requirement obligates a plaintiff to demonstrate a harm that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). To be concrete, an injury must "be 'real' rather than 'abstract.'" *Lupia v. Medicredit, Inc.*, 8 F.4th 1184,

---

Plaintiffs are likely to prevail on their preemption claims, its standing analysis focuses on that theory.

1190 (10th Cir. 2021) (quoting *Spokeo*, 578 U.S. at 340).  But it need not be "tangible."  *Spokeo*, 578 U.S. at 340.  And an injury is particularized if it "affect[s] the plaintiff in a personal and individual way."  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  As for imminence, "a plaintiff need not wait for the harm to occur to satisfy the injury-in-fact requirement."  *Rocky Mountain Gun*, 121 F.4th at 109.  Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409–10, 414 n.5).

For a pre-enforcement challenge to be justiciable, the plaintiff must show "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the challenged statute, and (2) that there exists a credible threat of prosecution thereunder."  *Rocky Mountain Gun*, 121 F.4th at 110 (brackets and internal quotation marks omitted).  For sufficient intent, "the plaintiff must present 'concrete plans to engage in conduct that ha[s] [the] potential to violate' the challenged statute."  *Id.* at 110 (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016)).  "Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient."  *Id.* (emphasis in original).  Regarding the threat of prosecution, the mere presence of an unconstitutional statute, without more, does not entitle a party to sue.  *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006).  But "[t]he threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff."  *Rocky Mountain Gun*, 121 F.4th at 110 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).

Coe declares that he is a 37-year-old citizen of Mexico who reentered the United States "without inspection"[5] in 2012. Pls.' Mot. for Inj., Ex. 2 at 2. He has remained in the United States ever since and now resides in Oklahoma. *Id.*, Ex. 2 at 2. Before his surreptitious reentry, the federal government removed him twice. *Id.*, Ex. 2 at 2.

Coe's continued presence in Oklahoma, then, plainly exposes him to prosecution under H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(D). The same is true for Boe. *See id.*, Ex. 1 at 2–4 (declaring that Boe, a citizen of Mexico who has not claimed eligibility for H.B. 4156's limited defenses, entered the United States surreptitiously in 2000, has remained in the United States ever since, and now resides in Oklahoma). And nothing in the record suggests that Defendants have disavowed enforcing H.B. 4156 against Coe, Boe, or anyone else. The Court therefore finds that they have made a clear showing of likely injury-in-fact. Further, though not challenged by Defendants,[6] the Court finds that each individual satisfies the remaining standing requirements of

---

[5] Federal law mandates that noncitizens enter the United States through designated entry points, where they must present necessary entry documents and undergo inspection by federal immigration officers. 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection). Noncitizens who surreptitiously enter or reenter the United States may face prosecution under 8 U.S.C. §§ 1325 and 1326, federal statutes with which H.B. 4156 aligns.

[6] Federal courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

causation[7] and redressability.[8]  Thus, the Court finds that Boe and Coe have established standing to seek preliminary relief enjoining H.B. 4156.

The Court reaches the same conclusion for Padres and LULAC, two organizations in Oklahoma.  "It has long been settled that . . . an association may have standing solely as the representative of its members."  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (internal quotation marks omitted).  Associational standing "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."  *Id.* at 290.  To establish associational standing, Padres and LULAC must show: (1) "[their] members would otherwise have standing to sue in their own right," (2) "the interests [they] seek[] to protect are germane to [their] purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of . . . individual members in the lawsuit."  *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397–98 (10th Cir. 1992) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

---

[7] Causation requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (alterations and internal quotation marks omitted).  "[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular [statute], the causation element of standing requires the named defendants to possess authority to enforce the complained-of [statute]."  *Bronson*, 500 F.3d at 1110.  Such authority is clearly present here.

[8] Redressability requires it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).  "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005).  The relief Boe and Coe request—enjoining enforcement of H.B. 4156—would redress their injuries.

The first prong asks "whether any member of [the organization] would have had standing individually to bring the[] claims." *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006); *see also Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1250 (N.D. Okla. 2016) (explaining that the first prong requires "an associational plaintiff to specifically identify at least one member harmed by the defendant's conduct"). In other words, Padres and LULAC must identify at least one member who, like Boe or Coe, faces a credible threat of prosecution under H.B. 4156.

Padres identifies one member, a 39-year-old Salvadoran national, who reentered the United States in 2013 following a prior removal. *See* Pls.' Mot. for Inj., Ex. 3 at 4. He now lives in Oklahoma with his wife and four U.S.-citizen children. *See id.*, Ex. 3 at 4. His presence in Oklahoma exposes him to a credible threat of prosecution under H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(D).

LULAC, for its part, similarly identifies a member who reentered the United States after removal. *See* Pls.' Mot. for Inj., Ex. 4 at 5–6; *see also id.*, Ex. 4 at 5 (identifying another member who entered the United States surreptitiously in 2007, regularly travels throughout Oklahoma for work, and does not claim eligibility for H.B. 4156's defenses). He has lived in this country ever since. *See id.*, Ex. 4 at 6. Like Boe and Coe, his presence in Oklahoma exposes him to a credible threat of prosecution under H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(D).

In sum, the Court finds that Padres and LULAC satisfy the first prong of associational standing.

Next, the Court concludes that the interests Padres and LULAC seek to protect are germane to their organizational purposes. *See Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (observing that the second prong of associational standing requires a showing by the organization

that the interests it seeks to protect are germane to its purpose). Here, both move to enjoin enforcement of a state immigration law—one they claim federal law preempts—that targets their members based on immigration status. And both organizations strive to advocate for and protect the rights of immigrant communities by increasing access to educational opportunities, enhancing civic engagement, and providing community-based support services. *See* Pls.' Mot. for Inj., Ex. 4 at 2 ("LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights in all aspects."); *id.*, Ex. 3 at 2 ("Padres['s] . . . mission is to amplify the voices of students and families to increase access to meaningful educational opportunities for immigrant students and all community members in the Tulsa Public School System."). What follows from these stated missions is that their "litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996); *see also Gonzalez ex rel. Doe v. Albuquerque Pub. Schs.*, No. CIV 05–580 JB/WPL, 2006 WL 1305032, at *2–3 (D.N.M. Jan. 17, 2006) (finding Padres had associational standing to challenge state questioning of members on immigration status).

Finally, "[i]ndividual participation is not normally required when 'an association seeks prospective or injunctive relief for its members' because 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *Gonzalez*, 2006 WL 1305032, at *2 (internal citation omitted) (first quoting *United Food*, 517 U.S. at 546; second quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *see also C.R. Educ. & Enf't Ctr. v. Sage Hosp. Res. LLC*, 222 F. Supp. 3d 934, 943 (D. Colo. 2016) ("Because [the organization] seeks only declaratory and injunctive relief, individual participation of [its] members is not required."). So since Padres and

14

LULAC seek only declaratory and injunctive relief, individual participation of their members is not required. *See* [Doc. No. 64] at 17.

In sum, the Court concludes that Padres and LULAC have made the requisite clear showing of associational standing necessary for preliminary relief.

### 2.    Preemption

Next, the Court turns to the likelihood that H.B. 4156 is preempted by federal law.[9]  Less than a year ago, it concluded that H.B. 4156 was likely both field and conflict preempted.[10]  *See Oklahoma*, 739 F. Supp. 3d at 997–1004.  *And though the case's posture has shifted, the principles underpinning that decision remain unchanged.*

---

[9] "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012).  Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2).  It is well established that "state law that conflicts with federal law is 'without effect.'"  *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation."  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

[10] Federal law can preempt state law either by an express statement of preemption or by implication.  *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Implied preemption, the sole kind of preemption at issue in this case, includes field preemption and conflict preemption.  *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Conflict preemption, on the other hand, can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Expectedly, Defendants disagree. They insist that a change in course is warranted because the federal government, led by a new chief executive, effectively greenlighted H.B. 4156 by dropping its prior preemption challenge. *See* Defs.' Resp. at 13–17. *But Congress's intent—not the shifting enforcement priorities of presidential administrations—controls the preemption inquiry.* *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (internal quotation marks omitted)); *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) ("Pre-emption fundamentally is a question of congressional intent . . . ."); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[P]re-emption claims turn on Congress's intent . . . ."). And in finding H.B. 4156 preempted last year, the Court was guided by just that.

First, in finding H.B. 4156 field preempted, it found "strong support for the conclusion that Congress . . . legislated . . . comprehensively in the field of noncitizen entry and reentry." *Oklahoma*, 739 F. Supp. 3d at 999 (internal quotation marks omitted). And applying the Supreme Court's instruction that "[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible," it concluded that "Oklahoma's attempt to parallel federal law must fail." *Id.* (first quotation quoting *Arizona*, 567 U.S. at 401).

This Court found, too, that H.B. 4156 was likely conflict preempted. It observed that "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 1003 (quoting *Arizona*, 567 U.S. at 408). And H.B. 4156's sweeping authorization for state officers to arrest, prosecute, and punish noncitizens, it reasoned, conflicted with the "system Congress created." *Id.* (quoting *Arizona*, 567 U.S. at 408); *see also id.* ("Congress' delineation of these cooperative frameworks . . . is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present. Nor is it a grant of authority

to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." (internal citation and quotation marks omitted)).

Now, to be fair, the Court did cite the federal government's then-opposition to H.B. 4156 as additional support for preemption. *See id.* at 997–1004. And the change in posture may bolster Defendants' position as a matter of policy. In the end, however, the Court's discussion of federal enforcement discretion and immigration considerations—like foreign policy, resource allocation, and humanitarian concerns—underscores Congress's intent to make immigration regulation exclusively federal. These considerations are not an invitation for preemption analysis to shift based on the enforcement priorities of a given administration. *See Kansas v. Garcia*, 589 U.S. 191, 212 (2020) ("The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." (quoting U.S. Const. art. VI, cl. 2)). That understanding is what guides the Court's ruling, both now and then.

Defendants may also disagree with the Court's heavy application of *Arizona* to H.B. 4156. The Court itself acknowledged that *Arizona*'s criticism of parallel state legislation arose in the context of "noncitizen registration, not noncitizen entry and reentry." *Oklahoma*, 739 F. Supp. 3d at 998. Still, the Court's reading of *Arizona* and the Supreme Court precedent that predates it leads to one conclusion: "*Arizona*'s logic . . . naturally extend[s] to this case." *Id.* Without further guidance from the Tenth Circuit or Supreme Court, that position is unlikely to change.

In the end, the Court recognizes now, as it did then, that Oklahoma "undoubtedly bears many of the consequences of unlawful immigration." *Id.* at 993 (internal quotation marks omitted). The topic is one of great importance to Oklahomans—historically and today. And the Court does not make light of the concerns Defendants raise. Yet "[f]or nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of

noncitizens—is *exclusively* a federal power." *Id.* at 991 (emphasis in original) (quoting *United States v. Texas*, 97 F.4th 268, 278–279 (5th Cir. 2024)). This finding flows naturally and consistently from Congress's creation of a federal "framework regulating the entry, presence, and removal of noncitizens." *Oklahoma*, 739 F. Supp. 3d at 991. Comprehensively, that framework identifies "*who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Id.* (emphasis in original) (quoting *Texas*, 97 F.4th at 283). And it specifically delineates the ways in which states may operate within it. *See id.* at 1003. Ultimately, the Court believes Congress's preemptive intent could not be clearer. *See Idaho Org.*, 2025 WL 1237305, at *10–13 (recently enjoining state law criminalizing unlawful entry and reentry on preemption grounds); *Fla. Immigrant Coal. v. Uthmeier*, ___ F. Supp. 3d ___, No. 25-21524-CV-WILLIAMS, 2025 WL 1423357, at *10 (S.D. Fla. Apr. 29, 2025) ("[C]ourts across the country have unanimously held that nearly identical state illegal entry and reentry laws recently enacted are likely preempted by federal immigration law governing noncitizen entry.").

For these reasons, and consistent with its prior ruling, the Court finds that Plaintiffs are likely to succeed on their claims that H.B. 4156 is preempted.[11]

### 3.    Invasion Defense

Also relevant to preemption, Defendants maintain that H.B. 4156 is essential to fend off the "invasion" of illegal immigration in Oklahoma. Defs.' Resp. at 20–23. This position, previously rejected by the Court, derives from Article I, Section 10, Clause 3 (the State War Clause)

---

[11] Because the Court finds Plaintiffs are likely to prevail on their preemption claims, it need not address their likelihood of success on any remaining theories. *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

of the Constitution, which provides: "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.  Defendants insist their reliance on the State War Clause is especially suitable now, pointing to a series of federal proclamations "declaring a national emergency" and "classif[ying] this emergency as an actual invasion."  Defs.' Resp. at 21.

But these proclamations do not sway the Court's reasoning.  To be sure, when Defendants faced opposition to H.B. 4156 during President Biden's tenure, they pointed to his own remarks as evidence of an immigration "crisis" in this country.  [Doc. No. 21] at 9.  And while the Biden administration was unlikely to acknowledge its gravity, Attorney General Drummond described a "veritable deluge of illegal immigration and criminality: desperate human beings, deadly weapons, dangerous drugs, etc."  *Id.* at 38.  The Court does not downplay these realities.

The Court's position then and now, however, is that the "historical and constitutional context" of the State War Clause does not support its use as a defense for legislation like H.B. 4156.  *Oklahoma*, 739 F. Supp. 3d at 1005.  Indeed, "[n]either the Supreme Court nor the Tenth Circuit has recognized [its] application . . . as broadly as [Defendants] advocate[]."  *Id.*  And "[o]ther courts have . . . rejected application of the State War Clause in the context of immigration."  *Id.* (collecting cases).  So while the federal government may have declared an "invasion" as a matter of policy, the Court remains unconvinced that Defendants can invoke the State War Clause to defend against preemption.

### B.    Remaining Showing for Preliminary Relief

To secure a TRO, Plaintiffs must demonstrate not only a likelihood of success on the merits but also that irreparable harm is likely, the balance of equities tips in their favor, and that injunctive relief serves the public interest.  *Little*, 607 F.3d at 1251.

"To show a threat of irreparable harm, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (internal quotation marks omitted).  When the Court granted the federal government injunctive relief last year, it focused on the irreparable harm the government faced.  *See Oklahoma*, 739 F. Supp. 3d at 1005–06.  Now, the focus shifts to whether Plaintiffs, too, can demonstrate irreparable harm.

The Tenth Circuit has recognized that "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Fish*, 840 F.3d at 752 (internal quotation marks omitted).  And some courts have extended this general principle to even structural constitutional injuries, such as Supremacy Clause violations.  *See United States v. Alaska*, 608 F. Supp. 3d 802, 809 (D. Alaska 2022) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm even when the constitutional injury is structural, such as a Supremacy Clause violation." (footnote and internal quotation marks omitted)); *Idaho Org.*, 2025 WL 1237305, at *14 ("Plaintiffs are likely to succeed on the merits of their claim that the challenged offenses violate their constitutional interests because federal law preempts them.  Such '[a]n alleged constitutional infringement will often alone constitute irreparable harm.'" (quoting *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984))).  *But see EEOC v. Local 638*, No. 71 Civ. 2877 (RLC), 1995 WL 355589, at *5 (S.D.N.Y. June 7, 1995) ("[A] Supremacy Clause violation allegedly caused by the enforcement of state regulations that may

have been preempted by federal law could not constitute per se irreparable harm."). Even so, this Court is hesitant to apply a per se rule of irreparable harm in the context of a likely Supremacy Clause violation.

Nevertheless, Plaintiffs here make a clear showing of likely irreparable harm. Boe, Coe, and the members Padres and LULAC represent face the imminent threat of state-sanctioned arrest, prosecution, and punishment absent preliminary relief. Unquestionably, that threat constitutes irreparable harm justifying injunctive relief. *See Farmwork Assoc. of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1337–40 (S.D. Fla. 2024) (finding a likelihood of irreparable harm where plaintiffs faced the threat of prosecution under a state law mirroring federal immigration law); *Valle del Sol Inc.*, 732 F.3d at 1029 (finding a likelihood of irreparable harm where plaintiffs faced the threat of prosecution under a state law mirroring federal immigration law); *Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*, 691 F.3d 1250, 1268–69 (11th Cir. 2012) (same).

According to Defendants, this harm is not irreparable because Plaintiffs would "face th[e] same harms under federal law." Defs.' Resp. at 29. That may be true. But the question is whether they will suffer irreparable harm absent an injunction—like state-sanctioned prosecution. *See Little*, 607 F.3d at 1251. The Court finds they likely will. Besides, state penalties imposed under H.B. 4156 would seemingly be cumulative—not a substitute—for those under federal law.

Finally, the Court turns to the third and fourth factors for preliminary relief—the balance of harms and the public interest—which merge when the government opposes the request. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court has already detailed the harms H.B. 4156 poses, all while acknowledging Defendants' concerns over unchecked immigration. But in weighing these harms, the Court cannot help but recognize that "the burden on Defendants if they are . . . enjoined from enforcing the challenged [statute] is a continuation of the status quo." *Idaho Org.*,

2025 WL 1237305, at *15.   Indeed, "Defendants have never previously regulated aliens' entry or reentry into either [Oklahoma] or the United States." *Id.*  And they undoubtedly possess a criminal code at their disposal to prosecute conduct—like drug trafficking and violence—they argue flows from unauthorized presence.  What's more, the current presidential administration has more than demonstrated its commitment to enforcing the comprehensive framework Congress established for immigration regulation.  In short, balancing the harms and public interest, the Court finds the scales tilt in Plaintiffs' favor.

For these reasons, the Court finds that Plaintiffs have established their entitlement to preliminary relief.

## IV.   <u>Class Certification</u>

When a federal court issues preliminary relief, it "should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).   Traditionally, this means that courts "provide[] party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute.").

"[S]o-called nationwide and statewide injunctions," by contrast, "prevent enforcement of a law against persons other than the plaintiffs."  *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 931 (2024) (mem.) (Kavanaugh, J., concurring).   While some courts authorize this relief in "rare" circumstances, *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281 (11th Cir. 2021), the Tenth Circuit has yet to take an express position.  On top of that, members of the Supreme Court

have recently decried their use, particularly those injunctions extending to nonparties nationwide. *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring) (stating that nationwide injunctions "are legally and historically dubious"); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring) (noting that nationwide injunctions "have little basis in traditional equitable practice"); *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 756 (2025) (mem.) (Alito, J., dissenting) (describing nationwide injunctions as defying "foundational limits on equitable jurisdiction" (internal quotation marks omitted)); *Labrador*, 144 S. Ct. at 931 (Kavanaugh, J., concurring) ("As I see it, prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law regardless of its impact on this Court's emergency docket.").[12]

A class action avoids these criticisms. *See Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1349 (D. Idaho 2024) (explaining that "class certification and injunctive relief are not inconsistent with the Supreme Court's guidance" and that members of the Supreme Court have "referenced class certification as a legitimate way to obtain the widespread relief . . . impermissibly granted . . . via universal injunction"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1306 (11th Cir. 2022) ("Reviewing courts should also be skeptical of nationwide injunctions premised on the need to protect nonparties. Several procedural devices allow nonparties with similar interests to seek the protection of injunctive relief—class certification under [Federal] Rule [of Civil Procedure] 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own."). Plaintiffs bring such an action here and move for class certification under Federal Rule of Civil

---

[12] Notwithstanding these concerns, courts are generally less reluctant to grant statewide injunctions in cases of preemption. *See Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-cv-22655-ALTMAN/Reid, 2025 WL 775558, at *2 (S.D. Fla. Mar. 11, 2025) ("[C]ourts routinely grant statewide injunctions where . . . the plaintiffs have shown a strong likelihood of success on the merits of their claim that a state law is preempted." (collecting cases)).

Procedure 23 in lockstep with their request for preliminary relief. *See* (Pls.' Mot. for Class Certification) [Doc. No. 61].

A party seeking class certification must show that it meets the "four threshold requirements" of Rule 23: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (alterations in original) (quoting Fed. R. Civ. P. 23(a)). Where, as here, a plaintiff seeks certification under Rule 23(b)(2), it must also show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

In their Rule 23 motion, Plaintiffs state that they "seek only *provisional* class certification for purposes of issuing preliminary relief, allowing additional time for the court to evaluate the matter before granting full class certification." Pls.' Mot. for Class Certification at 6 (emphasis added). Numerous courts have found provisional certification alone sufficient for purposes of awarding preliminary relief. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings."); *Carrillo v. Schneider Logistics*, No. CV 11–8557 CAS (DTBx), 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) ("[C]ourts routinely grant provisional class certification for purposes of entering injunctive relief." (collecting cases)); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *2 ("A district court may provisionally certify a class for purposes of a preliminary injunction." (internal quotation marks omitted)); *Idaho Org.*, 2025 WL 1237305, at *15–19

(granting provisional class certification with preliminary injunction of state entry and reentry law); *Afghan & Iraqi Allies Under Serious Threat v. Pompeo*, No. 18-cv-1388 (TSC), 2019 WL 367841, at *1 n.1 (D.D.C. Jan. 30, 2019) (granting provisional class certification "for the sole purpose of resolving" a motion for preliminary injunction, a motion for partial dismissal, and a motion for expedited discovery); *cf. Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994) (finding class certification unnecessary where all class members inherently benefitted from injunctive relief). "Although a plaintiff requesting provisional certification must still demonstrate that Rule 23's requirements are met, the court's normally rigorous analysis is tempered by the understanding that such certifications may be altered or amended before the decision on the merits." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (brackets and internal quotation marks omitted).

Plaintiffs here request that the Court provisionally certify two classes under Rule 23: (1) the "Entry Class," consisting of all noncitizens subject to the crime of "Impermissible Occupation" under H.B. 4156, specifically Okla. Stat. tit. 21, § 1795(C); and (2) the "Reentry Class," consisting of all noncitizens subject to the separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under H.B. 4156, specifically Okla. Stat. tit. 21, § 1795(D). *See* Pls.' Mot. for Class Certification at 1–2.

### A.    Numerosity

First, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[T]here is no set formula to determine if the class is so numerous that it should be so certified." *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)

(internal quotation marks omitted). Because the inquiry is so "fact-specific," the Tenth Circuit "grant[s] wide latitude to the district court in making this determination." *Id.*

Plaintiffs cite evidence indicating that "Oklahoma is home to an estimated 90,000 undocumented immigrants." Pls.' Mot. for Class Certification at 7. Given this substantial number, it stands to reason that the number of noncitizens falling within each proposed class would easily reach into the hundreds. Federal courts have required much less for numerosity. *See, e.g.*, *Stewart v. Abraham*, 275 F.3d 220, 226–227 (3d Cir. 2001) (presuming numerosity at 40 members); *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (same). For purposes of provisional certification, the Court finds that Plaintiffs have established numerosity.

## B.    Commonality

Second, Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, Plaintiffs must show that their claims rely on a "common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). It is "not enough . . . to demonstrate common questions apply to the class"; rather, "a class-wide proceeding [must] generate common *answers* apt to drive the resolution of the litigation." *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1192 (10th Cir. 2023) (emphasis in original) (internal quotation marks omitted). Still, commonality "do[es] not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (emphasis in original). "A finding of commonality requires only a single question of law or fact common to the entire class." *Sherman*, 84 F.4th at 1192 (internal quotation marks omitted).

Here, members of both proposed classes face arrest, prosecution, and punishment under H.B. 4156. Plaintiffs contend that Defendants' enforcement of the law is unlawful because the statute is preempted by federal immigration law. That preemption question presents a common issue of law that, if resolved in Plaintiffs' favor, would apply uniformly across the classes. As such, resolution of the preemption issue would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. For purposes of provisional certification, the Court finds that Plaintiffs have established commonality.

### C. Typicality

Third, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like commonality, typicality "do[es] not require that every member of the class share a fact situation identical to that of the named plaintiff." *Colo. Cross Disability Coal.*, 765 F.3d at 1216. "Typicality requires only that the claims of the class representative and class members are based on the same legal or remedial theory." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 924 (10th Cir. 2018) (internal quotation marks omitted); *see also Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.").

Again, the named Plaintiffs seek the same declaratory and injunctive relief as the class members and challenge H.B. 4156 on the same legal grounds. That their individual backgrounds may differ does not defeat typicality where, as here, the claims arise from a uniform statutory scheme and rest on a shared preemption theory. For purposes of provisional certification, the Court finds Plaintiffs have established typicality.

### D.    Adequacy

Fourth, Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (alterations and internal quotations omitted).  Accordingly, the "inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Id.* at 625.  To be an adequate class representative, the "representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* at 625–26.  In the Tenth Circuit, "[r]esolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (internal quotation marks omitted).

Barbara Boe and Christopher Coe wish to serve as representatives of the Entry and Reentry Classes, respectively, while Padres and LULAC seek to represent the interests of members of both classes.  *See* Pls.' Mot. for Class Certification at 10–13.  Nothing in the record suggests any conflict between the representatives and the classes they seek to represent.  All Plaintiffs share a common interest in halting enforcement of H.B. 4156, and each either faces or represents individuals who face prosecution under that law.  And all are represented by counsel—specifically, ACLU Immigrants' Rights Project and its affiliate in Oklahoma—with extensive experience in class

action and civil rights litigation.  For purposes of provisional certification, the Court finds the adequacy requirement satisfied.  Additionally, for purposes of provisional certification, the Court appoints Plaintiffs' counsel as class counsel under Rule 23(g).  *See* Fed. R. Civ. P. 23(g) (explaining that "[u]nless a statue provides otherwise, a court that certifies a class must appoint class counsel" upon consideration of several factors).

### E.    Rule 23(b)(2)

Where, as here, a plaintiff seeks certification under Rule 23(b)(2), it must also show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) "has been liberally applied in the area of civil rights."  *Braggs v. Dunn*, 317 F.R.D. 634, 667 (N.D. Ala. 2016) (internal quotation marks omitted).  "Indeed, some courts have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief.'"  *Id.* (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994)).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores*, 564 U.S. at 360.

Plaintiffs seek declaratory and injunctive relief that, if granted, would apply equally to all class members and enjoin enforcement of H.B. 4156 on a classwide basis.  Because the challenged conduct is alleged to rest on grounds generally applicable to the classes, and the requested relief is indivisible in nature, the Court finds that Rule 23(b)(2) is satisfied for purposes of provisional certification.

Accordingly, having found that Rule 23(a) and Rule (b)(2) are satisfied, the Court provisionally certifies two classes—the Entry Class and the Reentry Class—for purposes of enjoining Defendants' enforcement of H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(C)–(D).

## V.    Conclusion

In closing, Defendants' frustrations are not lost on the Court. But those concerns, however pressing, cannot override the constitutional design. When determining whether a state law like H.B. 4156 is preempted *the Supreme Court instructs courts like this one to look to the intent of Congress, not the enforcement priorities of any particular administration*. Doing so, and based on the comprehensive and exhaustive immigration framework that Congress designed, the Court is left with one conclusion: H.B. 4156 must fail. What remains, however, is the federal government's ability, with lawful assistance from its state partners, to enforce that framework as Congress intended.

For the reasons above, the Court GRANTS Plaintiffs' motion for injunctive relief [Doc. No. 60] to the extent it seeks a TRO; GRANTS Plaintiffs' motion for leave to proceed under pseudonyms [Doc. No. 62]; and GRANTS Plaintiff's motion for class certification [Doc. No. 61] to the extent it seeks provisional certification for purposes of preliminary relief.

The Court *provisionally* certifies the following classes: (1) the Entry Class, comprising all noncitizens subject to H.B. 4156's crime of "Impermissible Occupation" under Okla. Stat. tit. 21, § 1795(C); and (2) the Reentry Class, comprising all noncitizens subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under Okla.

Stat. tit. 21, § 1795(D). Further, the Court appoints Plaintiffs' counsel as counsel for the provisional classes.

Finally, the Court temporarily restrains Defendants—along with their officers, agents, servants, employees, attorneys, and any person acting in concert or participation with them—from enforcing H.B. 4156. Under Federal Rule of Civil Procedure 65(b)(2), this TRO will expire fourteen days after entry, unless extended for good cause or dissolved or modified sooner under Rule 65(b)(4). The Court waives the bond requirement under Rule 65(c).

IT IS SO ORDERED this 20th day of May, 2025.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE