UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, et al.,  )
            Plaintiffs,  )
v.  )  Case No. CIV-24-511-J
GENTNER DRUMMOND, et al.,  )
            Defendants.  )

**ORDER**[1]

On May 20, 2025, after fairly substantial briefing, this Court temporarily restrained enforcement of Oklahoma House Bill 4156 (H.B. 4156),[2] which authorizes state officers to arrest, prosecute, and punish noncitizens who enter Oklahoma without authorization to enter the United States. *See Padres Unidos de Tulsa v. Drummond*, ___ F. Supp. 3d ___, No. CIV-24-511-J, 2025 WL 1444433, at *1–16 (W.D. Okla. May 20, 2025). In its 31-page ruling, the Court found that Plaintiffs had standing and were likely to prevail on their claims that H.B. 4156 is preempted. *See id.* This conclusion was hardly novel: in cases brought by both the federal government and private parties, "courts across the country have unanimously held that nearly identical state illegal entry and reentry laws . . . are likely preempted by federal immigration law governing noncitizen entry." *Fla. Immigrant Coal. v. Uthmeier*, ___ F. Supp. 3d ___, No. 25-21524-CV-WILLIAMS, 2025 WL 1423357, at *10 (S.D. Fla. Apr. 29, 2025) (collecting cases).

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] H.B. 4156 is codified at Okla. Stat. tit. 21, § 1795.

Now, 14 days later, the Court must consider whether a preliminary injunction is warranted. *See* (Pls.' Mot. for Inj.) [Doc. No. 60].[3] Because the standard for a temporary restraining order is "essentially the same" as that for a preliminary injunction,[4] *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018), one might wonder what has changed. The answer is nothing.

Indeed, the Constitution still empowers Congress to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Congress's "comprehensive framework regulating the entry, presence, and removal of noncitizens"[5] stands firmly intact. *United States v. Oklahoma*, 739 F. Supp. 3d 985, 991 (W.D. Okla. 2024). Any preemption challenge continues to turn on "Congress's intent," not the shifting enforcement priorities of presidential administrations. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (internal quotation marks omitted). And this Court remains bound by the Supreme Court's instruction that "the power to control immigration—the entry, admission, and removal of noncitizens—*is exclusively a federal power*." *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis added) (quoting *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024)); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). So consistent with this understanding and its ruling 14 days ago, the Court grants Plaintiffs a preliminary injunction enjoining Defendants from enforcing H.B. 4156.

---

[3] At the Court's direction, Defendants opposed the request for a preliminary injunction on May 27, 2025. *See* (Defs.' Resp.) [Doc. No. 82]. Plaintiffs replied two days later. *See* [Doc. No. 86].

[4] A party seeking a temporary restraining order or preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

[5] Congress enacted this statutory framework, the Immigration and Nationality Act (INA), in 1952.

This conclusion does not overlook that a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and internal quotation marks omitted); *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (stressing that preliminary relief "is an extraordinary remedy, the exception rather than the rule" (internal quotation marks omitted)). It merely reflects that Plaintiffs have met that burden.

The Court does not aim to parrot its prior ruling. *See Padres Unidos*, 2025 WL 1444433, at *1–16. Instead, it addresses only the new arguments raised against preliminary relief and clarifies what the issuance of such relief does, and doesn't, mean. That discussion follows.

I.  **Discussion**

   A.  **Cause of Action**

A plaintiff must assert a valid cause of action to obtain relief. *Davis v. Passman*, 442 U.S. 228, 236–41 (1979). At the threshold, Defendants argue that Plaintiffs lack a valid cause of action for the relief they seek. *See* Defs.' Resp. at 12–20. In doing so, they lean heavily on the Tenth Circuit's decision in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), which they argue broadly curtails a private party's ability to obtain injunctive relief on preemption grounds. *See* Defs.' Resp. at 15–18.

In *Hickenlooper*, two landowners and a nonprofit, citing the Supremacy Clause, sued to enjoin Colorado's state-authorized marijuana regime on the ground that it sanctioned conduct illegal under, and thus preempted by, the federal Controlled Substances Act (CSA). 859 F.3d at 876. These plaintiffs were not themselves subject to any regulation under the state regime and instead alleged only incidental injuries—such as property damage and emotional harms—

3

stemming from its implementation. *See id.* at 896 ("The [landowners] seek . . . far-flung relief even though their only alleged injuries concern property damage and emotional harms."). Effectively, they sought to wield the CSA's preemptive force as a basis for dismantling a state framework that, while not regulating them directly, facilitated federally unlawful conduct. *See id.* at 895 (observing the plaintiffs' attempt "to enforce the CSA's preemptive effects . . . so long as they have been injured—in any way—by official conduct that also violates a federal statute" (emphasis omitted)).

But as the Tenth Circuit explained, "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action." *Id.* at 900 (internal quotation marks omitted) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015)). Nor does it "give *affected* parties a constitutional (and hence congressionally unalterable) *right to enforce federal law* against the States." *Id.* (emphasis in original) (quoting *Armstrong*, 575 U.S. at 325). To enforce a federal statute, a plaintiff must identify "a federal right of his or her own to vindicate under the statute at issue." *Id.* at 902 (internal quotation marks and alterations omitted). And because the plaintiffs had no such substantive rights in the CSA to vindicate, they could not invoke it to remedy their injuries. *See id.* at 877, 901–03.

Importantly, though, *Hickenlooper* did not purport to foreclose the availability of an equitable cause of action under *Ex parte Young*.[6] In addressing a different subset of plaintiffs in the case, *Hickenlooper* stressed that they were not seeking to "enjoin Colorado from *enforcing* [anything] *against them*." *Id.* at 906 (emphasis in original). Rather, they targeted the broader

---

[6] *Ex parte Young* represents an equitable exception to Eleventh Amendment sovereign immunity. 209 U.S. 123, 155–56 (1908). The doctrine allows a plaintiff to sue a state official, in their official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law. *See id.* at 159–60.

4

implementation of the regime itself. *See id.* *Hickenlooper* then reaffirmed that "[o]f course, a 'court may not convict a criminal defendant of violating a state law that federal law prohibits,'" and reiterated that "if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted."[7] *Id.* at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326). In such cases, *Hickenlooper* confirmed, "court[s] need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002)). This is precisely what Plaintiffs assert and seek here. *See* [Doc. No. 64] at 2–3, 7–12, 15.

In short, while *Hickenlooper* reaffirmed that the Supremacy Clause is not self-executing, it did not displace the equitable authority of federal courts to issue an injunction when a plaintiff shows "federal law immunizes him from state *regulation*." 859 F.3d at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326); *see also CNSP, Inc. v. Webber*, No. 17-0355 KG/SCY, 2020 WL 2745456, at *8 (D.N.M. May 27, 2020) ("[*Hickenlooper*] emphasized the plaintiffs could not maintain their preemption claims because they did not seek to enjoin the state

---

[7] Defendants cite additional language from *Hickenlooper* "indicat[ing] that 'immunizes' means that the person has federal 'rights' that he cannot be forced to give up through a threat of state prosecution." Defs.' Resp. at 17. They then contend that Plaintiffs' equitable claims fail because it is "illogical" to conclude that the INA "grants violators of its criminal str[u]ctures any sort of immunity or substantive 'rights.'" *Id.* But this argument rests on a flawed premise that a plaintiff seeking to enjoin state officials from enforcing a preempted law must first identify a federal statutory right of their own. On the contrary, the Supreme Court has permitted an *Ex parte Young* claim where plaintiffs alleged only that a state's regulatory actions violate federal law—preemption included. *See Verizon Md.*, 535 U.S. at 645 ("The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our straightforward inquiry." (internal quotation marks omitted)). Naturally, Defendants may dispute whether H.B. 4156 actually contravenes federal law. "But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md.*, 535 U.S. at 646.

from enforcing the state marijuana laws '*against them*.' The Tenth Circuit contrasted the plaintiffs' claims with claims brought pursuant to *Ex parte Young*, explaining 'if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted.'" (emphasis in original) (internal citation omitted) (quoting *Hickenlooper*, 859 F.3d at 906 n.19)); *cf. Verizon Md.*, 535 U.S. at 638–48 (permitting *Ex parte Young* suit to enjoin state commission order allegedly preempted by federal law); *Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-CV-22655-RAR, 2025 WL 1133682, at *5 (S.D. Fla. Apr. 17, 2025) ("Nothing in *Armstrong* interferes with the[] 'ability to sue to enjoin unconstitutional actions by state and federal officers'—an ability that, as *Armstrong* made clear, is 'the creation of courts of equity,' and which 'reflects a long history of judicial review of illegal executive action, tracing back to England.'" (quoting *Armstrong*, 575 U.S. at 327)).

Now this is not to say that this equitable authority is unbounded. As the Supreme Court has explained, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 327–28 (internal quotation marks omitted).

But the Court discerns no such "'intent to foreclose' equitable relief" here. *Id.* at 328 (quoting *Verizon Md.*, 535 U.S. at 647). Defendants point to three provisions of the INA as evidence of such intent, starting with 8 U.S.C. § 1231(a)(4)(D). *See* Defs.' Resp. at 19. That provision states that where a noncitizen is imprisoned on a state or federal crime and subject to an order of removal but has not yet completed their sentence, "[n]o cause or claim may be asserted . . . against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien." 8 U.S.C. § 1231(a)(4)(D). In other words,

Congress made clear that noncitizens serving criminal sentences may not sue to compel their release from custody or removal from the United States before completing their sentence. Plaintiffs make no such request here. And nothing about § 1231(a)(4)(D)'s contextual placement suggests that Congress intended to foreclose a preemption challenge to a state immigration law.

Second, in describing the "procedure" for asylum proceedings, 8 U.S.C. § 1158(d)(7) states that "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Plaintiffs' request here is in no way tied to the asylum procedures set out in subsection (d).

Third, 8 U.S.C. § 1182(a)(7)(A)(i) renders "inadmissible" any noncitizen who lacks "valid entry document[s]." Under 8 U.S.C. § 1225(b)(1)(A), certain "inadmissible" noncitizens—namely, those "arriving" at the border or those not admitted or paroled and who cannot affirmatively show two years of continuous presence in the United States—may be summarily removed by federal immigration officers "without further hearing or review" unless they indicate an intent to apply for asylum or express a fear of persecution. Again, it's difficult to follow how Congress's authorization of expedited removal proceedings in limited circumstances reflects an intent to foreclose the preemption challenge at issue here.

And the same is true with respect to Defendants' suggestion that Congress has impliedly foreclosed equitable challenges to state laws that criminalize conduct already criminalized under federal law. *See* Defs.' Resp. at 18–19. To be sure, they do not cite a single case adopting that view in this context. And for good reason: courts have routinely entertained equitable claims against state legislation mirroring federal immigration laws. *See, e.g.*, *Texas*, 97 F.4th at 275–77

(entertaining suit in equity challenging state immigration law closely mirroring federal unlawful entry and reentry provisions); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *1–22 (same).

In short, the Court concludes that Plaintiffs have stated a cognizable claim in equity for the relief they seek.

**B.     Standing**

The Court has already found that Plaintiffs have Article III standing to seek preliminary relief. *See Padres Unidos*, 2025 WL 1444433, at *3–8. And though that ruling arose in the context of a temporary restraining order, the Court applied the same standard that governs preliminary injunctions.[8] *See id.* at *3. That discussion need not be repeated here.

Even so, one argument against standing warrants closer scrutiny. Defendants argue again that Plaintiffs lack a "legally protected interest."[9] Defs.' Resp. at 20–24. In doing so, they rely on *Initiative and Referendum Institute v. Walker*'s observation that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (internal quotation marks

---

[8] Article III of the Constitution limits federal courts' jurisdiction by requiring that litigants have standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary injunction stage, this means that "at least one" plaintiff "make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff "must establish three elements [for standing]: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

[9] To establish the first element of standing, an injury-in-fact, "a plaintiff must show that they have suffered or likely will suffer 'an invasion of a *legally protected interest*' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Rocky Mountain Gun*, 121 F.4th at 109 (emphasis added) (quoting *Lujan*, 504 U.S. at 560).

8

omitted). From that, Defendants gather that Plaintiffs lack a legally protected interest because their presence in the United States is unauthorized under federal law. *See* Defs.' Resp. at 20–24.

*Walker* involved a First Amendment challenge to a Utah constitutional provision requiring a supermajority for certain ballot initiatives. *Walker*, 450 F.3d at 1085. In addressing standing, the Tenth Circuit offered several illustrative examples of asserted interests that are not "legally protected." *Id.* at 1093. Relevant here, it quoted a federal practice treatise for the proposition that "a person complaining that government action will make his *criminal* activity more difficult lacks standing because his interest is not 'legally protected.'" *Id.* (emphasis added) (quoting 3 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005)). *Walker* offered no commentary on this general statement, nor did it elaborate on how or when such reasoning applies. *See id.* And understandably so: *Walker* concerned an intent to engage in political advocacy, not criminal conduct. *See id.* at 1098.

This Court has already expressed concern about the implications of Defendants' reading of *Walker* in the context of preemption challenges. *See Padres Unidos*, 2025 WL 1444433, at *4. But even setting that concern aside, *Walker*'s general principle appears to address a different circumstance altogether. As the Supreme Court observed, "it is not a [federal] *crime* for a removable alien to remain present in the United States." *Arizona*, 567 U.S. at 407 (emphasis added). And removal proceedings are civil, *not criminal*, in nature. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). So when Plaintiffs seek to prevent enforcement of a state law that imposes penalties for unauthorized presence, they are surely not attempting to make federal "criminal activity" any easier. *Walker*, 450 F.3d at 1093. Put differently, they do not ask this Court

to bless prospective entry or reentry into the country—conduct that *is* criminalized under federal law. *See* 8 U.S.C. §§ 1325(a), 1326(a).

To be clear, none of this condones unauthorized presence or past criminal entries. The Court said as much from the outset. *See Padres Unidos*, 2025 WL 1444433, at *3 ("To be clear, the Court is not asked to enjoin enforcement of federal immigration law. [Plaintiffs], if discovered in Oklahoma, may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established."). The only question in this limited context is whether Plaintiffs have standing to sue—and whether *Walker*'s general principle applies. Perhaps, as Defendants suggest, *Walker* stands for the sweeping proposition that all "lawbreakers' lack standing. Defs.' Resp. at 23. But absent any elaboration from *Walker* itself, the Court must take the quoted statement at face value. And as written, it does not apply.

For these reasons and those previously set out, the Court finds that Plaintiffs have standing to seek preliminary relief.

**C.    Likelihood of Success on the Merits**

In two cases now[10]—one brought by the federal government and this one by private parties—the Court has found that the challengers are likely to prevail on their claims that H.B.

---

[10] In their response, Defendants suggest that the Court has overlooked the fact that Plaintiffs bring a facial challenge to H.B. 4156. *See* Defs.' Resp. at 11. To be sure, a facial challenge "is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (brackets and internal quotation marks omitted). And the Supreme Court has indeed "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But still, the fact that there could be "murderers" and "rapists" prosecuted under H.B. 4156 does not defeat a facial challenge. Defs.' Resp. at 12. The question is not whether those individuals could be prosecuted for other crimes, but whether H.B. 4156's regulation of *immigration* conflicts with federal law. Further, to the extent Defendants maintain that Article I, Section 10, Clause 3 (the State War Clause) of the Constitution insulates H.B. 4156 from a facial challenge, the Court has already found that argument unpersuasive. *See Padres Unidos*, 2025 WL 1444433, at *10 ("The Court's position then and now . . . is that the 'historical and constitutional context' of the State War

4156 is preempted.[11] *See Oklahoma*, 739 F. Supp. 3d at 997–1004; *Padres Unidos*, 2025 WL 1444433, at *8–9. In granting the temporary restraining order in this case, the Court was unconvinced that the federal government's newfound "greenlight[ing]" of H.B. 4156 weakened Plaintiffs' position. *Padres Unidos*, 2025 WL 1444433, at *8. That is because, again, "*Congress's intent—not the shifting enforcement priorities of presidential administrations—controls the preemption inquiry.*" *Id.* (emphasis in original). And applying that inquiry in light of *Arizona*,[12] the Court concluded that "Congress's preemptive intent could not be clearer." *Id.* This conclusion, again, is no outlier. *See Fla. Immigrant Coal.*, 2025 WL 1423357, at *10 ("[C]ourts across the country have unanimously held that nearly identical state illegal entry and reentry laws recently

---

Clause does not support its use as a defense for legislation like H.B. 4156." (quoting *Oklahoma*, 739 F. Supp. 3d at 1005)).

[11] Federal law can preempt—that is, invalidate—state law either expressly or implicitly. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011). Implied preemption, the sole kind of preemption at issue in this case, includes field preemption and conflict preemption. *Id.* Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conflict preemption, on the other hand, can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

[12] In *Arizona*, the Supreme Court held that most provisions of S.B. 1070, Arizona's attempt to regulate immigration, were preempted. 567 U.S. at 400–10. "While making clear that the problems posed to the States by illegal immigration must not be underestimated, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation." *Oklahoma*, 739 F. Supp. 3d at 994 (brackets, internal citation, and quotation marks omitted). This Court has repeatedly recognized that "*Arizona*'s logic . . . naturally extend[s]" to H.B. 4156. *Padres Unidos*, 2025 WL 1444433, at *9 (alterations in original) (quoting *Oklahoma*, 739 F. Supp. 3d at 998).

11

enacted are likely preempted by federal immigration law governing noncitizen entry." (collecting cases)).

Defendants, as they have before, urge that *Kansas v. Garcia*, 589 U.S. 191 (2020), not *Arizona*, should guide the Court's preemption inquiry. *See* Defs.' Resp. at 24–28. In *Garcia*, three noncitizens used another person's Social Security number on tax-withholding forms when securing employment. 589 U.S. at 195. Following their convictions under Kansas statutes for identity theft and making false information, they argued that the laws were preempted by the Immigration Reform and Control Act of 1986 (IRCA) as applied to their conduct. *See id.* They raised both field and conflict preemption claims. *See id.* at 208–13.

As to field preemption, the Supreme Court found the Kansas statutes "*fundamentally unrelated*" to any field occupied by Congress. *Id.* at 208 (emphasis in original). It explained that IRCA's "employment verification system is designed to prevent the employment of unauthorized aliens, whereas tax-withholding forms help to enforce income tax laws." *Id.* at 208–09. Moreover, "using another person's Social Security number on tax forms threatens harm that has *no connection with immigration law*." *Id.* at 209 (emphasis added).

Turning to conflict preemption, the Supreme Court held that the limited overlap between the Kansas statutes and federal laws prohibiting similar conduct did not come close to establishing preemption. *See id.* at 211 ("The mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption."). *Garcia* warned that "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap," and stressed that "there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap." *Id.* at 212. And to the extent state prosecutions might disrupt federal enforcement

priorities, it reminded that "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2).

But, of course, this Court has never suggested that minimal overlap alone suffices for preemption. In finding likely field preemption days ago, the Court explained that there is "strong support for the conclusion that Congress . . . legislated . . . comprehensively in the field of noncitizen entry and reentry." *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999); *see also Oklahoma*, 739 F. Supp. 3d at 1000 ("[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." (alterations in original) (quoting *Texas*, 97 F.4th at 285)). "And applying the Supreme Court's instruction that '[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible,' it concluded that 'Oklahoma's attempt to parallel federal law must fail.'" *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999).

In finding likely conflict preemption, the Court likewise "observed that '[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003). And it explained that "H.B. 4156's sweeping authorization for state officers to arrest, prosecute, and punish noncitizens . . . conflicted with the 'system Congress created.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003).

To be sure, the Court's findings were influenced by the broader implications surrounding immigration policy—such as "federal enforcement discretion and immigration considerations . . . like foreign policy, resource allocation, and humanitarian concerns." *Id.* But that is entirely consistent with Supreme Court precedent. In assessing the preemption of several provisions of a

13

state immigration law in *Arizona*, the Supreme Court engaged in "extensive discussion" of the same longstanding considerations. *See Oklahoma*, 739 F. Supp. 3d at 1001 (citing *Arizona*, 567 U.S. at 395, 397). In the end, that discussion was "not an invitation for preemption analysis to shift based on the enforcement priorities of a given administration," but rather an explanation for why, given the magnitude of immigration regulation, Congress intended "to make immigration regulation exclusively federal." *Padres Unidos*, 2025 WL 1444433, at *9; *see also Biden v. Texas*, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring) ("Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101.").

And *Arizona* remains binding on this Court. Surely it cannot be said that *Garcia*'s rejection of enforcement-priority-based preemption in a case having "no connection with immigration law," *Garcia*, 589 U.S. at 209, casts doubt on *Arizona*'s thorough examination of these and other concerns in a case—like this one—that touches so directly on immigration regulation, *see Oklahoma*, 739 F. Supp. 3d at 1002 ("Sensitive matters of immigration policy 'must be made with one voice.'" (quoting *Arizona*, 567 U.S. at 409)).

So again, for these reasons and consistent with its prior rulings, the Court finds that Plaintiffs are likely to prevail on their claims that H.B. 4156 is preempted.[13]

**D.     Pseudonymity**

In granting the temporary restraining order 14 days ago, the Court allowed Plaintiffs Barbara Boe and Christopher Coe to proceed under their designated pseudonyms. *See Padres*

---

[13] The Court likewise finds, consistent with its ruling 14 days ago, that Plaintiffs face a likelihood of irreparable harm absent preliminary relief and that the balancing the harms and public interest tilt in their favor. *See Padres Unidos*, 2025 WL 1444433, at *10–11.

14

*Unidos*, 2025 WL 1444433, at *2–3.  Defendants now ask the Court to reconsider that ruling.  *See* Defs. Resp. at 29–36.

"Proceeding under a pseudonym in federal court is, by all accounts, 'an unusual procedure.'"  *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998)).  There is no "specific statute or rule supporting the practice," and "the Federal Rules of Civil Procedure mandate that all pleadings contain the name of the parties."  *Id.*

Still, a plaintiff may be permitted to proceed under a pseudonym in "exceptional cases." *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)).  While "[t]he risk that a plaintiff may suffer some embarrassment is not enough," pseudonym status may be warranted in "cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Id.* (quoting *Doe*, 951 F.2d at 324).  Though pseudonymity is not the norm, "there is a long tradition in the federal courts of plaintiffs bringing suit under an alias."  *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024).  "The decision whether to allow litigation by pseudonym is left to the Court's discretion."  *Doe v. Priority Background Sols., Inc.*, No. 24-CV-337-JFH-SH, 2024 WL 4564534, at *1 (N.D. Okla. Oct. 24, 2024) (citing *Zavaras*, 139 F.3d at 802).

The Court previously found that Boe and Coe presented with "exceptional" circumstances warranting pseudonymity.  Requiring them to litigate under their real names, the Court explained, "would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found—is likely preempted."  *Padres Unidos*, 2025 WL 1444433, at *3 (citing *Oklahoma*, 739 F. Supp. 3d at 997–1004).  That dilemma, tied directly to their immigration status, falls neatly within the category of "matters of a highly sensitive and personal

15

nature" and thus qualifies as an "exceptional" circumstance. *Femedeer*, 227 F.3d at 1246 (internal quotation marks omitted). The Court sees no reason to depart from that position.

Nor do Defendants' mischaracterizations of the Court's ruling move the needle. As they see it, "[i]t is entirely inappropriate for a federal court to protect federal lawbreakers from the federal consequences of their actions." Defs.' Resp. at 32. But the Court was clear: its ruling was limited to pseudonymity and did not insulate Plaintiffs from "removal or prosecution under the comprehensive federal immigration regime that Congress established." *Padres Unidos*, 2025 WL 1444433, at *3. After all, this case concerns a state immigration law, and the federal government stands in no better—or worse—position to prosecute or remove Plaintiffs for federal immigration violations by virtue of their pseudonymity.

Finally, Defendants' speculative concerns about standing do not outweigh the showing for pseudonymity. Defendants suggest that Boe and Coe may be deported or leave Oklahoma during this litigation. *See* Defs.' Resp. at 33–34. And if their true names remain undisclosed, Defendants argue, neither they nor the Court would be in any position to assess whether the case has become moot.

The Court remains unmoved. Boe and Coe have each lived in the United States for over a decade. *See* Pls.' Mot. for Inj., Exs. 1–2. And while nothing compels them to remain in Oklahoma during this case, they express no desire to leave. *See id.* On the contrary, their desire to stay is a driving reason they filed suit. *See id.*

In sum, the Court sees no reason to revisit its conclusion that this case presents "exceptional" circumstances permitting the use of pseudonyms.[14]

---

[14] Nor does the Court find any reason to revisit its *conditional* certification, for purposes of preliminary relief, of the (1) "Entry Class" and (2) "Reentry Class." *See Padres Unidos*, 2025 WL

## II.     Conclusion

As this Court has said before, nothing here today "make[s] light of the concerns Defendants raise." *Padres Unidos*, 2025 WL 1444433, at *3. Oklahoma, now as then, "may have understandable frustrations with the problems caused by illegal immigration." *Oklahoma*, 739 F. Supp. 3d at 1007 (quoting *Arizona*, 567 U.S. at 416).

Nor, lest it need repeating, does this ruling shield those who violate federal immigration law from the consequences of their actions. The federal government retains, as it always has, "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. And noncitizens who violate federal immigration law—whether in Oklahoma or elsewhere—remain subject to that authority, if and when the federal government chooses to act.

At its core, indeed, this ruling changes little at all. States, like Oklahoma, remain free to prosecute noncitizens and citizens alike for crimes they maintain flow from unlawful immigration. And the federal government, as the Supreme Court has held "[f]or nearly 150 years," retains its "*exclusive*[]" power to control immigration. *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis in original).

In the end, that is why H.B. 4156 must fail—not to excuse unlawful presence or shield criminal conduct, but because it is what the Constitution demands.

For these reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction [Doc. No. 60]. Pending further proceedings, Defendants—along with their officers, agents, servants, employees, attorneys, and any person acting in concert or participation with them—are hereby preliminarily enjoined from enforcing H.B. 4156. This injunction applies to the following classes:

---

1444433, at *13 (conditionally certifying classes upon satisfaction of Federal Rules of Civil Procedure 23(a) and 23(b)(2)).

(1) the Entry Class, consisting of all noncitizens subject to H.B. 4156's "Impermissible Occupation" offense under Okla. Stat. tit. 21, § 1795(C); and (2) the Reentry Class, consisting of all noncitizens subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under Okla. Stat. tit. 21, § 1795(D).

Plaintiffs shall post a bond of $17.87 as security. *See* Fed. R. Civ. P. 65(c).

IT IS SO ORDERED this 3rd day of June, 2025.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE